**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ACA INTERNATIONAL, LLC; COLLECTION BUREAU SERVICES, INC.<br><br>Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>Defendants. | Case No. _____ |

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

In an overtly political act before the upcoming Presidential and Congressional elections, the

Consumer Financial Protection Bureau ("CFPB") made a rule concerning the collection of past-due

healthcare bills that bypassed the Administrative Procedure Act ("APA") and would insert debt

collectors into the private healthcare decisions made between patients and their providers. The

CFPB's October 1, 2024 advisory opinion (the "Advisory Opinion") regarding aspects of the Fair

Debt Collection Practices Act ("FDCPA") establishes four new rules that require a change in conduct

not only for debt collectors, but the entire healthcare billing and coding industry.[1] The Advisory Opinion establishes expectations that are impossible to meet and contrary to the plain text of the FDCPA, as well as the CFPB's previous determinations when it finalized Regulation F, 12 C.F.R. Part 1006. The rules issued in the Advisory Opinion had no evidentiary basis, no studies, and no input from the public. Moreover, the Advisory Opinion bypassed the mandatory federal administrative statutes. Medical debt collection is an important topic that deserves comprehensive analysis and opportunity public notice and comment. Although the Dodd-Frank Act created the CFPB as an independent agency[2]—supposedly free from the vagaries of politics—the Advisory Opinion's issuance was accompanied by an event at the White House, and first introduced by the vice president who is running for president, a little over a month before the November election.[3] Accordingly, Plaintiffs, ACA International ("ACA") and Collection Bureau Services, Inc. ("CBS"), bring this action for declaratory and equitable relief against Defendants, the CFPB and Rohit Chopra, in his official capacity as Director of the CFPB.

## I.
## NATURE OF THE CASE

1.    The FDCPA governs debt collection by third parties in the United States. *See* 15 U.S.C. §§ 1692–1692p. Specifically, the FDCPA limits the actions of third party debt collectors, including ACA members and CBS, who collect debts on behalf of another entity or person. *See, e.g.*, 15 U.S.C. § 1692f. One of the FDCPA's many provisions is the requirement in section 808(1) that prohibits, in relevant part, the collection of any amount "unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1). And section 807(2)(A)

---

[1] *See* 89 Fed. Reg. 80715–24. Hereinafter, "Advisory Opinion." Exhibit 1.
[2] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (2010).
[3] CFPB, Prepared Remarks of CFPB Director Rohit Chopra at a White House Convening on Medical Debt (released October 01, 2024), https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-of-cfpb-director-rohit-chopra-at-a-white-house-convening-on-medical-debt/. A true and correct copy of Director Chopra's remarks is attached hereto as Exhibit 2.

prohibits any false representation of "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2).

2. While styled as a "reminder" to debt collectors of their legal obligations, the CFPB's Advisory Opinion transgresses into legislative rulemaking. *See Sprint Corp. v. FCC*, 315 F.3d 369, 374 (D.C. Cir. 2003) ("[W]hen an agency['s interpretation] changes the rules of the game—such that one source becomes solely responsible for what had been a dual responsibility and then [that source] must assume additional obligations, . . ." the rule is legislative.)

3. The Advisory Opinion purports to "interpret" these FDCPA provisions to establish four new rules, summarized as follows:

4. Requirement to Review Account-Level Documents Before Sending a Validation Notice. A medical debt collector violates the FDCPA if it fails to review account-level documents and agreements for each patient to make an independent legal determination that the debt is valid prior to collection–even if there is a services agreement and the balance is accurate. 89 Fed. Reg. 80721–22. This rule requires debt collectors to perform a validation of the debt *before* it is requested pursuant to FDCPA § 1692g(b).

5. A new "Reasonableness" Standard. The Advisory Opinion prohibits the collection of or attempt to collect an amount that exceeds the allowable amount under state law "reasonableness" standards, reasoning that such practices may misrepresent the amount of the debt in violation of the FDCPA. 89 Fed. Reg. 80719–20. This rule requires debt collectors to use their own judgment as to the amount to collect from consumers rather than rely upon the amounts stated by the original creditor.

6. New Definition of a Debt in "Default." The Advisory Opinion establishes a new bright-line rule that all debts are in "default" if they are not paid in full "at a given time," regardless of how the creditor is treating the debt. If a person obtains that debt (or the right to collect it) after

that failure to make full payment, that person has obtained a debt "in default at the time it was obtained" and therefore does not qualify for the section 803(6)(F)(iii) exemption. 89 Fed. Reg. 80722–23. This rule will apply the FDCPA to an entire industry of medical billing companies who were not previously covered by the FDCPA.

7.    Medical Procedure Audits. A debt collector that collects or attempts to collect a debt that has been "upcoded" violates the FDCPA; therefore debt collectors must ensure that every aspect of a billed procedure was actually performed on the patient. 89 Fed. Reg. 80720. This rule will require debt collectors to audit the actual hospital procedure and ask patients and doctors if the coded procedure was performed in full.

8.    But, because these new rules impose new obligations on private parties and significantly affect their interests, the CFPB's action is legislative. *See In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 539 F. Supp. 2d 281, 308 (D.D.C. 2008) (quoting *Nat'l Family Planning v. Sullivan*, 979 F.2d 227, 238 (D.C. Cir. 1992) (a legislative rule is one that "grant[s] rights, impose[s] obligations, or produce[s] other significant effects on private interests.") (alterations in original)). And when the CFPB issues a legislative rule, it must comply with a myriad of federal statutes: APA (*see, e.g.*, 5 U.S.C. § 533), Regulatory Flexibility Act ("RFA") (5 U.S.C. §§ 601–612), Small Business Regulatory Enforcement Fairness Act ("SBREFA") (5 U.S.C. §601–612), the Paperwork Reduction Act ("PRA") (44 U.S.C. § 3501–3521), and the Consumer Financial Protection Act ("CFPA") (12 U.S.C. § 5512). It failed to comply with all of them.

9.    Not only does this Advisory Opinion impermissibly change the law, the CFPB is not the agency that Congress empowered to oversee medical services. The CFPB has vastly exceeded the authority Congress granted it and the entire Advisory Opinion must be set aside.

## II.
## PARTIES

### A.    ACA International

10.    ACA is a nonprofit corporation based in Minneapolis, Minnesota. Founded in 1939, as the American Collectors Association, ACA is the largest trade group for the debt collection industry. ACA has members in every state and more than 30 countries, including third-party collection agencies, asset buyers, attorneys, creditors, and vendor affiliates. ACA's members include sole proprietorships, partnerships, small businesses, and large corporations. ACA's members are vital to protecting both consumers and creditors. Members work with consumers to resolve consumer debt, which saves every American household, on average, more than $700 each year. *Kaulkin Ginsberg, 2020 State of the Industry Report, ACA International* (2020), bit.ly/3uxMcBC. ACA's members also help keep America's credit-based economy functioning with access to low-cost credit. For example, in 2018 the accounts receivable management ("ARM") industry returned more than $90 billion to creditors for goods and services they had provided to their customers. *Id*. These collections benefit consumers by lowering the costs of goods and services, particularly at a time when rising prices are hurting consumers throughout the country.

11.    ACA members regularly seek to recover unpaid past due amounts for services rendered—including for medical and hospital care. ACA members acquire from healthcare providers a variety of data and documents to support the accounts that they collect. ACA members work with their healthcare clients to answer consumers' questions, resolve disputes, and arrive at achievable settlements and payment plans. These members have performed these activities in the past but will also perform them after the Advisory Opinion's effective date, December 3, 2024.

12.    ACA's members who meet the definition of "debt collector" under the FDCPA, 15 U.S.C. §§ 1692–1692, have been complying with the provisions of that overarching federal debt-

collection law since its enactment in 1977. In addition, ACA's members have been complying with the provisions of Regulation F, codified at 12 C.F.R. Part 1006, which the federal CFPB began exploring in October 2012 via public field hearings before promulgating a final rule in October 2020.

13.    Upon the Advisory Opinion's implementation date, ACA members must also comply with the Advisory Opinion. If they do not, they face the risk of regulatory enforcement and plaintiffs asserting a private right of action against them based on the CFPB's directions.

**B.    Collection Bureau Services, Inc.**

14.    Collection Bureau Services, Inc. ("CBS") is a licensed third party debt collector and woman-owned business located in Missoula, Montana. It is a small, family-owned business in its third generation of ownership with less than 30 employees.

15.    CBS's principal purpose is the collection of debts owed or due, or asserted to be owed or due, to another. It is therefore a "debt collector" under the FDCPA, *see* 15 U.S.C. § 1692a(6), and a "covered person" under the Consumer Financial Protection Act, *see* 12 U.S.C. § 5481(6). CBS regularly seeks to recover unpaid past due amounts for services rendered—including for medical and hospital care. CBS acquires from healthcare providers a variety of data and documents to support the accounts that it collects. CBS works with its healthcare clients to answer consumers' questions, resolve disputes, and arrive at achievable settlements and payment plans. CBS has performed these activities in the past but will also perform them after the Advisory Opinion's effective date, December 3, 2024.

16.    The owners of CBS also own and manage a medical billing company. This company services accounts on behalf of healthcare companies during the period before the healthcare provider deems the account to be in default. The services that it provides to the healthcare providers and consumers are far different from those provided by CBS because the accounts it services are in an earlier stage of the revenue management cycle and are often still receiving reimbursements from

third-party payors.

17.    Upon the Advisory Opinion's implementation date, CBS and its medical billing company must also comply with the Advisory Opinion. If it does not, CBS faces the risk of regulatory enforcement and plaintiffs asserting a private right of action against CBS based on the CFPB's directions.

**C.    Defendants**

18.    Defendant CFPB is a federal agency in the executive branch and is subject to the Administrative Procedure Act. See 12 U.S.C. § 5491(a); 5 U.S.C. § 551(1).

19.    Defendant Rohit Chopra, sued in his official capacity, is the Director of the CFPB.

**III.**
**JURISDICTION AND VENUE**

20.    This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law and the U.S. Constitution.

21.    The APA waives sovereign immunity of the United States and its federal agencies by allowing parties who are adversely affected or aggrieved by an agency action seek judicial review. 5 U.S.C. §§ 702, 704.

22.    Plaintiff ACA has associational standing to bring this suit on behalf of their members who are adversely affected by the Advisory Opinion. Those members would have standing to sue in their own right, the interests at issue are germane to the organizations' missions, and the participation of an individual member is not required. Specifically, the Advisory Opinion requires ACA members to modify their practices in four separate respects, as enumerated above. These ACA members will be required to expend time and resources to supervise the billing and coding practices of hospitals, physicians, and other healthcare providers. If this Advisory Opinion becomes effective, ACA members will incur new litigation risk based on the directives in the Advisory Opinion.

23.    Each of these harms is directly traceable to the Advisory Opinion and would be remedied by an order enjoining the Advisory Opinion from taking effect and vacating it.

24.    Venue is proper in this district under 28 U.S.C. § 1391(c). Defendants are an agency and an officer of the United States, Plaintiff ACA does business in this district, a substantial part of the events or omissions giving rise to the claims occurred in this district, and no real property is involved in this action.

**IV.**
**THE ADVISORY OPINION IS A LEGISLATIVE RULE**

25.    The CFPB did not provide notice of an intent to issue an opinion nor did it accept comments from the public when it promulgated the Advisory Opinion. There was no SBREFA panel related to this rule. The Advisory Opinion does not contain a cost-benefit analysis or any studies that measured the necessity, impact, paperwork, or expense of the rules in the Advisory Opinion. If ACA, ACA members, and CBS had been provided the opportunity to comment on a proposed Advisory Opinion, it would have provided documents and data informing the CFPB that its proposal would harm consumers, harm the healthcare industry, and cause the negative effects set forth in this Complaint.

26.    The APA requires that, before undertaking certain actions, federal agencies publish a "[g]eneral notice of proposed rulemaking" in the Federal Register and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)–(c).

27.    Section 553 exempts "interpretative rules" and "general statements of policy" from notice and comment procedures. 5 U.S.C. § 553(b)(3)(A). Nonetheless, an agency may not label a substantive change to a rule an interpretation simply to avoid the notice and comment requirements. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000).

28.     A rule is interpretive if it "spells out a duty that is fairly encompassed within the [statute or] regulation that the interpretation purports to construe." *Air Transp. Ass'n of Am. v. FAA*, 291 F.3d 49, 55-56 (D.C. Cir. 2002).

29.     The inquiry of whether a rule is interpretive turns on four questions. "(1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule." *Am. Mining Cong. v. MSHA*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). "If the answer to any of these questions is affirmative, we have a legislative, not an interpretive rule." *Id.* at 1112.

30.     Critically, D.C. Circuit precedent "does not defer to the agency's view that its regulations are a mere 'clarification of an existing rule' pursuant to the APA; instead, the court conducts its own inquiry into whether the new rules 'work substantive changes in prior regulations.'" *Stuttering Found. of America v. Springer*, 498 F. Supp. 2d 208, 211 (D.C. Cir. 2007) (quoting *Sprint Corp. v. FCC*, 315 F.3d 369, 374 (D.C. Cir. 2003)).

31.     "A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (citation omitted).

**A.     The New Requirement to Review Account-Level Documents Before Sending a Validation Notice is Contrary to Prior Guidance and Contradicts the FDCPA § 1692g**

32.     The Advisory Opinion requires that before beginning collections "[d]ebt collectors must have a reasonable basis for asserting that the debts they collect are valid and the amounts correct." 89 Fed. Reg. 80716. This statement alone is not objectionable. The new aspect of this rule is in the CFPB's proscription for how a debt collector must establish the reasonable basis. The CFPB

9

calls for debt collectors to review account-level documentation before beginning collections:

> Debt collectors may be able to satisfy this requirement by obtaining appropriate information to substantiate those assertions, consistent with patients' privacy. This information could include payment records (including from insurance); records of a hospital's compliance with any applicable financial assistance policy; copies of executed contracts or, in the absence of express contracts, documentation that the creditor can make a prima facie claim for an alleged amount under State law (*e.g.*, "reasonable" or "market rates").

89 Fed. Reg. 80716.

33.    The Advisory Opinion provides that "[c]ollecting or attempting to collect medical debts without substantiation violates [FDCPA] section 807(2)(A)." 89 Fed. Reg. 80722.

34.    However, under existing and long established law, a debt collector does not violate the FDCPA by attempting to collect a debt without first substantiating it through reviewing account-level documents and agreements for each account. It is well-settled that the FDCPA does not require a debt collector to independently investigate each account prior to collection.[4]

(1)    The CFPB's new standard on substantiation differs from its previous guidance.

35.    In enacting Regulation F, the CFPB explicitly declined to include a rule that debt collectors are obligated to substantiate a debt prior to collection, finding that such a rule was "not advisable" without the "benefit of public notice and comment." *See* 85 FR 76734, 76857 n.27 ("The Bureau received feedback asking the bureau to include in the final rule certain interventions that the

---

[4] *See, e.g., Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1276-77 (11th Cir. 2011) ("we agree with ICS that the FDCPA does not require debt collectors to independently investigate and verify the validity of a debt to qualify for the bona fide error defense"); *Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1173-74 (9th Cir. 2006) ("Within reasonable limits, [Defendants] were entitled to rely on their client's statements to verify the debt. Moreover, the FDCPA did not impose upon them any duty to investigate independently the claims presented") (internal citations omitted); *Jenkins v. Heintz*, 124 F.3d 824, 834 (7th Cir. 1997) (holding that a debt collector has no obligation to conduct an independent debt validity investigation); *Smith v. Transworld Systems, Inc.*, 953 F.2d 1025, 1032 (6th Cir. 1992) (debt collectors are entitled to rely on the information they receive from the creditor); *Huebner v. Midland Credit Mgmt., Inc.*, 2016 WL 3172789, *6 (E.D. N.Y. June 6, 2016), *aff'd*, 897 F.3d 42 (2d Cir. 2018) (debt collector "had no obligation to independently investigate the debt prior to beginning collection.).

Bureau did not pose; many such comments addressed debt collectors' obligation to substantiate debts. The Bureau concludes that it is *not advisable* to finalize such interventions *without the benefit of public notice and comment* and therefore does not address such comments further in the Notice.") (emphasis added).

36.    In the instant Advisory Opinion, however, the CFPB does just that. This provision, therefore, is directly contrary to a prior agency position. The CFPB did not explain the necessity for this change or its rationale for this change.

(2)    The CFPB's new standard on substantiation differs from FDCPA statutory text.

37.    Further, the FDCPA and Regulation F require a debt collector to provide verification of the debt to the consumer or cease collection if the consumer disputes the debt in writing within 30 days after receiving the debt collector's initial written notice. *See* 15 U.S.C. § 1692g. Existing law under the FDCPA is clear that a debt collector has the option of either providing the consumer validation of the debt or ceasing collection. *Id.*

38.    Requiring pre-collection investigation conflicts with the plain language of the FDCPA and would render the validation process provided by § 1692g(a) superfluous. S*ee, e.g., Azar v. Hayter*, 874 F. Supp. 1314 (N.D. Fla. 1995) ("No provision of the FDCPA has been found which would require a debt collector independently to investigate the merit of the debt, *except to obtain verification*, or to investigate the accounting principles of the creditor, or to keep detailed files.") (emphasis added).

39.    The Advisory Opinion directive that medical debt collectors substantiate the debt prior to making a collection attempt is a substantive and material change of law because it will require medical debt collectors to review account-level documentation prior to making an initial collection attempt on a medical debt.

**B.**    **The CFPB's New Reasonableness of Pricing Standard is Contrary to Existing Law and Sets a New Binding Standard**

40.    The Advisory Opinion requires medical debt collectors, when attempting to collect a medical debt that is not created by an express contract between the consumer and healthcare provider setting forth the dollar amount of the services, to make a legal determination that a debt is reasonable and not unconscionable pursuant to state law. *See* 89 Fed. Reg. 80719–20. This additional obligation on debt collectors represents a new standard.

(1)    The Reasonableness-of-Pricing Standard is Contrary to Existing Law.

41.    Under existing law, debt collectors are not required to make an independent legal determination as to whether the consumer has any potential legal defense to the debt prior to collection. *See Sessa v. Trans Union*, LLC, 74 F.4th 38 (2d Cir. 2023).

42.    Under existing law, debt collectors collect debt on behalf of third-parties and do not own the accounts; they therefore do not have the contractual right to adjust the contract value of the underlying obligation. Rather, a consumer who disagrees with an amount charged may work directly with the healthcare provider to reduce charges.

43.    Currently, debt collectors rely upon existing structures, such as audits from the Centers for Medicare & Medicaid Services ("CMS") and enforcement of federal price transparency law to form a reasonable belief in the accuracy of the prices charged to patients. CMS's hospital price transparency requirements are authorized by section 2718(e) of the Public Health Service Act, which requires each hospital operating in the United States to make its standard charges public. 42 U.S.C. § 300gg-18(e). In addition, debt collectors like Plaintiff CBS take reasonable precautions like reviewing a client's policies and procedures and researching a provider's regulatory history to establish a reasonable belief in the accuracy of account balance information.

44.    The Advisory Opinion's new standard eviscerates debt collectors' reasonable reliance

upon their client's policies and regulatory history and subjects debt collectors to enforcement and private litigation risk that did not exist prior to this Advisory Opinion.

      (2)    <u>The Reasonableness-of-Pricing Standard Requires Changes to Practices.</u>

45.    Hospitals and surgery centers establish their pricing based on a variety of factors that may include their own costs, market pressures, and the types and complexity of medical procedures offered.

46.    Currently, debt collectors rely on the bill and invoice amounts established by their healthcare clients in the ordinary course of business. The amounts charged to the consumer are provided to debt collectors in the form of summary data after the healthcare provider or medical billing service establishes the proper charges.

47.    Debt collectors are not medical professionals and do not have the requisite education or experience to second-guess the prices their healthcare clients establish. For example, should a debt collector decide whether the cost of a life-saving triple by-pass heart surgery is unreasonable? Moreover, it's well-known that private payors subsidize costs for indigent patients who do not pay at all—how could a debt collector accurately assess reasonability in such a complex system?

48.    Debt collectors do not routinely acquire sensitive health information about the consumers from whom they are attempting to collect. Debt collectors do not know if a procedure is especially complex because of the consumer's health condition, or whether a procedure is even necessary. Debt collectors do not know the prices of inputs such as medical devices or medications. Debt collectors do not—and should not—be second-guessing the prices charged to consumers for healthcare.

49.    The Advisory Opinion directive that a debt collector determine if a medical bill is reasonable or if the consumer has a legal defense to the debt is a substantive and material change in the law because it creates a new requirement that medical debt collectors make an independent legal

determination regarding a consumer's legal defenses to the debt prior to making a collection attempt. The Advisory Opinion is therefore not an interpretive rule, but rather a legislative one.

(3)    The New Requirement for Medical Procedure Audits and "Substantiation" will Be Outrageously Expensive to Implement.

50.    To comply with the Advisory Opinion sections discussed above, Plaintiffs must audit the medical services provided and the medical billing codes that providers use to substantiate the bills they attempt to collect. Debt Collectors must determine for each patient whether there is potential defense to the debt or potential reduction in the bill amount.

51.    ACA members and CBS do not have the ability to determine if the medical procedure code is correct or the amount charged was over-priced. Further, ACA members and CBS do not have the necessary information to perform this task, even if they had the expertise.

52.    The Advisory Opinion would require debt collectors to be intimately involved in the medical coding process, and to substitute their judgment for the judgment of their clients—the actual healthcare providers. The Advisory Opinion will likely cause more billing mistakes to occur by relying on debt collectors' inexperience in this newly regulated field.

53.    ACA members and Plaintiff CBS will bear substantial costs to comply with the new regulations under the Advisory Opinion. First, they must hire at least three full-time certified medical coders to audit every medical provider's bills. Second, they must hire at least one physician to review whether the billing code was medically appropriate to the procedure or services performed. This would increase costs to CBS and ACA members by approximately four-hundred thousand dollars per year for every mid-size medical collections agency. Larger medical collections agencies may pay double that or more.

54.    The Advisory Opinion directive that medical debt collectors independently evaluate the reasonableness of a medical bill prior to making a collection attempt is a substantive and material

change of law.

**C.**    **The New Definition of a Debt in "Default" Extends the FDCPA to the Entire Medical Billing Industry without a Legal Basis**

55.    The Advisory Opinion redefines "default" for medical debt where the consumer and healthcare provider have not otherwise defined the term by agreement, to occur when the consumer has failed to pay in full "at a given time," regardless of how the creditor treats the debt. 89 Fed. Reg. 80723.

56.    This new bright-line rule that all debts are in "default" if they are not paid in full "at a given time," regardless of how the creditor is treating the debt, is contrary to longstanding law interpreting the FDCPA and constitutes a substantive change of law, rather than a mere explanation or interpretation of existing law. *See, e.g., Alibrandi v. Fin. Outsourcing Servs., Inc.*, 333 F.3d 82, 86 (2d Cir. 2003) (per curiam) ("In applying the FDCPA, courts have repeatedly distinguished between a debt that is in default and a debt that is merely outstanding, emphasizing that only after some period of time does an outstanding debt go into default"). Moreover, this new definition conflicts with Centers for Medicare & Medicaid Services ("CMS") rules. CMS does not allow a provider to declare a Medicare patient bill as delinquent and subject to claim on a Medicare cost report until the debt is greater than 120 days old and has been billed multiple times. Given the requirements by the federal government agency responsible for medical billing oversight, this new ruling by the CFPB would seem to be in direct conflict with CMS, indicating that a Medicare patient portion could be in "default" if not paid at the time of service.

(1)    The CFPB's Interpretation of "Default" is Contrary to Existing Law.

57.    The FDCPA only applies to debt that is in "default" when obtained by the debt collector. *See* 15 U.S.C. § 1692a(6)(F)(iii). "Default" is not defined in the FDCPA; however, where the agreement between the creditor and the debt collector does not define the term, courts interpreting

the FDCPA generally consider the facts and circumstances surrounding the relationship between the consumer, creditor, and debt collector to determine if a debt is in "default" under the FDCPA. *See, e.g., Mavris v. RSI Enterprise Inc*., 86 F. Supp. 3d 1079, 1086 (D. Ariz. 2015) (the question a court must answer to determine if a debt is in "default" under the FDCPA is whether, "at the time a third party obtains a debt for collection, would a reasonable person in the debtor's position believe that the creditor viewed the debt as being in default").

58.    Under existing law, when neither an agreement between the consumer and creditor nor state law defines when a consumer defaults, courts make a factual determination on a case-by-case basis to determine whether a debt is in "default" under the FDCPA. *See, e.g., Echlin v. Dynamic Collectors, Inc*., 102 F. Supp. 3d 1179, 1185 (W.D. Wash. 2015).

59.    The CFPB's attempt to redefine "default" for medical debt where there is not an express agreement as to the amount of the services is a substantive change in the law.

(2)    <u>The CFPB's Interpretation of "Default" Would Materially Change Practices.</u>

60.    Currently, some ACA members, including CBS, operate companies that provide medical billing services for healthcare accounts that are aging, but not considered in "default" by the healthcare providers. In CBS's experience, medical providers do not consider a bill to be in default (i.e., "written off" under Generally Accepted Accounting Principles) at 31 days just because a payment in full has not been made. Generally, hospitals and medical providers do not charge-off accounts but instead give consumers a flexible period to pay medical bills and process insurance coverage. This benefits consumers by providing time and opportunities for reasonable payment plans.

61.    Medical billing companies service accounts that are not deemed to be in default. These companies provide a variety of services for healthcare providers. They assist healthcare practitioners in reducing spending and payer denials; they process insurance claims; ensure

compliance with state and federal medical billing laws; manage insurance delays; prepare bills and send them to consumers; provide customized billing reports; and contact consumers to obtain payment or acquire additional information for insurance processing.

62.    Medical billing companies do not identify themselves as FDCPA "debt collectors" because they do not collect defaulted debt, and therefore are not required to comply with FDCPA provisions like, for example, providing a "mini-Miranda" notice when communicating about an account.

63.    According to publicly-available research, in 2023, there were 1,395 Medical Billing Services businesses in the US.[5]

64.    Billing services, in general, cost healthcare providers about half as much as a debt collection service.

65.    Under the Advisory Opinion's definition of "default," these billing companies would now be considered FDCPA debt collectors.

66.    These medical billing companies would need to establish compliance programs specific to the FDCPA, modify their systems of record, modify their letter templates, train all personnel to comply with the FDCPA, modify their telephony systems to comply with the FDCPA. These efforts would incur significant cost—an estimated at fifty-thousand dollars initially and an estimated twenty thousand dollars annually thereafter.

67.    If the medical billing service business is subject to the FDCPA under the Advisory Opinion, the cost-savings that this business provides to its clients will disappear, thus increasing costs for all healthcare providers who formerly relied upon medical billing providers. These costs

---

[5] See IBIS World, Medical Billing Services in the US, NAICS Medical Billing Services in the U.S. (Jan. 30, 2024), *available at* https://www.ibisworld.com/industry-statistics/number-of-businesses/medical-billing-services-united-states/.

are passed on to consumers in the form of higher price points for goods and services. Furthermore, vastly larger numbers of patients would have the experience of being in collections—even if they received their first bill a mere 30 days earlier.

68.    The Advisory Opinion's directive that any account that is not paid in full at the "due by" date is in default is a substantive and material change of law that does substantial harm to healthcare providers and patients.

**D.    The New Requirement for Medical Procedure Audits is Uncompelled by the FDCPA and Binds Debt Collectors to New Standards**

69.    The Advisory Opinion explains that medical bills, especially those from visits to hospitals, are often calculated based on a standardized set of codes that correspond to the type and degree of medical attention a patient received. The more serious, urgent, or involved the care, the higher the charge as that fits the resources used to treat the patient. 89 Fed. Reg. 80717. The Advisory Opinion says that, "[a] debt collector that collects or attempts to collect a debt that has been "upcoded" violates the FDCPA's prohibitions against unfair or unconscionable debt collection practices because the amount is not expressly authorized by the agreement for services actually rendered and also violates the FDCPA's prohibitions against deceptive or misleading debt collection practices because it would falsely represent the amount of the debt." 89 Fed. Reg. 80720.

70.    The concerning statement in this directive is that the Bureau is establishing a new FDCPA violation when there may be upcoding and "the amount is not expressly authorized by the agreement for services actually rendered." *Id.*

71.    In CBS's experience, many agreements with hospitals provide that a patient will be billed for services in accordance with hospital policy, for example, a standard authorization from a patient may read:

"I understand that I am agreeing to pay for such services and/or procedures in the amount(s) consistent with [hospital] policies and pricing and I am responsible for complying with any

18

insurance requirements, including but not limited to obtaining pre-authorization."

72.     Moreover, debt collectors would have no reason to know that "upcoding" occurred unless they performed a detailed audit on each bill or invoice.

(1)     <u>The Requirement for Medical Procedure Audits is a Change in the Law.</u>

73.     The FDCPA expressly allows debt collectors to seek payment for amounts authorized by agreement. 15 USC 1692f(1).

74.     Yet the Advisory Opinion states that collecting on "upcoded" bills is an FDCPA violation, even if was done pursuant to hospital billing policies and pricing, and even if it is consistent with the agreement between the consumer and the hospital.

(2)     <u>The Requirement for Medical Procedure Audits is a Change in Practices.</u>

75.     Compliance with the Advisory Opinion's new rules on validating healthcare providers' bills regarding services rendered would cause Plaintiffs' members and CBS to materially adjust their practices.

76.     Medical coding is a profession that requires specialized training. Indeed, those seeking employment in this industry can receive a Certified Professional Coder certification.

77.     Medical coders translate the documentation of a patient's visit to a medical provider into standardized system that identifies, among other critical facts, a patient's diagnosis; the treatment, services, and supplies, the patient received; and any unusual circumstances of medical conditions that affected those treatments or services.

78.     Without the assistance of a professional medical coder, debt collectors would not have the experience or knowledge necessary to identify when a patient's bill has been "upcoded." Moreover, such a review would require more than just account originating documentation, it would require specialized knowledge about the patient's actual malady, treatment, and experiences with his or her physicians.

19

79.    Currently, it is Plaintiff CBS's policy to comply with HIPPA. This requires CBS to limit the use of protected health information to the minimum necessary to accomplish the intended purpose of the use, disclosure, or request.

80.    Complying with the Advisory Opinion would require that CBS adjust its HIPPA compliance practices and invade the medical privacy of consumers from whom it would seek to collect.

(3)    <u>The Advisory Opinion Eviscerates HIPAA's Privacy Protections.</u>

81.    To properly substantiate accounts and verify that medical coding was appropriate to the services offered, debt collectors will be required to collect and review a slew of personal health information protected by HIPAA and other state privacy laws.

82.    HIPAA requires that entities subject to its regulations collect only the "minimum necessary" for that entity to perform its role. Debt collection is recognized as a payment activity within the "payment" definition under HIPAA. 45 CFR § 164.501. Through a business associate arrangement, the covered entity may engage a debt collection agency to perform this function on its behalf. Disclosures to collection agencies are governed by other provisions of the Privacy Rule, such as the business associate and minimum necessary requirements. 45 CFR § 164.504(e)(2)(i)–(ii).

83.    A HIPAA covered entity's contract with a business associate may not authorize the business associate to use or further disclose the information in a manner that would violate the HIPAA Privacy Rule if done by the covered entity. *See* 45 CFR § 164.504(e)(2)(i). Thus, a business associate contract must limit the business associate's uses and disclosures of, as well as requests for, protected health information to be consistent with the covered entity's minimum necessary policies and procedures. Given that a business associate contract must limit a business associate's requests for protected health information on behalf of a covered entity to that which is reasonably necessary to accomplish the intended purpose, a covered entity is permitted to reasonably rely on such requests

from a business associate of another covered entity as the minimum necessary.

84.     Under the Advisory Opinion, the minimum necessary for debt collectors to substantiate the debts from medical providers will expand to include intrusive details about patient symptoms, treatments, reactions, and outcomes. This outcome from the Advisory Opinion is directly contrary to the purpose of HIPAA, exposes sensitive medical information to further disclosure, and is unlikely to be appreciated by consumers.

85.     The Advisory Opinion directive that medical debt collectors independently evaluate whether the services charged were actually rendered to making a collection attempt is a substantive and material change of law.

### V.
### COMPLIANCE WITH THE ADVISORY OPINION WILL BE EXPENSIVE AND CAUSE IRREPARABLE HARM

86.     The Advisory Opinion forces ACA members and CBS to assume new duties when attempting to meet their obligations under the FDCPA.

87.     The Advisory Opinion will require every medical debt collector to modify systems, computers, training, and processes to adapt their often nationwide policies and procedures.

88.     Each of these departures from the existing standards creates hardship for collectors who must invest significant time, money, and manpower in adjusting practices. Collectors who do not have the resources to adjust systems to quickly comply with the December 3, 2024 implementation date face two harmful options: (1) continue to collect without complying with the Advisory Opinion or (2) stop collecting on medical debt accounts and allow their accounts receivable assets to age and lose their value.

89.     The Advisory Opinion has already inflicted upon ACA members, including Plaintiff CBS, concrete, particularized, actual, and imminent harm in several ways. The Advisory Opinion requires the diversion of dozens of hours of staff time and other company resources to understand

the Advisory Opinion, purchase and reprogram computer systems and communications to comply with the Advisory Opinion, and analyze contracts with clients.

90.    The Rule has already inflicted upon ACA concrete, particularized, actual, and imminent harm in several ways. The Advisory Opinion required the need to divert from existing duties dozens of hours of ACA staff time and other company resources to help members understand the Rule and to develop internal compliance materials, including an FAQ resource, to educate members, and help members achieve early compliance prior to the unnecessarily quick effective date.

91.    The Advisory Opinion poses an imminent threat to ACA's membership levels and revenues from membership dues.

92.    The Advisory Opinion poses an imminent threat to ACA's members' revenues.

93.    The Advisory Opinion poses an imminent threat to CBS's revenues.

## VI.
## THE ADVISORY OPINION EXCEEDS THE BUREAU'S STATUTORY AUTHORIZATION UNDER THE FDCPA AND CFPA

94.    Through the Advisory Opinion, the CFPB is attempting to regulate the medical field—an area decidedly not within its purview. Congress delegated rulemaking authority over healthcare to several other federal agencies such as the U.S. Departments of Health and Human Services ("HHS"),[6] Labor ("DOL"),[7] and the Treasury,[8] which are tasked with creating laws and regulations surrounding insurance.[9] In fact, Congress recently passed the No Surprises Act to address some of these issues.[10] But Congress decidedly did not delegate any regulatory authority in this space to the CFPB.

---

[6] 42 U.S.C. § 3501 *et. seq.*
[7] 29 U.S.C. § 551 *et seq.*
[8] 31 U.S.C. § 301 *et. seq.*
[9] *See e.g.*, 26 U.S.C. §§ 9801–9834 (regulating group health plans and assigning enforcement and regulation to the IRS); 42 U.S.C. § 300gg (regulating insurance requirements including limiting cost-sharing and assigning enforcement and regulation to HHS); 42 U.S.C. 1320f (directing HHS to establish a Drug Price Negotiation Program).
[10] *See* Consolidated Appropriations Act of 2021, Pub.L. 116–260 (2020).

95.    In 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"). Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (2010). The Dodd-Frank Act made substantial changes to many of the statutes in the Consumer Protection Act and established in Title X, the CFPB. The Dodd-Frank Act assigns to the CFPB some of the rulemaking and enforcement authority that the FTC and banking regulators previously held. It also grants the CFPB rulemaking authority regarding unfair, deceptive, or abusive practices.

96.    Notably, the language in the CFPB's Enabling Act grants it the authority to "regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws." The CFPB's jurisdiction is thus limited to "financial products" and "financial services."

97.    A consumer financial product or service is a financial product or service that is offered or provided for use by consumers primarily for personal, family, or household purposes. A financial product or service means one of a handful of specified activities (with certain exceptions):

- Extending credit and servicing loans;
- Extending or brokering leases;
- Providing real estate settlement services;
- Engaging in deposit-taking or funding custodial activities;
- Selling, issuing, or providing stored value cards or payment instruments;
- Check cashing, check collection, or check guaranty services;
- Providing payments or other financial data processing products or services;
- Providing financial advisory services;
- Collecting, maintaining, or providing consumer report information or other account information;
- Debt collection related to consumer financial products or services;
- Products or services permissible for a bank or financial holding company to offer that will impact consumers.

98.    The CFPB's rulemaking and enforcement authority related to consumer financial products and services is strictly limited to "covered persons." This includes only those who offer or provide a financial product or service, and anyone controlling, controlled by, or under common

control with such a person who acts as a service provider for such a person.

99.    Here, the CFPB's Advisory Opinion goes far beyond the CFPB's statutory authority. While it is clear that the CFPB may regulate the offering and provision of debt collection, under the Advisory Opinion, non-covered persons like hospitals, medical billing firms, and physician's offices must change their practices to comply with the CFPB's directives. Indeed, while the intention behind the proposals is aimed at debt collectors, the practical effect is a regulation of the healthcare system. The rules now being considered therefore do not fit within the definition of a "financial product" or "service" and the CFPB lacks authority to issue rules in this area.

100.    In addition to the CFPB's enabling statute, the CFPB's rulemaking and enforcement authority is also limited by case law. It is well settled that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Sweeping grants of regulatory authority are rarely accomplished through "vague terms" or "subtle device[s]," and courts must "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *United States Telecom Assn. v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing *en banc*).

## VII.
## THE ADVISORY OPINION SHOULD BE SET ASIDE BECAUSE THE CFPB IS UNCONSTITUTIONALLY FUNDED

**A.    The Supreme Court's CFPB Decision**

101.    On May 16, 2024, the Supreme Court issued its opinion in *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd., No. 22-448 (U.S. Nov. 14, 2022)*. The Supreme Court decided that the CFPB's funding mechanism complied with the Appropriations Clause. *Id*. at 420–21.

102.    The Supreme Court then held that only CFPB's funding from the "combined earnings" of the Federal Reserve complied with the requirements of the Appropriations Clause because the "money [is] otherwise destined for the general fund of the Treasury." *Id*. at 425, 435.

**B.        The CFPB Lacks Funding to Promulgate or Enforce The Advisory Opinion**

103.    As the Supreme Court made clear, the CFPB only has constitutional funding from the Federal Reserve's "combined earnings." 12 U.S.C. § 5497(a)(1).

104.    But the Federal Reserve has had no "earnings" since September 2022, when the Federal Reserve's costs and expenses first exceeded its income, as demonstrated in the chart below. *See generally,* Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve Banks Combined Quarterly Financial Report* 2, 25 (Mar. 31, 2024).[11]

105.    Without "earnings," the Federal Reserve's transfers of funds to the CFPB after September 2022 were not in compliance with the statute governing the CFPB's funding. *See* 12 U.S.C. § 5497; *CFSA*, 601 U.S. at 435.

106.    The CFPB lacked constitutionally appropriated funding when it published the Advisory Opinion in the Federal Register on October 1, 2024. As such, the Advisory Opinion and the CFPB's associated rulemaking violates the Appropriations Clause and must be vacated. *CFSA*, 51 F.4th at 642 (citation omitted), *rev'd and remanded on other grounds*, 601 U.S. 416; *Collins v. Yellen*, 594 U.S. 220, 258 (2021); *Seila Law LLC v. CFPB*, 591 U.S. 197, 233 (2020).

**VIII.**
**RELIEF REQUESTED**

107.    Plaintiffs seek an order from this Court enjoining the enactment and enforcement of the Advisory Opinion in its entirety. While this Complaint focuses on four key provisions that are legislative rulemaking, these provisions are not severable from the Advisory Opinion and the entire promulgation was unlawful.

108.    The claims and relief requested in this lawsuit do not require participation of individual ACA members because the members who are subject to the Advisory Opinion will benefit

---

[11] Available at https://www.federalreserve.gov/aboutthefed/files/quarterly-report-20240517.pdf.

similarly from a favorable decision in this case, as would the consumers that the ACA members wish to help.

109.    A decision in this case favorable to ACA will redress the injury to ACA and its members because, among other things, it will protect against further APA violations and will relieve ACA's members of the costs imposed by the Advisory Opinion, permitting them to operate in a manner that respects their relationship with each individual consumer and their contracts with their clients.

## CLAIMS FOR RELIEF

### COUNT I
### Failure to Engage in Notice-and-Comment Rulemaking in
### Violation of APA, 5 U.S.C. §§ 553, 706(2) (A), (D)

110.    Plaintiffs repeat and incorporate by reference all of the foregoing allegations.

111.    The Advisory Opinion is a legislative rule.

112.    In issuing the Advisory Opinion, the CFPB did not comply with the notice-and-comment rulemaking procedures required under the APA.

113.    Therefore, the Advisory Opinion must be set aside under the APA, 5 U.S.C. §§ 553, 706.

### COUNT II
### Arbitrary and Capricious in
### Violation of APA, 5 U.S.C. §§ 553, 706(2)(A)

114.    Plaintiffs repeat and incorporate by reference all of the foregoing allegations.

115.    The CFPB had the duty under the APA to publish its proposed rulemaking and give the public a meaningful opportunity to comment. "Integral to these requirements is the agency's duty to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules. An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful

commentary." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007).

116.    The Advisory Opinion utterly fails to make available any studies or data underlying its rule or to consider any commentary.

117.    The Advisory Opinion did not consider the factors required by its implementing statute, the CFPA, at 12 USC § 5512. It thus failed to consider an important aspect of the problem and failed to consider a statutory factor. *See State Farm Mut. Automobile Ins. Co*, 463 U.S. at 44, 57 ("[A]n agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem.").

118.    The Advisory Opinion changes its view from prior rulemakings. CFPB in issuing the Advisory Opinion did not evidence an awareness of the change and provide a reasoned explanation for the new approach. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position.").

119.    The Advisory Opinion is arbitrary and capricious.

120.    Consequently, the CFPB violated the APA by failing to engage in reasoned decision making, failing to explain its reasoning sufficiently, and failing to support its conclusions with substantial evidence. The Advisory Opinion must be set aside. 5 U.S.C. § 706(A).

**COUNT III**
**Administrative Procedure Act**
**(Without Observance of Procedure Required by Law)**
**5 U.S.C. § 706(2)(D)**

121.    Plaintiffs repeat and incorporate by reference all of the foregoing allegations.

122.    The CFPB in issuing the Advisory Opinion did not comply with the Regulatory Flexibility Act ("RFA") (5 U.S.C. §§ 601–612), Small Business Regulatory Enforcement Fairness

Act ("SBREFA") (5 U.S.C. §601–612), or the Paperwork Reduction Act ("PRA") (44 U.S.C. § 3501–3521).

123.    Consequently, the CFPB violated the APA by failing to observe procedure required by law. 5 U.S.C. § 706(2)(D).

**COUNT IV**
**Administrative Procedure Act**
**(Excess of Statutory Jurisdiction, Authority, or**
**Limitations, or Short of Statutory Right)**
**5 U.S.C. § 706(2)(C)**

124.    Plaintiffs repeat and incorporate by reference all of the foregoing allegations.

125.    An administrative agency's power to promulgate legislative regulations is limited to the authority delegated to it by Congress. *VanDerStok v. Garland*, 86 F.4th 179, 187 (5th Cir. 2023) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)). The "core inquiry" of Section 706(2)(C) asks whether the rule in question is a "lawful extension of the statute under which the agency purports to act, or whether the agency has indeed exceeded its 'statutory jurisdiction, authority, or limitations." *Id.* at 188 (quoting 5 U.S.C. § 706(2)(C)).

126.    By interpreting the FDCPA in a manner that is inconsistent with existing debt collection law, the Advisory Opinion exceeds the Bureau's statutory jurisdiction, authority, or limitations.

127.    By interpreting the FDCPA in a manner that is inconsistent with HIPAA, the Advisory Opinion exceeds the Bureau's statutory jurisdiction, authority, or limitations.

128.    Furthermore, by failing to sufficiently consider the likely costs to consumers of the Advisory Opinion, including the reduced access to credit for some consumers, the CFPB did not meet the standards for rulemaking under the Dodd-Frank Act, 12 U.S.C. § 5512, which requires, among other things, that the CFPB consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial

products or services resulting from such rule." *Id.* § 5512(b)(2)(A)(i).

129.    For each of these reasons, the Advisory Opinion must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

**COUNT V**
**VIOLATION OF THE U.S. CONSTITUTION, 12 U.S.C. § 5497, AND APA**
**(ARTICLE I, § 9, CLAUSE 7; 12 U.S.C. § 5497(A)(1); 5 U.S.C. § 706(2)(A), (B))**

130.    Plaintiffs repeat and incorporate by reference all of the foregoing allegations.

131.    The rights enforceable by 42 U.S.C. § 1983 include, among other rights guaranteed by the United States Constitution, the right to be free from ultra vires government regulation.

132.    The United States Supreme Court held in *CFSA* that only CFPB's funding from the "combined earnings" of the Federal Reserve complied with the Appropriations Clause because the "money [is] otherwise destined for the general fund of the Treasury." *CFSA*, 601 U.S. at 421, 425, 435.

133.    The Federal Reserve has had no "combined earnings" since September 2022, when its expenses first exceeded its revenue. The Federal Reserve may only transfer funds that are "combined earnings" pursuant to 12 U.S.C. § 5497(a)(1).

134.    The CFPB lacks constitutionally appropriated funds to issue and enforce the Advisory Opinion because the Federal Reserve has lacked "combined earnings" since September 2022.

135.    Thus, the CFPB unlawfully promulgated and modified the Advisory Opinion because it lacked constitutionally authorized funding to issue the Advisory Opinion, violating the U.S. Constitution's Appropriation Clause and 12 U.S.C. § 5497(a)(1). As such, the Advisory Opinion must be vacated. *See CFSA*, 601 U.S. at 643.

136.    Moreover, under the APA, agency action must be vacated if it is "not in accordance with law," 5 U.S.C. § 706(2)(A), or "contrary to constitutional right, power, privilege, or immunity." *Id.* § 706(2)(B). Because the Advisory Opinion was promulgated and modified in violation of the

U.S. Constitution, it is not in accordance with law and contrary to constitutional right and power and must be set aside. *See CFSA*, 51 F.4th at 642, *rev'd and remanded on other grounds*, 601 U.S. 416.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court enter judgment in their favor and award the following relief:

137.    A declaration that the CFPB's Advisory Opinion is arbitrary, capricious, or otherwise contrary to law within the meaning of the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(A);

138.    A declaration that the CFPB's Advisory Opinion is in Excess of Statutory Jurisdiction, Authority, or Limitations, or Short of Statutory Right within the meaning of the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(C);

139.    A declaration that the CFPB's Advisory Opinion is Without Observance of Procedure Required by Law within the meaning of the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(D);

140.    A declaration that the CFPB's Advisory Opinion is unconstitutional because it was funded in violation of the Appropriations Clause;

141.    An order vacating and setting aside the Advisory Opinion nationwide for all affected persons in its entirety;

142.    An order issuing all process necessary and appropriate to stay the effective date and enjoin the implementation of the Advisory Opinion nationwide for all affected persons pending the conclusion of this case;

143.    To the extent the CFPB's Advisory Opinion is not vacated and enjoined in its entirety, a declaration that the CFPB's provisions regarding "reasonableness" at 89 Fed. Reg. 80719 ¶ 5 and 80720 ¶ 1, regarding "reviewing account statements at 89 Fed. Reg. 80721 ¶ 2–5 and 80722 ¶ 1, regarding "default" at 89 Fed. Reg. 80722 ¶ 3–4 and 80723 ¶ 1–4, and medical procedure auditing

or "upcoding" at 89 Fed. Reg. 80720 ¶ 2–4 are within the meaning of the Administrative Procedure Act, *see* 5 U.S.C. § 706, and an order vacating and setting aside those provisions;

144.    To the extent the CFPB's Advisory Opinion is not vacated and enjoined, a declaration that the cost-analysis provisions are arbitrary, capricious, or otherwise contrary to law within the meaning of the Administrative Procedure Act, *see* 5 U.S.C. § 706, and an order vacating and setting aside that provision in its entirety;

145.    To the extent the CFPB's Advisory Opinion is not vacated and enjoined, a declaration that the CFPB's effective date must be revised and an order implementing a proper effective date;

146.    An order awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

147.    Any other relief that the Court deems just and equitable.

Dated: November 1, 2024

Respectfully submitted,

ACA INTERNATIONAL, LLC and COLLECTION
BUREAU SERVICES, INC.

By its attorneys,

*/s/ David B. Meschke*
David B. Meschke, #CO0069
Sarah J. Auchterlonie, #489442 *(application pending)*
Brownstein Hyatt Farber Schreck, LLP
675 Fifteenth Street, Suite 2900
Denver, CO 80202
Telephone: 303-223-1100
Email:  dmeschke@bhfs.com;
        sja@bhfs.com

and

Leah Dempsey, #1033593
Brownstein Hyatt Farber Schreck, LLP
1155 F Street, NW
Washington, DC, 20004
Telephone: 202.296.7353
Email: ldempsey@bhfs.com

## CERTIFICATE OF SERVICE

I certify that on November 1, 2024 I electronically filed the foregoing document(s) using the CM/ECF system and they are available for viewing and downloading from the Court's CM/ECF system, and that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system where appropriate.

*/s/Paulette M. Chesson*
Paulette M. Chesson, Paralegal
Brownstein Hyatt Farber Schreck, LLP
675 Fifteenth Street, Suite 2900
Denver, CO 80202
Phone: 303-223-1100