# Rules and Regulations

Federal Register
Vol. 89, No. 193
Friday, October 4, 2024

**EXHIBIT 1**

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

---

## NUCLEAR REGULATORY COMMISSION

**10 CFR Part 2**

**[NRC–2023–0210]**

**RIN 3150–AL09**

### Non-Substantive Amendments to Adjudicatory Proceeding Requirements

**AGENCY:** Nuclear Regulatory Commission.

**ACTION:** Direct final rule; confirmation of effective date.

**SUMMARY:** The U.S. Nuclear Regulatory Commission (NRC) is confirming the effective date of November 5, 2024, for the direct final rule that was published in the **Federal Register** on August 22, 2024. This direct final rule amended the agency's rules of practice and procedure to improve access to documents and make e-filing rules technology neutral, to delete an obsolete regulation, to clarify the applicability of subpart L and subpart N procedures, to enhance internal consistency for page limit requirements, to enhance consistency with the Federal Rules of Evidence for ''true copies,'' and to better reflect current Atomic Safety and Licensing Board Panel practice regarding admission of evidence.

**DATES:** *Effective date:* The effective date of November 5, 2024, for the direct final rule published in the **Federal Register** on August 22, 2024 (89 FR 67830), is confirmed.

**ADDRESSES:** Please refer to Docket ID NRC–2023–0210 when contacting the NRC about the availability of information for this action. You may obtain publicly available information related to this action by any of the following methods:

• *Federal Rulemaking Website:* Go to *https://www.regulations.gov* and search for Docket ID NRC–2023–0210. Address questions about NRC dockets to Helen Chang; telephone: 301–415–3228; email: *Helen.Chang@nrc.gov.* For technical questions, contact the individual listed in the **FOR FURTHER INFORMATION CONTACT** section of this document.

• *NRC's Agencywide Documents Access and Management System (ADAMS):* You may obtain publicly available documents online in the ADAMS Public Documents collection at *https://www.nrc.gov/reading-rm/adams.html.* To begin the search, select ''Begin Web-based ADAMS Search.'' For problems with ADAMS, please contact the NRC's Public Document Room (PDR) reference staff at 1–800–397–4209, at 301–415–4737, or by email to *PDR.Resource@nrc.gov.* The comment can be viewed in ADAMS under Accession No. ML24256A206.

• *NRC's PDR:* The PDR, where you may examine and order copies of publicly available documents, is open by appointment. To make an appointment to visit the PDR, please send an email to *PDR.Resource@nrc.gov* or call 1–800–397–4209 or 301–415–4737, between 8 a.m. and 4 p.m. eastern time, Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Ethan Licon, U.S. Nuclear Regulatory Commission, Washington, DC 20555–0001; telephone: 301–415–1016, email: *Ethan.Licon@nrc.gov.*

**SUPPLEMENTARY INFORMATION:** On August 22, 2024 (89 FR 67830), the NRC published a direct final rule amending its regulations in part 2 of title 10 of the *Code of Federal Regulations* to revise the agency's rules of practice and procedure to improve access to documents and make e-filing rules technology neutral, to delete an obsolete regulation, to clarify the applicability of Subpart L and Subpart N procedures, to enhance internal consistency for page limit requirements, to enhance consistency with the Federal Rules of Evidence for ''true copies,'' and to better reflect current Atomic Safety and Licensing Board Panel practice regarding admission of evidence. In the direct final rule, the NRC stated that if no significant adverse comments were received, the direct final rule would become effective on November 5, 2024. The NRC received one anonymous comment, which can be viewed at ADAMS Accession No. ML24256A206; the comment was not a significant adverse comment on the direct final rule. Therefore, this direct final rule will become effective as scheduled.

Dated: October 1, 2024.

For the Nuclear Regulatory Commission.

**Cindy Bladey,**

*Chief, Regulatory Analysis and Rulemaking Support Branch, Division of Rulemaking, Environmental, and Financial Support, Office of Nuclear Material Safety and Safeguards.*

[FR Doc. 2024–23015 Filed 10–3–24; 8:45 am]

**BILLING CODE 7590–01–P**

---

## CONSUMER FINANCIAL PROTECTION BUREAU

**12 CFR Part 1006**

### Debt Collection Practices (Regulation F); Deceptive and Unfair Collection of Medical Debt

**AGENCY:** Consumer Financial Protection Bureau.

**ACTION:** Advisory opinion.

**SUMMARY:** The Consumer Financial Protection Bureau (CFPB) is issuing this advisory opinion to remind debt collectors of their obligation to comply with the Fair Debt Collection Practices Act (FDCPA) and Regulation F's prohibitions on false, deceptive, or misleading representations or means in connection with the collection of any medical debt and unfair or unconscionable means to collect or attempt to collect any medical debts.

**DATES:** This advisory opinion is applicable as of December 3, 2024.

**FOR FURTHER INFORMATION CONTACT:** George Karithanom, Regulatory Implementation & Guidance Program Analyst, Office of Regulations, at 202–435–7700 or at: *https://reginquiries.consumerfinance.gov/.* If you require this a document in an alternative electronic format, please contact *CFPB_Accessibility@cfpb.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. Executive Summary

The CFPB is issuing this advisory opinion through the procedures for its Advisory Opinions Policy.[1] Refer to those procedures for more information.

This advisory opinion explains that debt collectors are strictly liable under the FDCPA and Regulation F (12 CFR part 1006) for engaging in the following

---

[1] 85 FR 77987 (Dec. 3, 2020).

unlawful practices when collecting medical bills:

○ *Collecting an amount not owed because it was already paid.* This includes instances when a bill was already fully or partially paid by insurance or a Government payor.

○ *Collecting amounts not owed due to Federal or State law.* This includes where law prohibits obligating a person on certain debts. For example, a State workers' compensation scheme may make employers or insurers responsible for qualifying medical expenses, rather than the patients. In addition, the Nursing Home Reform Act prohibits nursing homes from requiring third parties to pay for a patient's expenses in certain circumstances.

○ *Collecting amounts above what can be charged under Federal or State law.* This includes, for example, collecting amounts that exceed limits in the No Surprises Act. It also includes collection of amounts that exceed a State's common law remedies for claims when there is no express contract.

○ *Collecting amounts for services not received.* This includes "upcoding" where a patient is charged for medical services that are more costly, more extensive, or more complex than those actually rendered.

○ *Misrepresenting the nature of legal obligations.* This includes collecting on uncertain payment obligations that are presented to consumers as amounts that are certain, fully settled, or determined.

○ *Collecting unsubstantiated medical bills.* Debt collectors must have a reasonable basis for asserting that the debts they collect are valid and the amounts correct. Debt collectors may be able to satisfy this requirement by obtaining appropriate information to substantiate those assertions, consistent with patients' privacy. This information could include payment records (including from insurance); records of a hospital's compliance with any applicable financial assistance policy; copies of executed contracts or, in the absence of express contracts, documentation that the creditor can make a prima facie claim for an alleged amount under State law (*e.g.*, "reasonable" or "market rates").

This advisory opinion also interprets the meaning of "in default" for purposes of FDCPA section 803(6)(F)(iii) in the medical debt context to be determined by the terms of any agreement between the consumer and the medical provider under applicable law governing the agreement.

## II. Background

Medical debt is a major burden for many Americans. Recent estimates place total medical debt owed by people in the United States at $220 billion.[2] Medical debt is known to disproportionately impact young and low-income adults, Black and Hispanic people, veterans, older adults, and people in the Southern United States.[3]

Medical debt is unique because consumers rarely plan to take on medical debt or choose among providers based on price. Most medical debt arises from acute or emergency care.[4] In many cases, patients lack the ability to substantively comparison-shop between medical service providers due to emergency need, restrictive insurance networks, price opacity, or limited provider availability.[5] This leaves many patients subject to the pricing and policies of the medical service providers available to them.

Healthcare providers send medical bills to consumers to obtain compensation for care rendered to patients. In some cases, providers and patients enter into express contractual relationships, which may define patients' payment obligations or providers' pricing for the care. Yet contracts between providers and patients may still be vague, as some do not define specific prices for the care provided.[6] In other cases, such as in emergency settings or where independent contractors or provider groups are involved (*e.g.,* lab work or anesthesiology), consumers may not have any contractual relationship with a medical provider that provides care and then sends a bill.[7]

Consumers consistently report being confused about medical billing practices.[8] One reason for this is the variation in how medical providers bill their patients. In most cases, medical providers charge different rates for the same services to different payors, for example charging patients far more than what Medicare would pay for a given procedure if the patient is not covered by Medicare.[9] This, in part, stems from the fact that the pricing of medical services is heavily negotiated between providers and certain institutional payors such as insurance companies, and set by Government programs like Medicare and Medicaid. As a result, healthcare providers are incentivized to initially set high list prices as starting offers in negotiations with insurers.[10] As a result, uninsured and out-of-network patients are often charged much higher prices than those ultimately agreed to with insurers for patients in their networks.[11] Even within network, prices sometimes vary by facility or department.[12] These rates often vastly exceed the cost of providing care.[13] Research has also shown that healthcare markups are higher at hospitals with

---

[2] Shameek Rakshmit et al., *The Burden of Medical Debt in the United State*s, KFF (Feb. 12, 2024), https://www.kff.org/health-costs/issue-brief/the-burden-of-medical-debt-in-the-united-states/#:~:text=This%20analysis%20of%20government%20data,debt%20of%20more%20than%20%2410%2C000.

[3] CFPB, *Medical Debt Burden in the United States* at 2 (Mar. 1, 2022), https://www.consumerfinance.gov/data-research/research-reports/medical-debt-burden-in-the-united-states/.

[4] *See* Lunna Lopes et al., *Health Care Debt in the U.S.: The Broad Consequences of Medical and Dental Bills,* KFF (June 16, 2022), https://www.kff.org/report-section/kff-health-care-debt-survey-main-findings/ (finding that 50 percent of the people in the United States who have medical debt have it because of emergency care and 72 percent have it because of acute care).

[5] CFPB, *Medical Debt Burden in the United States,* at 3 (Mar. 1, 2022), https://www.consumerfinance.gov/data-research/research-reports/medical-debt-burden-in-the-united-states/.

[6] George A. Nation III, *Contracting for Healthcare: Price Terms in Hospital Admission Agreements,* at 106, 124 Dick. L. Rev. 91 (2019) (describing how it is "very common" for admissions agreements to not include exact prices).

[7] *Id.* at 92 ("self-pay patients, who enter the hospital through the emergency department, simply lack capacity to contract due to the rushed, stressful and tension-laden emergency circumstances"). As described below, the issue of whether this constitutes an implied contract is a matter of State law.

[8] *See* CFPB, *Medical Debt Burden in the United States,* at 3 (Mar. 1, 2022), https://www.consumerfinance.gov/data-research/research-reports/medical-debt-burden-in-the-united-states/ ("medical billing and collections practices can be confusing and difficult to navigate").

[9] *See* Eric Lopez et al., *How Much More Than Medicare Do Private Insurers Pay? A Review of the Literature,* KFF (Apr. 15, 2020), https://www.kff.org/medicare/issue-brief/how-much-more-than-medicare-do-private-insurers-pay-a-review-of-the-literature/; Frank Griffin, *Fighting Overcharged Bills from Predatory Hospitals,* 51 ARIZ. ST. L.J. 1003 (2019).

[10] Hospitals generally have no limit on their "chargemaster" rate, the rate they initially charge most private payors, and chargemaster rates are typically significantly higher than the actual cost of services rendered. *See* National Nurses United, *Fleecing Patients: Hospitals Charge Patients More Than Four Times the Cost of Care*" (Nov. 2020), https://www.nationalnursesunited.org/sites/default/files/nnu/graphics/documents/1120_CostChargeRatios_Report_FINAL_PP.pdf.

[11] *See* Jennifer Tolbert et al., *Key Facts about the Uninsured Population,* KFF (Dec. 18, 2023), https://www.kff.org/uninsured/issue-brief/key-facts-about-the-uninsured-population/.

[12] *See* Matthew Panhans et al., *Prices for Medical Services Vary Within Hospitals, but Vary More Across Them,* Medical Care Research and Review 78(2), 157 (June 19, 2019); Xu, Tim, Angela Park and Ge Bai, *Variation in Emergency Department vs Internal Medicine Excess Charges in the United States,*" JAMA Internal Medicine (2017), https://pubmed.ncbi.nlm.nih.gov/28558093/.

[13] *See* Ge Bai and Gerard F. Anderson, "*Extreme Markup: The Fifty US Hospitals With The Highest Charge-To-Cost Ratios,*" Health Affairs (June 2015), https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2014.1414.

more Black and Hispanic patients and at investor-owned, for-profit hospitals.[14]

Further, healthcare providers sometimes charge patients for "upcoded" services, or services more expensive than what the consumer actually received.[15] A 2024 study found that, from 2010–2019, the total of upcoding expenses for Medicare Parts A, B, and C was $656 million, $2.39 billion, and $10–15 billion, respectively.[16] Upcoding is relatively widespread and has been estimated to account for 5–10 percent of total healthcare expenditures in the United States.[17]

After an individual receives a medical service, they and their insurer are billed, if the individual is insured. Some healthcare providers also market medical payment products or other external financing options to their patients.[18] In some cases, providers are obligated by State or Federal laws to perform certain affirmative functions involving the medical bill or refrain from specific collection actions.[19] After any insurance payments or payment via a medical payment product are received, unpaid amounts, if any, are collected by phone calls, letters, emails, and offers of payment plans or settlements.[20] Hospitals and other healthcare providers in the United States are increasingly outsourcing medical billing and collection activities to third parties, such as "Revenue Cycle Management" firms, which are often funded by private equity.[21] One estimate projects the domestic market for Revenue Cycle Management companies to grow by 10.2 percent annually until 2030.[22] Unpaid medical bills may also be assigned to more traditional debt collectors, including those that specialize in medical debt, placed with an attorney for litigation, or, more rarely, sold to a debt buyer.

The CFPB has observed and reported on many issues with how debt collectors collect medical debt in the United States. For example, the CFPB has brought enforcement actions against debt collectors for collecting on disputed medical debts without adequate substantiation.[23] The CFPB has also previously described reports from consumers who have received collections notices for medical debts they should or do not owe. Specifically, consumers have reported receiving collections notices for debts that have or should have been covered by insurance, government payors, hospital financial assistance programs, or that the patient has otherwise paid.[24] Consumers also have reported receiving collections notices for debts they believe they do not owe under State or Federal law.

Further, many debt collectors do not have timely access to healthcare providers' billing and payment information, increasing the likelihood that the debt collector collects on an amount that is not owed, such as a bill that has already been paid.[26] Many consumers have reported difficulties receiving verification of medical debts for which they have received collections notices.[27] In some cases, debt collectors either may not have or refuse to provide to a consumer upon request proof of insurance payments, documentation confirming that the amount billed complies with State law and other affirmative collection requirements, such as hospital financial assistance, or other documents that would demonstrate the validity of the debt and the accuracy of the demanded amount.

The FDCPA's protections are enforced by the CFPB, by other Federal regulators, by individual consumers, and, under certain circumstances, by States.[28] And the CFPB is responsible for issuing rules regarding the FDCPA.[29] To the extent a person qualifies as a "debt collector" under the FDCPA and its implementing Regulation F, that person is subject to the FDCPA and

---

[14] *See* CFPB, *Medical Debt Burden in the United States,* at 11 (Mar. 1, 2022), https://www.consumerfinance.gov/data-research/research-reports/medical-debt-burden-in-the-united-states/ (referencing Faiz Gani, et al., *Hospital markup and operation outcomes in the United States, Surgery* (July 2016), https://www.sciencedirect.com/science/article/abs/pii/S0039606016300022?via%3Dihub; Tim Xu, Angela Park, and Ge Bai, *Variation in Emergency Department vs Internal Medicine Excess Charges in the United States, Jama Internal Medicine* (2017), https://pubmed.ncbi.nlm.nih.gov/28558093/).

[15] Medical care providers often calculate and itemize charges for care using a standardized set of codes. These codes indicate the various aspects of care a patient received along with the type and scope of that care. Typically, more serious, more urgent, or more involved forms of care will incur higher charges. If a medical provider designates an aspect of a patient's care with a code that denotes a higher or more involved level of care than was actually received, the provider is said to be "upcoding."

[16] Keith Joiner, Jianjing Lin, and Juan Pantano, *Upcoding in medicare: where does it matter most,* Health Economics Review 14(1) (2024), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10759668/.

[17] William Hsiao, *Fraud and Abuse in Healthcare Claims,* California HHS (Jan. 2022), https://www.chhs.ca.gov/wp-content/uploads/2022/01/Commissioner-William-Hsiao-Comments-on-Fraud-and-Abuse-in-Healthcare-Claims.pdf.

[18] Consumers are increasingly using medical credit cards and other financing options to pay for medical care, and the CFPB has done significant work studying and addressing this issue. *See* CFPB, *Medical Credit Cards and Financing Plans*" (May 4, 2023), https://www.consumerfinance.gov/data-research/research-reports/medical-credit-cards-and-financing-plans/; *see also* Lorelei Salas, *Ensuring consumers aren't pushed into medical payment products*" (June 18, 2024), https://www.consumerfinance.gov/about-us/blog/ensuring-consumers-arent-pushed-into-medical-payment-products/; CFPB, *Request for Information on Medical Payment Products,*" 88 FR 44281 (July 12, 2023).

[19] Certain Federal laws, such as the No Surprises Act and the Nursing Home Reform Act, limit collection activities for certain kinds of medical debt. Non-profit hospitals may lose their non-profit tax status if they fail to evaluate patients for eligibility for financial assistance before the hospital takes certain types of collection actions. *See* 26 U.S.C. 501(r)(6). Some State laws similarly limit medical debt collections activities. For example, states have enacted additional requirements that broaden the applicability of hospital financial assistance, covering additional services for those patients deemed eligible. *See* Washington State Charity Care Law, RCW 70.170.060 (2024) (requiring non-profit hospitals to provide charity care for patients and their guarantors with incomes less than 300 percent of the Federal poverty guidelines). Medicare and Medicaid requirements also vary by State and may limit medical debt collections activities.

[20] *See* CFPB, *Medical Debt Burden in the United States,* at 12 (Mar. 1, 2022), https://www.consumerfinance.gov/data-research/research-reports/medical-debt-burden-in-the-united-states/.

[21] *See* Jacqueline LaPointe, *What's Behind Private Equity's Interest in RCM Vendors,* TechTarget (Mar. 5, 2024), https://www.techtarget.com/revcyclemanagement/answer/Whats-Behind-Private-Equitys-Interest-in-RCM-Vendors.

[22] *See* Grand View Research, *U.S. Revenue Cycle Management Market Size, Share, and Trends Analysis Report,* https://www.grandviewresearch.com/industry-analysis/us-revenue-cycle-management-rcm-market.

[23] *See* Consent Order, *Commonwealth Fin. Sys., Inc.,* CFPB No. 2023–CFPB–0018 (Dec. 15, 2023); Consent Order, *Phoenix Fin. Servs., LLC,* CFPB No. 2023–CFPB–0004 (June 8, 2023).

[24] *See* CFPB, *Fair Debt Collection Practices Act CFPB Annual Report 2023* (Nov. 16, 2023); https://www.consumerfinance.gov/data-research/research-reports/fair-debt-collection-practices-act-cfpb-annual-report-2023/.

[25] *See* CFPB, *Fair Debt Collection Practices Act CFPB Annual Report 2023* (Nov. 16, 2023), https://www.consumerfinance.gov/data-research/research-reports/fair-debt-collection-practices-act-cfpb-annual-report-2023/; CFPB, *Nursing Home Debt Collection* (Sept. 9, 2022), https://www.consumerfinance.gov/data-research/research-reports/issue-spotlight-nursing-home-debt-collection/; *see also, e.g.,* Complaint for Civil Penalties, Injunctive and Other Relief, *Washington* v. *Providence Health & Services,* No. 22–2–01754–6 SEA (King Cnty. Sup. Ct. Feb. 24, 2024), ¶¶ 70–77 (alleging that hospital system sent the accounts of patients it knew were eligible for financial assistance under state law to debt collectors).

[26] John McNamara, *Debt collectors re-evaluate medical debt furnishing in light of data integrity issues* (Feb. 14, 2023), https://www.consumerfinance.gov/about-us/blog/debt-collectors-re-evaluate-medical-debt-furnishing-in-light-of-data-integrity-issues/.

[27] *See* CFPB, *Medical Debt Burden in the United States,* at 4 (Mar. 1, 2022), https://www.consumerfinance.gov/data-research/research-reports/medical-debt-burden-in-the-united-states/.

[28] 15 U.S.C. 1692l, 1692k; *see* 87 FR 31940, 31941 (May 26, 2022) (explaining state authority to address violations of the federal consumer financial laws committed by "covered persons" and "service providers" under the Consumer Financial Protection Act).

[29] 12 U.S.C. 5481(12)(F), (H), 5512(b), 5514(c); 15 U.S.C. 1692l(d).

Regulation F.[30] The FDCPA and Regulation F prohibit the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt,"[31] including, for example, any false representation of "the character, amount, or legal status of any debt."[32] The FDCPA and Regulation F also prohibit the use of "unfair or unconscionable means to collect or attempt to collect any debt,"[33] including, for example, the "collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."[34] The CFPB reminds debt collectors that these FDCPA prohibitions interact with other Federal and State laws in a variety of ways that could create liability for debt collectors operating in the medical debt market.

The CFPB also reminds debt collectors that sections 1692e(2)(A) and 1692f(1) impose strict liability. First, these two provisions include no scienter requirement, in contrast to several others that do.[35] Second, the statute differentiates between intentional and unintentional violations.[36] As many courts have held,[37] imposing strict liability for violations of these provisions is therefore the best reading of the plain language, consistent with the statute's overall structure, and consonant with Congress' intent.[38]

### III. Collection of Debts Invalid Under Law

#### A. Collection of Amounts Not Owed Because Already Paid

Section 808(1) of the FDCPA prohibits, in relevant part, the collection of any amount "unless such amount is expressly authorized by the agreement creating the debt or permitted by law."[39] And section 807(2)(A) prohibits any false representation of "the character, amount, or legal status of any debt."[40]

Under these provisions, debt collectors must only collect or attempt to collect the amount that a consumer, in fact, owes at the time of a debt collection action after all appropriate deductions for partial payments by the consumer or third parties are made. The amounts due on a medical bill can often be adjusted multiple times, in light of payments made by consumers themselves or by third parties, such as insurers. Providers may also agree to accept a reduced amount in full satisfaction of the bill, or reduce the amount billed pursuant to a financial assistance policy or program.

Under the FDCPA, the "amount [ ] expressly authorized by the agreement creating the debt" refers only to the remaining balance on a debt that is fully owed by the consumer after any payments that reduce the debt's remaining balance are deducted because such payments reduce the amount that the consumer is obligated to pay under the original agreement. Accordingly, seeking to collect an amount that does not account for partial payments or changes to the bill made by the provider would violate the FDCPA's prohibitions against unfair or unconscionable debt collection practices because the amount has not been expressly agreed to. In other words, once a partial payment has been made toward an agreed-to amount, collection or attempted collection of the full amount without accounting for the partial payment is collection of an amount *greater* than that agreed to or permitted by law. Such collection or attempted collection would also violate the FDCPA's prohibitions against deceptive or misleading debt collection practices because it would misrepresent the amount of the debt actually owed.[41] Because payments toward a debt might be made at any time, debt collectors are responsible for ensuring that the correct collection amount is sought during each attempt at collection.

#### B. Collection of Amounts Not Owed Due to Federal or State Law

Section 808(1) of the FDCPA prohibits, in relevant part, the collection of any amount "unless such amount is expressly authorized by the agreement creating the debt or permitted by law."[42] An "amount expressly authorized by the agreement creating the debt or permitted by law" means only a debt that the consumer is legally obligated to pay. If a Federal or State law relieves consumers of the obligation to pay for medical costs, in whole or in part, then collection of those costs is not "permitted by law" but rather prohibited by law. Thus, any amount that a consumer is not obligated to pay by operation of Federal or State law, is not an "amount . . . permitted by law." Nor is the amount collectible as an "amount [ ] expressly authorized by the agreement creating the debt" since contractual terms that contravene Federal or State law are unenforceable as contrary to public policy.[43]

---

[30] 15 U.S.C. 1692a(6) (defining "debt collector"); 12 CFR 1006.2(i) (same).

[31] 15 U.S.C. 1692e; 12 CFR 1006.18(a).

[32] 15 U.S.C. 1692e(2)(A); 12 CFR 1006.18(b)(2)(i).

[33] 15 U.S.C. 1692f; 12 CFR 1006.22(a).

[34] 15 U.S.C. 1692f(1); 12 CFR 1006.22(b).

[35] *See, e.g.,* 15 U.S.C. 1692e(8) (prohibiting "[c]ommunicating or threatening to communicate to any person credit information *which is known or which should be known* to be false") (emphasis added); 15 U.S.C. 1692d(5) (prohibiting debt collectors from "causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously *with intent* to annoy, abuse, or harass") (emphasis added); 15 U.S.C. 1692j(a) (making it unlawful to "design, compile, and furnish any form *knowing* that such form would be used" to deceive consumers in a specified way") (emphasis added).

[36] *See, e.g.,* 15 U.S.C. 1692k(b)(1) (including as a factor for calculating statutory damages "the extent to which [the debt collector's] noncompliance was intentional"). Entities may also have an affirmative defense to liability for violations described in this advisory opinion, but only if they maintain procedures that are reasonably designed to prevent unintentional violations that are the result of bona fide errors. *See* 15 U.S.C. 1692k(c) (providing affirmative defense for violations if they are: (1) "not intentional," (2) the result of "a bona fide error," and (3) occurred despite "the maintenance of procedures reasonably adapted to avoid any such error"). Further, "the broad statutory requirement of procedures reasonably designed to avoid 'any' bona fide error indicates that the relevant procedures are ones that help to avoid errors like clerical or factual mistakes. Such procedures are more likely to avoid error than those applicable to legal reasoning. . . ." *Jerman* v. *McNellie, et al.,* 559 U.S. 573, 587 (2010).

[37] Every Federal Circuit Court of Appeals to address this issue has held that the FDCPA is a strict liability statute. *See, e.g., Vangorden* v. *Second Round, Ltd. P'ship,* 897 F.3d 433, 437–38 (2d Cir. 2018) ("The FDCPA is 'a strict liability statute' and, thus, there is no need for a plaintiff to plead or prove that a debt collector's misrepresentation . . . was intentional."); *Allen ex rel. Martin* v. *LaSalle Bank, N.A.,* 629 F.3d 364, 368 (3d Cir. 2011) ("The FDCPA is a strict liability statute to the extent it imposes liability without proof of an intentional violation."); *Stratton* v. *Portfolio Recovery Assocs., LLC,* 770 F.3d 443, 448–49 (6th Cir. 2014) ("The FDCPA is a strict-liability statute: A plaintiff does not need to prove knowledge or intent.").

[38] Congress enacted the FDCPA in 1977 to "eliminate abusive debt collection practices by debt collectors, to ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." Public Law 95–109, sec. 802(e), 91 Stat. 874, 874 (codified at 15 U.S.C. 1692(e)).

[39] 15 U.S.C. 1692f(1); 12 CFR 1006.22(b).

[40] 15 U.S.C. 1692e(2)(A); 12 CFR 1006.18(b)(2)(i).

[41] *See Vangorden* v. *Second Round, L.P.,* 897 F.3d 433, 437–38 (2d Cir. 2018) (consumer stated claim under FDCPA sections 807 and 808 when debt collector sought to collect debt that consumer had already settled with creditor); *Gonzalez* v. *Allied Collection Servs., Inc.,* No. 216CV02909MMDVCF, 2019 WL 489093, at *8–9 (D. Nev. Feb. 6, 2019), *aff'd,* 852 F. App'x 264 (9th Cir. 2021) (debt collector violated FDCPA sections 807 and 808 when it sought to collect full amount of debt that had been partially paid); *see also* Complaint for Permanent Injunction and Other Equitable Relief, *FTC* v. *Midwest Recovery Systems, LLC,* No. 12–00182 (E.D. Mo. Nov. 25, 2020), https://www.ftc.gov/system/files/documents/cases/01_-_complaint.pdf (pleading violation of FDCPA section 807 where, among other things, "[t]he debt was medical debt in the process of being re-billed to the consumer's medical insurance").

[42] 15 U.S.C. 1692f(1); 12 CFR 1006.22(b).

[43] *See* Restatement (Second) of Contracts sec. 178 ("A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable. . . .");

A range of laws protect consumers from the legal obligation to pay medical bills in certain circumstances. For example, a State workers' compensation scheme may provide that a medical provider only has recourse against a patient's employer or workers' compensation insurer for the treatment of a work-related injury.[44] And the Federal Nursing Home Reform Act prohibits, among other things, nursing care facilities that participate in Medicaid or Medicare from requesting or requiring a third-party guarantee of payment as a condition of admission, expedited admission, or continued stay in the facility, and thus nursing care facilities cannot collect the debt from third parties in violation of this law.[45]

A debt collector that collects or attempts to collect a debt from a consumer who is not legally obligated on the debt by operation of State or Federal law violates the FDCPA's prohibitions against unfair or unconscionable debt collection practices because the amount is not expressly authorized by the agreement creating the debt or permitted by law [46] and also violates the FDCPA's prohibitions against deceptive or misleading debt collection practices because it would falsely represent the amount of the debt. Debt collectors are responsible for ensuring that they do not collect or attempt to collect debts that are not legally owed by the relevant consumer, whether by operation of State or Federal law.

### C. Collection of Amounts Above That Permitted by Federal or State Law

Section 807 prohibits any false representation of "the character, amount, or legal status of any debt."[47] Section 808(1) of the FDCPA prohibits, in relevant part, the collection of any amount "unless such amount is expressly authorized by the agreement creating the debt or permitted by law."[48] Debt collectors would violate the FDCPA when they collect or attempt to collect amounts that exceed limits or calculation methods provided by State or Federal law, thus misrepresenting the consumer's obligation to pay the debt and collecting or attempting to collect an amount not permitted by law. Here again, a range of laws may operate to limit or control the amount that a medical provider may bill a patient in certain circumstances. For example, the Federal No Surprises Act of 2020 restricts the charges that certain medical providers can bill to certain patients depending on a number of factors such as their insured status and whether a billing provider is in- or out-of-network for a patient's health insurance plan.[49] As the CFPB has previously stated, the FDCPA's prohibition on misrepresentations includes misrepresenting that a consumer must pay a debt stemming from a charge that exceeds the amount permitted by the No Surprises Act.[50] Thus, for example, a debt collector who represents that a consumer owes a debt arising from out-of-network charges for emergency services would violate the prohibition on misrepresentations if those charges exceed the amount permitted by the No Surprises Act. Relatedly, if a Federal law limits or caps the amount a consumer may be billed in a given circumstance, then collection or attempted collection of an amount over the relevant limit or cap would run afoul of the FDCPA's prohibition on collection of amounts unless permitted by law.

State law may also provide a limit on the allowable amount that a medical provider can bill a consumer. Many States have enacted laws to protect consumers from unexpected medical bills in much the same vein as the Federal No Surprises Act and which may provide additional protections beyond those in the Federal law.[51] While State laws vary considerably, many include limits on the amounts that medical providers, both emergency and non-emergency, can bill certain consumers and provide specific standards to guide billing calculations.[52] As with the Federal statute, where one of these State laws applies to limit the amount that a medical provider can bill a consumer, a debt collector that collects or attempts to collect an amount that exceeds the relevant limits would violate the FDCPA's prohibition against misrepresenting the amount of the debt owed and the prohibition against collecting or attempting to collect an amount unless permitted by law.

Finally, State contract or common law may also provide limits on the allowable amount that a medical provider can bill a consumer in certain circumstances. For example, consumers are sometimes billed by medical service providers that the consumer did not enter into an express agreement with prior to receiving the services. In these circumstances, some courts have held that State contract law provides that the relationship between the consumer and provider is governed by an implied-in-fact agreement, the price term of which may be limited to a "reasonable" amount.[53] Courts have also interpreted some States' laws to require that when an express contract for medical services contains no explicit price term, a "reasonable" price term should be inserted.[54] Courts have even invalidated

---

*see also, e.g., United States* v. *Blue Cross/Blue Shield of Ala.,* 999 F.2d 1542, 1547 (11th Cir. 1993) ("The application of a regulatory statute that is otherwise valid may not be defeated by private contracts.") (citing *Connolly* v. *Pension Benefit Guaranty Corp.,* 475 U.S. 211, 224 (1986)); *SodexoMAGIC, LLC* v. *Drexel Univ.,* 24 F.4th 183, 219–20 (3d Cir. 2022) ("[A] voluntarily-agreed-to contract term is enforceable unless a statute or the common law specifically prevents enforcement of that term.") (applying Pennsylvania law); *Metcalfe* v. *Grieco Hyundai LLC,* 698 F. Supp. 3d 239, 2442 (D.R.I. 2023) ("Because the [Rhode Island State statute] explicitly allows collective actions, the class action waiver provision in the Leasing Agreement is unenforceable as against public policy in Rhode Island.") (applying Rhode Island law).

[44] *See, e.g., Kottler* v. *Gulf Coast Collection Bureau, Inc.,* 460 F. Supp. 3d 1282, 1293 (S.D. Fla. 2020), aff'd, 847 F. App'x 542 (11th Cir. 2021) (debt collector violated section 807(2)(A) when it attempted to collect a debt for which consumer had pending workers' compensation claim); *Young* v. *NPAS, Inc.,* 361 F. Supp. 3d 1171, 1196 (D. Utah 2019) (debt collector violated FDCPA sections 807(2)(A) and 808(1) when it attempted to collect a debt that consumer did not owe under Utah workers' compensation law); *Raytman* v. *Jeffrey G. Lerman, P.C.,* No. 17 CIV. 9681 (KPF), 2018 WL 5113952, at *5–6 (S.D.N.Y. Oct. 19, 2018) (consumer stated claim for violations of FDCPA sections 807 and 808 when debt collector sought to collect debt that consumer did not owe under New York Medicaid payment rules).

[45] *See generally CFPB Circular 2022–05: Debt collection and consumer reporting practices involving invalid nursing home debts* (Sept. 8, 2022), *available at:* https://www.consumerfinance.gov/compliance/circulars/circular-2022-05-debt-collection-and-consumer-reporting-practices-involving-invalid-nursing-home-debts/.

[46] This may be the case even if terms of the contract creating the debt would make a given consumer liable. *See, e.g., Tuttle* v. *Equifax Check,* 190 F.3d 9, 13 (2d Cir. 1999) (noting that it would be a violation of section 1692f(1) to collect a fee if State law expressly prohibits such fees, even if the contract allows it).

[47] 15 U.S.C. 1692e(2)(A); 12 CFR 1006.18(b)(2)(i).
[48] 15 U.S.C. 1692f(1); 12 CFR 1006.22(b).
[49] *See Requirements Related to Surprise Billing; Part II,* 86 FR 55980 (Oct. 7, 2021).
[50] *See CFPB Bulletin 2022–01: Medical Debt Collection and Consumer Reporting Requirements in Connection With the No Surprises Act,* 87 FR 3025, 3026 (Jan. 20, 2022).

[51] *See State Surprise Billing Laws and the No Surprises Act,* accessible at: https://www.cms.gov/files/document/nsa-state-laws.pdf, at 2 ("The No Surprises Act supplements State surprise billing law protections; it does not replace them.").
[52] *See, e.g.,* Conn. Gen. Stat. secs. 38a–477aa, 20–7f; Mich. Comp. Laws sec. 333.24507.
[53] *See, e.g., Leslie* v. *Quest Diagnostics, Inc.,* No. CV171590ESMAH, 2019 WL 4668140, at *7 (D.N.J. Sept. 25, 2019) ("Plaintiffs sufficiently allege that Quest's chargemaster prices are unreasonable based on Quest's internal cost structure, the usual and customary rates charged, and payments received for these services by both Quest and other laboratory testing services.").
[54] *Colomar* v. *Mercy Hosp., Inc.,* No. 05–22409–CIV–SEITZ, 2007 WL 2083562, at *4 (S.D. Fla. July 20, 2007) ("Florida law is settled that when the price term in a contract for hospital services is left 'open' or undefined, then the courts will infer a reasonable price.").

explicit price terms in contracts when those terms were determined to be unconscionable under State law, often limiting the price that must be paid to some ''reasonable'' amount as a remedy.[55]

The CFPB reminds debt collectors that State law may determine or limit the amount that medical providers may charge to consumers, and that collection of or an attempt to collect an amount that exceeds the allowable amount under State law (including applicable State case law) may misrepresent the amount of the debt in violation of the FDCPA. Collection or an attempt to collect an amount that exceeds the allowable amount under State law may also violate the prohibition against collecting or attempting to collect an amount unless permitted by law. These State law cases make clear that the collection amount that is ''permitted by law'' may be much less than the amount asserted to be owed by the medical provider. Debt collectors are responsible for ensuring that they do not collect or attempt to collect amounts above that which the relevant consumer(s) can be charged under applicable State and Federal laws. Because, as noted above, the FDCPA imposes strict liability, debt collectors should ensure that they only collect or attempt to collect amounts that may be charged under applicable State law.[56]

### D. Collection of Amounts Not Owed Because Services Not Received

Section 808(1) of the FDCPA prohibits, in relevant part, the collection of any amount ''unless such amount is expressly authorized by the agreement creating the debt or permitted by law.'' [57] And section 807(2)(A) prohibits any false representation of ''the character, amount, or legal status of any debt.'' [58] As relevant here, the ''amount [] expressly authorized by the agreement creating the debt'' means amounts due for services actually rendered under the relevant agreement. Similarly, a ''false representation of the . . . amount . . . of any debt'' includes a representation to a consumer that they owe an amount for services that have not been rendered.

Courts have held that it is a violation of the FDCPA for debt collectors to collect or attempt to collect amounts for services that were not rendered.[59] Medical bills, especially for services rendered in hospitals, are frequently calculated by reference to a standardized set of codes that indicate the type and degree of medical care a patient received. Typically, providers will seek greater compensation for more serious, more urgent, or more involved forms of care. As noted above, if a medical provider designates an aspect of a patient's care with a code that denotes a higher or more involved level of care than was actually received, the provider is said to be ''upcoding.'' [60]

A debt collector that collects or attempts to collect a debt that has been ''upcoded'' violates the FDCPA's prohibitions against unfair or unconscionable debt collection practices because the amount is not expressly authorized by the agreement for services actually rendered and also violates the FDCPA's prohibitions against deceptive or misleading debt collection practices because it would falsely represent the amount of the debt. Debt collectors are responsible for ensuring that they do not collect or attempt to collect amounts that have been charged for services that have not actually been rendered.[61]

### IV. Misrepresentation of the Nature of Legal Obligations

Section 807(2)(A) prohibits any false representation of ''the character, amount, or legal status of any debt.'' A ''false representation of the . . . legal status of any debt'' includes representations to a consumer about the legal nature of the provider's claim for payment and the legal rights and obligations that arise under that particular type of claim.

As described above, there are a variety of ways in which medical bills and the amounts demanded therein differ from consumer transactions where a consumer agrees to a known and definite price in exchange for goods or services. In medical billing, consumers sometimes enter agreements that have undefined price terms or are billed by providers with whom the consumer has never entered into an express agreement. The legal basis for a provider's claim for payment in such circumstances therefore also varies, and each such basis may have different implications for a consumer's legal rights or obligations. For example, under some States' laws, providers sometimes demand payment for services on the basis of an account stated theory, whereby a party presents another with an alleged statement of account and a legal obligation to pay that amount arises if the receiving party does not object within a reasonable period of time.[62] The inverse is also true under these State's laws: an account stated claim cannot be maintained if the receiving party disputes the alleged statement of account within a reasonable period of time before making payments on the account.[63]

However, the variations in medical billing and the associated legal consequences are not readily apparent or known to most consumers.[64] Most

---

[55] *See, e.g., Ahern* v. *Knecht,* 563 NE2d 787, 793 (Ill. App. 1990) (price term in contract for appliance repair was unconscionable and repairman would be allowed only ''the actual value of his services''); *Toker* v. *Westerman,* 274 A.2d 78, 81 (N.J. Super. 1970) (price term in contract for sale of refrigerator was unconscionably high; court refused to enforce term, relieving the defendant-consumer from obligation to pay remaining balance owed); Restatement (Second) of Contracts sec. 208— Unconscionable Contract or Term, cmt. g (1981) (''the offending party [to an unconscionable contract] will ordinarily be awarded at least the reasonable value of performance rendered by him''); *see also De La Torre* v. *CashCall, Inc.,* 422 P.3d 1004, 1009 (Cal. 2018) (''As long established under California law, the doctrine of unconscionability reaches contract terms relating to the price of goods or services exchanged.'').

[56] Debt collectors may be able to minimize risk of misrepresentations in these circumstances by working with client medical providers to ensure that pricing and billing practices comply with applicable legal limits.

[57] 15 U.S.C. 1692f(1); 12 CFR 1006.22(b).

[58] 15 U.S.C. 1692e(2)(A); 12 CFR 1006.18(b)(2)(i).

[59] *Langley* v. *Statebridge Co., LLC,* No. CIV.A. 14–6366 JLL, 2014 WL 7336787, at *3 (D.N.J. Dec. 22, 2014) (consumer stated claim under FDCPA section 807(2)(A) when debt collector attempt to collect debt for tax and insurance payments not actually made by creditor); *Fitzsimmons* v. *Rickenbacker Fin., Inc.,* No. 2:11–CV–1315 JCM PAL, 2012 WL 3994477, at *3 (D. Nev. Sept. 11, 2012).

[60] *See* Centers for Medicare & Medicaid Servs., *Common Types of Healthcare Fraud,* at 2 (2016), https://www.cms.gov/files/document/overviewfwacommonfraudtypesfactsheet072616pdf. (''Upcoding is a term that is not defined in [] regulations but is generally understood as billing for services at a higher level of complexity than the service actually provided or documented in the file.''); *U.S. ex rel. Harris* v. *Bernad,* 275 F. Supp. 2d 1, 4 (D.D.C. 2003) (''The government alleges that the defendants engaged in 'upcoding'—that is, submitted claims with CPT codes that represented a level of care higher than the defendants actually provided.'').

[61] Nothing in this Advisory Opinion should be interpreted to mean that in order to mitigate risk of violations of the FDCPA debt collectors should obtain access to documents beyond relevant patient contracts or bills. Again, debt collectors may be able to minimize risk of misrepresentations in these circumstances by working with client medical providers to ensure appropriate billing practices.

[62] *See, e.g., Univ. of S. Ala.* v. *Bracy,* 466 So.2d 148, 150 (Ala. Civ. App. 1985) (stating elements of account stated claim under Alabama law in medical context); *Egge* v. *Healthspan Servs. Co.,* No. CIV. 00–934 ADM/AJB, 2001 WL 881720, at *2 (D. Minn. July 30, 2001) (elements of account stated claim under Minnesota law in medical context).

[63] *See, e.g., Grandell Rehab. & Nursing Home, Inc.* v. *Devlin,* 809 N.Y.S.2d 481 at *3 (N.Y. Sup. Ct. 2005) (rejecting nursing home's account stated claim because, among other reasons, receiving consumer disputed their liability and the amounts) (citing *Abbott, Duncan & Wiener* v. *Ragusa,* 214 A.D.2d 412, 413 (N.Y. App. Div. 1995)).

[64] When evaluating a claim under section 807 of the FDCPA, courts apply the ''least sophisticated debtor'' standard. *See, e.g., Jensen* v. *Pressler & Pressler,* 791 F.3d 413, 420 (3d Cir. 2015) (applying ''least sophisticated debtor'' standard to evaluate liability under section 807); *McCollough* v. *Johnson, Rodenburg & Lauinger, LLC,* 637 F.3d 939, 952 (9th

consumers understand a demand for payment from a debt collector to mean that they owe the full amount demanded. The least sophisticated consumer presented with a demand for payment may believe that the full demanded amount is legally owed.[65] In particular, a consumer may be unlikely to know that, in the absence of an express agreement and definite price term, a debt collector's demand for payment may not accurately reflect the consumer's actual legal obligation to the provider under State law.[66]

A debt collector that collects or attempts to collect a debt where the amount is not based on an express contractual price term risks violating the FDCPA's prohibitions against deceptive or misleading debt collection practices if the debt collector gives the misleading impression that the amount demanded is final and that precise amount is legally owed. Moreover, because, as noted above, the FDCPA imposes strict liability, debt collectors are responsible for ensuring that they do not collect or attempt to collect debts in a way that deceives or misleads a consumer, explicitly or impliedly, about the legal status of the medical provider's claim and a consumer's right to object to claims, as appropriate; a debt collector may misrepresent the legal status of the debt even if the collector is relying on information provided by the medical provider. When dealing with uncertainty arising from the lack of express agreement, debt collectors may be able to minimize their risk of engaging in violations by communicating clearly and conspicuously with consumers about the legal status of the debt and the amount owed, for example, as appropriate, that an enforceable payment obligation may not exist until proven in court.

## V. Substantiation of Medical Debts

Section 807(2)(A) prohibits any false representation of "the character, amount, or legal status of any debt." When a debt collector makes a demand for payment of a debt or otherwise represents that a consumer owes a debt, the collector makes an implied representation that it has a reasonable basis to assert the character, amount, and legal status of the debt.[67] A debt collector violates the prohibition against false representations if the collector has no reasonable basis on which to represent that the specific amount demanded is due and legally collectible.

The many unique features of the markets for medical care and services present particularly acute risks of uncertainty as to the "character, amount, or legal status" of debts that are incurred in these markets. As described above, the health care market is complex, variable, and opaque. Prices charged by providers vary widely even for the same treatment or procedure and are often conditional, changing based on factors that often cannot be known before services are rendered. A variety of State and Federal laws may impact a consumer's liability for payment, in whole or in part, or for the amount that may be charged. Billing and payment are complicated by the involvement of third-party payors such as insurers, public compensation programs, or tortfeasors. And the nature or legal basis of a provider's claim for payment may be unclear, often due to a lack of express agreements. While this level of uncertainty may arise from the inherently complex reality of medical care and the broader heath care system, it underscores the need for debt collectors to properly substantiate the character, amount, and legal status of medical debt before they begin collection, in accord with consumer's expectations that debt collectors have a reasonable basis for their demands.[68]

Although a debt collector must be able to substantiate claims regarding the amount and validity of the debt made to a consumer, including those made at the outset of collection, the type and amount of information that is necessary to substantiate a particular representation will vary depending upon the claim itself, the circumstances surrounding the claim, and the need to observe patients' privacy rights under relevant law. The inherently uncertain and conditional nature of the costs of and payments for medical care means that debt collectors should exercise heightened care to ensure that they have a reasonable basis to assert that the debt is legally collectible and the specific amount is owed. For example, consider a debt collector that receives summary information concerning accounts for collection from a provider group that operates within a hospital. An initial reasonable step to substantiate the debts prior to collection may include obtaining any relevant patient agreements or contracts executed by the relevant patients. If, as is often the case, there is no contract between patients and the provider group, the debt collector may need documents sufficient to make a prima facie case for the demanded amount under the applicable State law. Consider another example where a debt collector is onboarding a hospital client. The debt collector may reduce risk of liability if it has access to full payment histories for the patient accounts, including any payments from third parties covering any portion of an overall demanded amount, and to confirm the hospital's compliance with any affirmative legal obligations, such as requirements to assess consumers under financial assistance policies if the hospital is a non-profit [69] or otherwise participates in financial assistance programs, to ensure that there is a reasonable basis for the demanded amount.[70]

Regulators, including the CFPB, have brought actions against debt collectors for failing to substantiate collection

---

Cir. 2011) (same); *Jeter* v. *Credit Bureau, Inc.,* 760 F.2d 1168, 1177 n.11 (11th Cir. 1985) (same).

[65] *See, e.g., Miller* v. *Carrington Mortgage Servs., LLC,* 607 B.R. 1, 5–6 (D. Me. 2019) (consumer alleged fear that "he would never be free from demands for payment" or that debt collector had "found a way of getting around the bankruptcy discharge protections."); *cf. Daugherty* v. *Convergent Outsourcing, Inc.,* 836 F.3d 507, 513 (5th Cir. 2016) ("[A] collection letter seeking payment on a time-barred debt (without disclosing its unenforceability) but offering a 'settlement' and inviting partial payment (without disclosing the possible pitfalls) could constitute a violation of the FDCPA."); *Buchanan* v. *Northland Grp., Inc.,* 776 F.3d 393, 399 (6th Cir. 2015) (consumer stated claim under section 807(2)(A) when debt collector offered to "settle" time-barred debt at a discount and noting that rule under Michigan law that partial payment revives a time-barred debt "is almost assuredly not within the ken of most people, whether sophisticated, whether reasonably unsophisticated, or whether unreasonably unsophisticated").

[66] *C.f. Shula* v. *Lawent,* 359 F.3d 489, 491–92 (7th Cir. 2004) (affirming finding of liability under section 807 where debt collector attempted to collect amount of court costs that were not in fact awarded in State law action); *Van Westrienen* v. *Americontinental Collection Corp.,* 94 F. Supp. 2d 1087, 1101–02 (D. Or. 2000) (consumer stated claim under section 807(2)(A) when debt collector's communications suggested that wage garnishment or asset seizure would occur "within 5 days" when such legal action was not procedurally possible in that time span); *Biber* v. *Pioneer Credit Recovery, Inc.,* 229 F. Supp. 3d 457, 473–74 (E.D. Va. 2017) (consumer stated claim under section 807(2)(A) when debt collector threatened to garnish wages without disclosing that it had not in fact taken preliminary procedural steps required to do so).

[67] *See Debt Collection Practices (Regulation F),* Final Rule, 85 FR 76734, 76857 (Nov. 30, 2020) (codified at 12 CFR part 1006) ("[I]it is clear that a debt collector must have (or have access to) records reasonably substantiating its claim that a consumer owes a debt in order to avoid engaging in deceptive or unfair collection practices in violation of the FDCPA when it attempts to collect the debt.").

[68] As noted above, nothing in this Advisory Opinion should be interpreted to mean that in order to mitigate risk of violations of the FDCPA debt collectors are encouraged to obtain access to documents beyond relevant patient contracts or bills as permitted under applicable privacy laws.

[69] *See* 26 U.S.C. 501(r).

[70] This example is provided merely as an illustration of the kinds of information that may be necessary to properly substantiate debt collection information in a given circumstance and is not offered as a complete or exhaustive list that would guarantee compliance in all circumstances.

information for accuracy and completeness before beginning collection efforts when there were indications that the information suffered from a high degree of uncertainty or unreliability.[71] For example, many debt collectors operate as ''debt buyers,'' purchasing large portfolios of debts from creditors or other debt collectors at significant discounts from the face value of the underlying debts.[72] These ''portfolios'' of debts may functionally be little more than spreadsheets containing purported information concerning debts and may not be accompanied by underlying contracts, customer agreements, or other documentation evidencing the existence and amount of the debts.[73] This information may be facially unreliable, such as when the sellers of the debt explicitly disclaim its accuracy or collectability or when it is readily apparent that the information is inaccurate.[74] In these circumstances, the CFPB and other regulators have alleged that the debt collectors were on notice that collecting or attempting to collect the purported debts based on the information in their possession could lead to widespread or repeated violations of section 807(2)(A).[75] Proceeding to collect the purported debts based on that unsubstantiated information misrepresented to the affected consumers that the collectors had a reasonable basis for their collection attempts.[76] Importantly, this misrepresentation did not rely on a finding that the claimed amount was incorrect—for which a debt collector can be separately liable, *see generally* section II, *supra*—but on their failure to substantiate the validity and amounts of the debts that were sought.

Debt collectors working with medical debts are responsible for ensuring that they possess a reasonable basis for collecting or attempting to collect those debts. Collecting or attempting to collect medical debts without substantiation violates section 807(2)(A).

## VI. Defining Default Under the FDCPA

The prohibitions imposed by sections 807 and 808 of the FDCPA apply only to ''debt collectors.''[77] As relevant here, Section 803 of the FDCPA defines ''debt collector'' in two ways: (1) ''any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts,'' or (2) any person ''who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.''[78] The statute also provides a limited number of exemptions from the definition of ''debt collector.'' One of those exemptions carves out of the definition ''any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person.''[79] In the context of medical debt collection, for purposes of section 803(6)(F)(iii)'s exemption, whether a debt is ''in default'' is determined by the terms of any agreement between the consumer and the medical provider under applicable law governing the agreement.[80]

The term ''default'' is not specifically defined in the FDCPA, so the meaning of the term should first be determined by its ordinary meaning.[81] ''Default'' is commonly defined as the failure to satisfy an agreement, promise, or obligation, especially a failure to make a payment when due.[82] These definitions are consistent with the longstanding common law use of the word as a party's failure to perform contractual obligations at the time they come due.[83] Further, applicable law—typically State contract law—may determine when obligations are due under a contract.

However, some third-party firms collecting on past-due medical bills have argued that the bills were not in default because the firm or the creditor did not consider or treat the accounts as in default until some later date.[84] To the contrary, under the plain meaning of ''default,'' when a ''default'' has occurred for purposes of section 803(6)(F)(iii) with respect to medical bills is determined based on the terms of the relevant consumer-provider

---

[71] *See, e.g.,* Complaint for Civil Penalties, Injunctive and Other Relief, *United States* v. *Asset Acceptance, LLC,* No. 12–00182 (M.D. Fla. Jan. 30, 2012), ECF No. 1 (*Asset Acceptance Compl.*); Consent Order, *Encore Capital Grp., Inc.,* CFPB No. 2015–CFPB–0022 (Sept. 9, 2015) (*Encore Consent Order*); Consent Order, *Portfolio Recovery Assocs., LLC,* CFPB No. 2015–CFPB–0023 (Sept. 9, 2015) (*PRA Consent Order*).

[72] *See Asset Acceptance Compl.* ¶¶ 9–10; *Encore Consent Order,* ¶ 22; *PRA Consent Order,* ¶ 24.

[73] *See Asset Acceptance Compl.,* ¶ 11; *Encore Consent Order,* ¶ 23; *PRA Consent Order,* ¶ 27.

[74] *See Asset Acceptance Compl.,* ¶ 11–16, 49–52; *Encore Consent Order,* ¶¶ 24–35; *PRA Consent Order,* ¶¶ 28–32.

[75] *See Asset Acceptance Compl.,* ¶ 81–83; *Encore Consent Order,* ¶ 112–114; *PRA Consent Order,* ¶ 103–105.

[76] *See Asset Acceptance Compl.,* ¶ 54–55; *Encore Consent Order,* ¶ 45–47, 78–81, 103–105; *PRA Consent Order,* ¶ 63–66, 94–96,.

[77] 15 U.S.C. 1692e (''A *debt collector* may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.) (emphasis added); 15 U.S.C. 1692f (''A *debt collector* may not use unfair or unconscionable means to collect or attempt to collect any debt.'') (emphasis added).

[78] 15 U.S.C. 1692a(6). Section 803 also provides that the term ''debt collector'' ''includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts'' as well as, ''[f]or the purpose of section 808(6), . . . any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests.'' 15 U.S.C. 1692a(6). The term ''creditor'' is defined as ''any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another.'' 15 U.S.C. 1692a(4).

[79] 15 U.S.C. 1692a(6)(F)(iii). The exemptions under section 803a(6)(F)—including the exemption for debt collection activity that ''concerns a debt which was not in default at the time it was obtained by such person''—explicitly apply only to persons collecting or attempting to collect debts ''owed or due another.'' *Compare* 15 U.S.C. 1692a(6)(F) (exemption that references ''owed or due another'') *with* 15 U.S.C. 1692a(6)(A)–(E) (exemptions that do not use ''owed or due another'' language).

[80] *De Dios* v. *Int'l Realty & Invs.,* 641 F.3d 1071, 1074 (9th Cir. 2011). Outcomes for non-express agreements may vary considerably under relevant State law, and this Advisory Opinion takes no position on the correct interpretation of those laws.

[81] *See, e.g., Lawson* v. *FMR LLC,* 571 U.S. 429, 440 (2014); *see also, e.g., Taniguchi* v. *Kan Pac. Saipan, Ltd.,* 566 U.S. 560, 566 (2012) (''When a term goes undefined in a statute, we give the term its ordinary meaning.'').

[82] *See, e.g., Default Merriam-Webster.com Dictionary,* https://www.merriam-webster.com/dictionary/default/ (accessed Aug. 19, 2024) (''failure to do something required by duty or law . . . a failure to pay financial debts''; *Default, Black's Law Dictionary* (11th ed. 2019) (''The omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due.''); *Default, Ballentine's Law Dictionary* (3d ed. 1969) (''Fault; neglect; omission; the failure to perform a duty or obligation; the failure of a person to pay money when due or when lawfully demanded.'').

[83] *See, e.g., The Restatement (First) of Contracts Index D80* (1932) (''Default: See Breach of Contract.''); *Restatement (Second) of Contracts* sec. 235(2) (1981) (''When performance of a duty under a contract is due any non-performance is a breach.''); *23 Williston on Contracts* sec. 63:16 (4th ed.) (''It is a material breach of a contract to fail to pay any substantial amount of the consideration owing under the contract.''); *Butler Mach. Co.* v. *Morris Constr. Co.,* 682 NW2d 773, 778 (S.D. 2004) (''Morris was to make monthly payments of $5,547 and its failure to make such monthly payments constituted a default under the terms of that agreement.'').

[84] *See Ward* v. *NPAS, Inc.,* 63 F.4th 576, 583–84 (6th Cir. 2023) (Though medical provider's bill said ''due on receipt'' court considered evidence that provider ''didn't treat Ward's failure to pay immediately as a breach'' dispositive to the question of whether debt was in default when placed with third-party.); *Prince* v. *NCO Fin. Servs., Inc.,* 346 F. Supp. 2d 744, 749 (E.D. Pa. 2004) (''This evidence of Capital One's State of mind with regard to whether the debt was in default is a satisfactory initial showing that Capital One did not consider Prince's account to be ''in default.''); *Roberts* v. *NRA Grp., LLC,* No. CIV.A. 3:11–2029, 2012 WL 3288076, at *6 (M.D. Pa. Aug. 10, 2012) (''[W]hether Plaintiff's account was in default will be determined by looking at the 'state of mind' of the creditor to see whether the creditor considered the debt to be in default.'').

agreements under applicable law. It is the terms of the contract—the "[o]bjective indicators of the debt's status" at the time it was obtained [85]— that governs when collection of medical debts is covered by the FDCPA, not the subjective state of mind of the medical debt collector.[86]

In addition to being consistent with the term's plain meaning, reading "default" as coextensive with contractual breach under applicable law is consistent with Congress's intent to apply this exemption to "servicers" of debt that is not in default at the time the person obtains it. The FDCPA's legislative history explains that Congress "[did] not intend the definition [of debt collector] to cover the activities of . . . mortgage service companies and others who service outstanding debts for others, so long as the debts were not in default when taken for servicing." [87] These references make clear the intended distinction between a consumer who has failed to meet their contractual obligation to pay and a consumer who has an outstanding debt but under their contract repays it over a defined period of time (i.e., their failure to pay the entire outstanding balance on a payment due date does not breach the contract).[88] Courts and the Federal Trade Commission (FTC) have likewise recognized a distinction between a debt that may yet be "outstanding" but for which a consumer is not necessarily "in default." [89]

In the context of medical debt, amounts owed are not typically paid on a regular, recurring schedule over time pursuant to the terms of a contract. To the contrary, as noted above, medical debts are contractually generally due in full at a given time. Medical debt collectors therefore do not "service" debts on an ongoing basis like the mortgage servicers intended to be covered by this exemption.

To be sure, the terms of a given contract or the principles of applicable law may differentiate between one (or more) missed payments and contractual breach, in which case the debt may not be "in default" if a single payment is missed. But absent such terms or applicable legal principle, failure to make full payment by the given time constitutes a breach of the consumer's contractual obligation. If a person obtains that debt (or the right to collect it) after that failure to make full payment, that person has obtained a debt "in default at the time it was obtained" and therefore does not qualify for the section 803(6)(F)(iii) exemption.

Finally, defining "default" for purposes of section 803(6)(F)(iii) by reference to relevant consumer-provider agreements and background legal principles also best effectuates the statute's purpose and Congress' intent, closes off avenues for regulatory evasion, and is consistent with prior regulatory interpretations. The FDCPA is a remedial consumer protection statute aimed at curbing abusive and unscrupulous conduct by debt collectors and establishing comprehensive national standards for the debt collection industry.[90] As such, the statute's provisions are interpreted liberally in favor of consumers' interests.[91] Defining "default" by reference to the relevant consumer agreements and applicable governing law advances consumer interests because it is an objective, transparent standard that a consumer or their advocate can apply to ascertain the status of a party seeking to collect money that is claimed to be owed by the consumer. Relatedly, an objective standard for defining "default" prevents debt collectors from attempting to expand the section 803(6)(F)(iii) exemption by reference to the subjective intent or belief of the collector or creditor or by reference to agreements or policy documents that the consumer has no access to.[92] And this interpretation is consistent with prior staff advisory opinions on this definition issued by the FTC in the period when that agency had primary regulatory authority over the FDCPA.[93]

## VII. Regulatory Matters

The CFPB has concluded that the advisory opinion is an interpretive rule in part and a general statement of policy in part. Insofar as the advisory opinion constitutes an interpretive rule, it is issued under the CFPB's authority to interpret the Fair Debt Collection Practices Acts and Regulation F, including under section 1022(b)(1) of the Consumer Financial Protection Act of 2010, which authorizes guidance as may be necessary or appropriate to enable the CFPB to administer and carry

---

[85] Mavris v. RSI Enters., 86 F. Supp. 3d 1079, 1088 (D. Ariz. 2015).

[86] Echlin v. Dynamic Collectors, Inc., 102 F. Supp. 3d 1179, 1185 (W.D. Wash. 2015) (rejecting defendant's argument that it did not "consider" plaintiffs debt to be in default until a particular dunning letter was sent because "Dynamic's belief that Echlin's account was not in default is not dispositive of whether default had in fact occurred"); Hartman v. Meridian Fin. Servs., Inc., 191 F. Supp. 2d 1031, 1043–44 (W.D. Wis. 2002) (holding that defendant did not meet section 803(6)(F)(iii) exception and rejecting argument that defendant does not "consider" a buyer to be in default before end of 30-day cure period when buyer's contract with creditor expressly provided that buyer would be in default "if he fails to pay on time").

[87] S. Rep. No. 95–382, at 3–4 (1977), as reprinted in 1977 U.S.C.C.A.N. 1695, 1698. In its section-by-section discussion of the bill, the report reiterates that "The term [debt collector] does not include . . . persons who service debts for others." S. Rept. No. 95–382, at 7, 1977 U.S.C.C.A.N. 1695, 1701.

[88] Of course, an entity that operates as a mortgage servicer does not enjoy a blanket exemption from the FDCPA for all its activities and can still satisfy the definition of "debt collector" for those debts that were in default when they were obtained by the entity. See, e.g., Babadjanian v. Deutsche Bank Nat'l Tr. Co., No. CV1002580MMMRZX, 2010 WL 11549894, at *5 (C.D. Cal. Nov. 12, 2010) (collecting cases); S. Rep. No. 95–382, at 3–4 (1977), as reprinted in 1977 U.S.C.C.A.N. 1695, 1698 ("so long as the debts were not in default when taken for servicing).

[89] See, e.g., Alibrandi v. Fin. Outsourcing Servs., Inc., 333 F.3d 82, 86 (2d Cir. 2003) (collecting cases that "distinguish[] between a debt that is in default and a debt that is merely outstanding"); FTC, Annual Report to Congress on the Fair Debt Collection Practices Act (2000), (available at https://www.ftc.gov/reports/annual-report-congress-fair-debt-collection-practices-act-0) ("[Section 803(6)(F)(iii)] was designed to avoid application of the FDCPA to mortgage servicing companies, whose business is accepting and recording payments on current debts.") (emphasis in original) (citing S. Rep. No. 95–382).

[90] See 15 U.S.C. 1692(e) ("It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.").

[91] See, e.g., Salinas v. R.A. Rogers, Inc., 952 F.3d 680, 683 (5th Cir. 2020) ("Because Congress intended the FDCPA to have a broad remedial scope, the FDCPA should be construed broadly and in favor of the consumer.") (internal quotations omitted); Brown v. Card Serv. Ctr., 464 F.3d 450, 453 (3d Cir. 2006) ("Because the FDCPA is a remedial statute . . . we construe its language broadly, so as to effect its purpose. . . ."); Johnson v. Riddle, 305 F.3d 1107, 1117 (10th Cir. 2002) ("Because the FDCPA, like the Truth in Lending Act (TILA), 15 U.S.C. 1601 et seq., is a remedial statute, it should be construed liberally in favor of the consumer.").

[92] See, e.g., Alibrandi v. Fin. Outsourcing Servs., Inc., 333 F.3d 82, 88 (2d Cir. 2003) (rejecting argument by debt collector that default status of debt should be determined by a "letter agreement" between the collector and creditor); Echlin v. Dynamic Collectors, Inc., 102 F. Supp. 3d 1179, 1185 (W.D. Wash. 2015) ("Dynamic's belief that Echlin's account was not in default is not dispositive of whether default had in fact occurred."); Mavris v. RSI Enters., 86 F. Supp. 3d 1079, 1086 (D. Ariz. 2015) ("[T]he lender's subjective choice that the debtor has not defaulted cannot be dispositive of whether default has in fact occurred. If it were, debtors' access to FDCPA protections would be subject to the whim of creditors, who could leave debtors completely in the dark about when, if ever, those protections commence. Objective indicia of a creditor's treatment of a debt are entitled to greater weight.").

[93] See, e.g., FTC, Staff Opinion Letter, 1989 WL 1178045 at *1 n.2 (Apr. 25, 1989) ("Whether a debt is in default is generally controlled by the terms of the contract creating the indebtedness and applicable state law.").

out the purposes and objectives of Federal consumer financial laws.[94]

Insofar as the advisory opinion constitutes a general statement of policy, it provides background information about applicable law and articulates considerations relevant to the CFPB's exercise of its authorities. It does not confer any rights of any kind.

The CFPB has determined that this rule does not impose any new or revise any existing recordkeeping, reporting, or disclosure requirements on covered entities or members of the public that would be collections of information requiring approval by the Office of Management and Budget under the Paperwork Reduction Act.[95]

Pursuant to the Congressional Review Act,[96] the CFPB will submit a report containing this interpretive rule and other required information to the United States Senate, the United States House of Representatives, and the Comptroller General of the United States prior to the rule's published effective date. The Office of Information and Regulatory Affairs has designated this interpretive rule as a ''major rule'' as defined by 5 U.S.C. 804(2).

**Rohit Chopra,**
*Director, Consumer Financial Protection Bureau.*

[FR Doc. 2024–22962 Filed 10–3–24; 8:45 am]
**BILLING CODE 4810–AM–P**

---

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**14 CFR Part 39**

**[Docket No. FAA–2024–0768; Project Identifier AD–2022–00504–R; Amendment 39–22825; AD 2024–16–19]**

**RIN 2120–AA64**

**Airworthiness Directives; Bell Textron Inc. Helicopters**

**AGENCY:** Federal Aviation Administration (FAA), DOT.
**ACTION:** Final rule.

**SUMMARY:** The FAA is adopting a new airworthiness directive (AD) for certain Bell Textron Inc. Model 212, 412, 412CF, and 412EP helicopters. This AD was prompted by reports of cracked tail boom attachment barrel nuts (barrel nuts). This AD requires replacing all steel alloy barrel nuts with nickel alloy barrel nuts, replacing or inspecting other tail boom attachment point hardware, repetitively inspecting torque, and repetitively replacing tail boom attachment bolts (bolts). This AD also prohibits installing steel alloy barrel nuts. The FAA is issuing this AD to address the unsafe condition on these products.

**DATES:** This AD is effective November 8, 2024.

The Director of the Federal Register approved the incorporation by reference of certain publications listed in this AD as of November 8, 2024.

**ADDRESSES:**

*AD Docket:* You may examine the AD docket at *regulations.gov* under Docket No. FAA–2024–0768; or in person at Docket Operations between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The AD docket contains this final rule, any comments received, and other information. The address for Docket Operations is U.S. Department of Transportation, Docket Operations, M–30, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue SE, Washington, DC 20590.

*Material Incorporated by Reference:*

• For Bell material identified in this AD, contact Bell Textron Inc., P.O. Box 482, Fort Worth, TX 76101; phone: (450) 437–2862 or 1–800–363–8023; fax: (450) 433–0272; email: *productsupport@bellflight.com;* or website: *bellflight.com/support/contact-support.*

• You may view this material at the FAA, Office of the Regional Counsel, Southwest Region, 10101 Hillwood Parkway, Room 6N–321, Fort Worth, TX 76177. For information on the availability of this material at the FAA, call (817) 222–5110. It is also available at *regulations.gov* under Docket No. FAA–2024–0768.

**FOR FURTHER INFORMATION CONTACT:** Jacob Fitch, Aviation Safety Engineer, FAA, 1801 S Airport Road, Wichita, KS 67209; phone: (817) 222–4130; email: *jacob.fitch@faa.gov.*

**SUPPLEMENTARY INFORMATION:**

**Background**

The FAA issued a notice of proposed rulemaking (NPRM) to amend 14 CFR part 39 by adding an AD that would apply to certain serial-numbered Bell Textron Inc. (Bell) Model 212, 412, 412CF, and 412EP helicopters. The NPRM published in the **Federal Register** on May 8, 2024 (89 FR 38841). The NPRM was prompted by reports of cracked barrel nuts on Model 412EP helicopters. According to Bell, the root cause for cracking can vary from corrosion damage, high time in service, or hydrogen embrittlement. Barrel nut cracking can also cause loss of torque on the associated bolt and subsequent bolt cracking. Due to design similarities, Model 212, 412, and 412CF helicopters are also affected.

In the NPRM, the FAA proposed to require, for certain serial-numbered Model 212, 412CF, 412, and 412EP helicopters, replacing the upper left-hand (LH) steel alloy barrel nut and bolt with a new nickel alloy barrel nut, retainer, and bolt. For certain other serial-numbered Model 412 and 412EP helicopters, the FAA proposed to require removing the upper LH steel alloy barrel nut, inspecting the removed upper LH steel alloy barrel nut and replacing it with a nickel alloy barrel nut and retainer, and either inspecting or replacing the upper LH bolt. For those serial-numbered Model 212, 412, 412CF, and 412EP helicopters, the FAA also proposed to require removing the upper right-hand (RH), lower LH, and lower RH steel alloy barrel nuts, inspecting those removed steel alloy barrel nuts and replacing them with new nickel alloy barrel nuts and retainers, and either inspecting or replacing the upper RH, lower LH, and lower RH bolts. Thereafter for those helicopters, as well as for one additional serial-numbered Model 412/412EP helicopter, the FAA proposed to require inspecting the torque applied on each bolt to determine if the torque has stabilized and, depending on the results, replacing and inspecting certain tail boom attachment point hardware and repeating the torque inspections, or applying torque stripes. For all applicable helicopters, the FAA proposed to require repetitively inspecting the torque applied on each bolt within a longer-term compliance time interval and, depending on the results, replacing and inspecting certain tail boom attachment point hardware and repeating the torque inspections and stabilization, or applying torque stripes. Additionally, for all applicable helicopters, within a longer-term compliance time interval, the FAA proposed to require repetitively replacing the upper LH bolt and inspecting the other three bolts and, depending on the results, taking corrective action. Following accomplishment of those actions, the FAA proposed to require inspecting the torque applied on each bolt to determine if the torque has stabilized and, depending on the results, replacing and inspecting certain tail boom attachment point hardware and repeating the torque inspections, or applying torque stripes. Lastly, the FAA proposed to prohibit installing steel alloy barrel nuts on any helicopter. The

---

[94] 12 U.S.C. 5512(b)(1).
[95] 44 U.S.C. 3501–3521.
[96] 5 U.S.C. 801 *et seq.*