**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ACA INTERNATIONAL, LLC; COLLECTION BUREAU SERVICES, INC. | |
| Plaintiffs, | |
| v. | Case No. 1:24-cv-03118-DLF |
| CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | |
| Defendants. | |

**MOTION ON APPLICATION FOR PRELIMINARY INJUNCTION AND**
**TEMPORARY RESTRAINING ORDER**

When a federal agency's "advisory opinion" issued weeks before a national election "interprets" the law targeting the medical debt collection business and forces collectors to spend $400,000.00 more per year to comply with brand new requirements, it is a rulemaking, not an interpretation. The new rule, under the guise of an "advisory opinion," issued by the Consumer Financial Protection Bureau ("CFPB") in early October, will impose novel restrictions and obligations that create massive costs and administrative burdens on over one thousand businesses attempting to collect "medical debt," *i.e.*, past-due accounts arising from healthcare services (the "Advisory Opinion"). *See* 89 Fed. Reg. 80715–24 (Oct. 4, 2024).

The men and women of the debt collection industry who ensure that merchants and service providers are fairly paid can be an easy target during an election year, as most of the population does not relish the idea of paying debts. Nevertheless, informal and out-of-court debt collection keeps our

American commercial systems functioning. When the debt at issue arises from healthcare services, timely payment on past due accounts directly supports our medical care providers – and thus ensures that patients throughout the country have options for care in their communities. But this care has come under attack from an agency that seems increasingly focused on partisan political wins.

The Advisory Opinion requires collectors to step into the shoes of healthcare providers and audit medical procedures to ensure the providers' compliance with various laws and regulations. These new requirements are uncompelled by statute. The Advisory Opinion also tells collectors to be intimately involved in the medical coding process (a special skill usually reserved for in-house specialists at a medical care facility, with over 74,000 codes to choose from) and to substitute their judgment for the judgment of their clients—the actual health care providers. It mandates that detailed patient medical records be handled by debt collectors, and turns medical billing firms that currently can offer less expensive services for healthcare providers into a new class of third-party collectors (notwithstanding that Congress and the CFPB already have very specific language about who are covered as "debt collectors" under the Fair Debt Collection Practices Act and Regulation F).

This motion for a preliminary injunction and temporary restraining order seeks to enjoin the rule from taking effect before its December 3, 2024 implementation date. An injunction here is warranted because the rule bypassed the mandatory federal Administrative Procedure Act ("APA") and exceeds the Bureau's authority. It also sets impossible standards that are contrary to the FDCPA's plain text, as well as the CFPB's previous determinations when the agency finalized the debt collection rule at Regulation F, 12 C.F.R. Part 1006. Further, the Advisory Opinion cites no evidentiary basis, no studies, and no input from the public while it simultaneously adopts standards in conflict with Centers for Medicare & Medicaid Services ("CMS") "bad debt" rules and contrary to the privacy goals of the Health Insurance Portability and Accountability Act, Pub. L. No. 104–191 (1996) ("HIPAA").

The complex problems inherent in the American healthcare payments system deserve a comprehensive analysis, Congressional directives, and the opportunity for public notice and comment. The CFPB deprived Plaintiffs and the American public of this right when it issued the Advisory Opinion.

Plaintiffs ACA International, LLC ("ACA") and Collection Bureau Services, Inc. ("CBS") (collectively, "Plaintiffs") bring this action against Defendants CFPB and Rohit Chopra, in his official capacity as Director of the CFPB. Plaintiffs seek a temporary restraining order and preliminary injunction on an emergency basis and expedited briefing schedule to enjoin the adoption of the Rule in contravention of current law under the FDCPA and Regulation F.

## I.    BACKGROUND

According to Defendant CFPB, about $88 billion of outstanding medical bills are currently due and owing to America's healthcare providers. These bills are generated from services ranging from emergency care, treatment of complex disease, dental and orthodontic care, or elective procedures. This debt exists for a myriad of reasons. First, America relies upon an opaque third-party payor system that complicates provider repayment. For example, one in three inpatient claims submitted by providers to commercial insurers in first quarter 2023 weren't paid for over three months and 15% of inpatient and outpatient claims were initially denied.[1] Second, hospitals and physicians have complex pricing systems—largely because the country's largest payor chronically underpays: Medicare paid a record-low 82 cents for every dollar spent by hospitals caring for Medicare patients in 2022. This resulted in about $100 billion in Medicare underpayments that year

---

[1] American Hospital Association, <u>Report: Hospitals struggle to collect payments from commercial insurers</u> (May 22, 2023) at https://www.aha.org/news/headline/2023-05-22-report-hospitals-struggle-collect-payments-commercial-insurers .

alone.[2] Thus, commercially insured patients often subsidize the 60 million patients who receive Medicare coverage.

America also has a physician availability problem. It's estimated that more than 83 million people in the U.S. currently live in areas without sufficient access to a primary care physician.[3] In large parts of Idaho and Mississippi, for example, pregnant women can't find OBGYNs to care for them. *Id*. Ninety percent of counties in the U.S. are without a pediatric ophthalmologist. Eighty percent are without an infectious disease specialist. More than one-third of Black Americans live in cardiology deserts. *Id*. Experts cite economic disincentives and bureaucratic health care systems as the primary causes for this problem. *Id.*

Congress empowered the U.S. Department of Health and Human Services ("HHS") to address these and other problems with American healthcare services. HHS has 13 operating divisions, including 10 agencies in the U.S. Public Health Service and three human services agencies.[4] Moreover, Congress establishes healthcare policy—including payments policy—through legislation that is typically codified in Title 42 of the U.S. Code. *See* 42 U.S.C. § 27 *et. seq*. Title 42 has 164 separate Chapters, which each set forth Congress' views on public health and welfare.

The CFPB Defendant in this matter, however, is not an HHS agency. Nor does the CFPB have any authorities granted under any chapter in Title 42. Rather, the CFPB is an independent agency under the Federal Reserve. 12 U.S.C. § 5491(a). Nevertheless, in the so-called "interpretive" rule at issue in this lawsuit, without any notice or comment, the CFPB made

---

[2] American Hospital Association, <u>Government Programs Don't Cover the Cost of Caring … Hospitals Need Support, Not More Payment Cuts That Would Jeopardize Access to Care and Services</u> (Jan. 26, 2024) at https://www.aha.org/news/perspective/2024-01-26-government-programs-dont-cover-cost-caring-hospitals-need-support-not-more-payment-cuts-would.
[3] American Medical Association, <u>AMA president sounds alarm on national physician shortage</u> (Oct. 25, 2023) at https://www.ama-assn.org/press-center/press-releases/ama-president-sounds-alarm-national-physician-shortage.
[4] HHS, About HHS (visited Nov. 15, 2024) at https://www.hhs.gov/about/index.html.

healthcare payment policy that data shows will make it more difficult for healthcare providers to recoup $ 88 billion in revenue. This cannot be allowed.

## A.    <u>The Advisory Opinion Adds New Requirements for FDCPA Compliance.</u>

The CFPB has no authority under Title 42, but does implement the Fair Debt Collection Practices Act ("FDCPA").  *See* 15 U.S.C. §§ 1692–1692p. The FDCPA limits the actions of third party debt collectors, including ACA members and CBS, who collect debts on behalf of another entity or person. 15 U.S.C. § 1692f. One of the FDCPA's many provisions is the requirement in section 808(1) that prohibits, in relevant part, the collection of any amount "unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1). And section 807(2)(A) prohibits any false representation of "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A).

Although styled as a "reminder" to debt collectors of their legal obligations, the Advisory Opinion involves legislative rulemaking and establishes four new obligations for debt collectors attempting to collect on medical debt. One, the Advisory Opinion requires debt collectors to analyze for accuracy account-level documents like hospital bills and treatment plans before its first contact with a consumer. Two, the Advisory Opinion requires, prior to the first consumer contact, that debt collectors decide if the amount charged to the patient is "reasonable" or not "unconscionable" under state common law. Three, the Advisory Opinion requires debt collectors to audit how medical procedures are performed to ensure that patients were not "upcoded" or billed for items or care they did not actually receive. Lastly, the Advisory Opinion redefines when a payment for healthcare services is in "default" so that ordinary medical bills are suddenly considered "debts" in third-party collections. *See generally* 89 Fed. Reg. 80716 (executive summary).

**B.**     <u>The CFPB is Changing Healthcare Policy in the U.S.</u>

    The CFPB has previously interfered in healthcare policy. On June 11, 2024, the CFPB issued a proposed rulemaking concerning the suppression of medical debt on consumer credit reports. The rule would prohibit consumer reporting agencies from furnishing information about medical debts to potential creditors, and therefore prohibit parties such as debt collectors from furnishing medical debt information to consumer reporting agencies. *See* 89 Fed. Reg. 51682. This rule, if implemented, would decrease medical account collections referred to third-party debt collectors by eight-percent, thus reducing revenue for medical service providers.[5]

    The CFPB's authority to regulate the medical industry is notably absent from regulations or the Dodd-Frank Act, 12 U.S.C. § 5512. In fact, in prior publications the CFPB has disclaimed authority over medical debt. The CFPB itself has stated that it has authority to regulate the debt collection market because that "is a market for financial products and services under the Act," but that debt arising from medical expenses should be excluded because it is "unrelated to consumer financial products or services." 77 Fed. Reg. 9597 (Feb. 17, 2012). Further, Congress explicitly stated its intent to delegate to the CFPB the authority to regulate reporting of medical debt only to the extent required to protect the privacy of consumers. *See* 15 U.S.C. § 1681b(g)(2), (5). The 2024 FCRA rulemaking attempt came after the CFPB's previous effort to convince credit reporting agencies to suppress accurate information about unpaid medical debts for debts less than $500.

    The CFPB is attempting to regulate an area it knows nothing about. Congress delegated rulemaking authority over healthcare to HHS, 42 U.S.C. § 3501 *et seq.*, the Department of Labor, 29 U.S.C. § 551 *et seq.*, and the U.S. Treasury, 31 U.S.C. § 301 *et. seq.*, which are tasked with creating laws and regulations surrounding healthcare and health insurance.  In fact, Congress

---

[5] Federal Register, *Comment from Economic Analysis [sic] Dr. Andrew Rodrigo Nigrinis*, Regulations.gov (Nov. 15, 2024, 6:22 PM), https://www.regulations.gov/comment/CFPB-2024-0023-1019.

recently passed the No Surprises Act to address some of these issues. *See* Consolidated

Appropriations Act of 2021, Pub.L. 116–260 (2020). But Congress decidedly did not delegate any

regulatory authority in this space to the CFPB. Further, the CFPB's attempts go well beyond its

explicit authority to "regulate the offering and provision of consumer financial products or services

under the Federal consumer financial laws." 12 U.S.C. § 5491(a). The Advisory Opinion goes well

beyond that statutory authorization and impedes the direct statutory authority of HHS, Labor and

the Treasury.

**C.**    **Plaintiffs Challenge the Advisory Opinion on Multiple Bases Under the APA.**

Because the CFPB's Advisory Opinion constitutes several substantive and material changes

in the law,  Plaintiffs are likely to prevail on their action seeking declaratory judgment and

permanent injunctive relief. Plaintiffs bring five counts under the Administrative Procedure Act

and the U.S. Constitution against both the CFPB and Rohit Chopra, in his official capacity as

Director of the CFPB:

- Plaintiffs' Count I is for violation of APA sections 553 and 706(2)(A), (D). (*See generally* Compl. ¶¶ 110–113, ECF No. 2-1.) APA section 553 requires that federal agencies provide general notice of proposed rulemaking, shall publish such notice in the Federal Register, and shall then provide opportunity for public comment on the proposed rulemaking. 5 U.S.C. § 553. The CFPB did not engage in full notice-and-comment rulemaking in this instance.

- Plaintiffs' Count II is for an APA violation under sections 553 and 706(2)(A), as the CFPB's actions were arbitrary and capricious. (*See* Compl. ¶¶ 114–120.) In issuing the Advisory Opinion, the CFPB acted arbitrarily and capriciously by failing to make available any studies or data underlying its rule, failing to consider (or even request) any commentary, failing to consider the factors required by its implementing statute, failing to explain its reasoning sufficiently, failing to support its conclusions with substantial evidence, and by changing its view from prior rulemaking. (*Id.*) Thus, the agency's actions were arbitrary and capricious in violation of APA sections 553 and 706(2)(A).

- Plaintiffs' Count III is for an APA violation under section 706(2)(D), without observance of procedure required by law. (*Id.* at ¶¶ 121–123.) In issuing the Advisory Opinion, the CFPB did not comply with the Regulatory Flexibility Act ("RFA") (5 U.S.C. §§ 601–612), Small Business Regulatory Enforcement Fairness Act ("SBREFA") (5 U.S.C. §601–612), or the Paperwork Reduction Act ("PRA")

(44 U.S.C. § 3501–3521). (*Id.* at ¶ 122.) As the Advisory Opinion was a legislative rule, *supra*, the CFPB failed to comply with these requirements and thus violated APA section 706(2)(D).

- Plaintiffs' Count IV is for an APA violation for the CFPB exceeding its statutory jurisdiction, authority, or limitations under section 706(2)(C). (*See* Compl. ¶¶ 124–129.) The Advisory Opinion interprets the FDCPA in a manner that is inconsistent with existing debt collection law, including the FDCPA and Regulation F, as well as HHS regulations concerning Medicare "bad debt" and HIPAA. (*Id.* at ¶¶ 126–127.) By interpreting the FDCPA in this manner, the Advisory Opinion exceeds the Bureau's statutory jurisdiction, authority, or limitations. (*Id.*) Further, the CFPB exceeded its statutory limitations when it failed to sufficiently consider the factors proscribed for CFPB rulemaking under the Dodd-Frank Act, 12 U.S.C. § 5512. (*Id.* at ¶ 128.) Thus, the agency's actions exceeded its statutory jurisdiction, authority, and limitations violating the APA under section 706(2)(C).

- Plaintiff's Count V is for a violation of the Appropriations Clause of the U.S. Constitution, 12 U.S.C. § 5497(a)(1), and sections 706(2)(A), (B) of the APA. (*Id.* at ¶¶ 130–136.) The CFPB is funded by the Federal Reserve's combined earnings, which have not existed since September 2022. (*Id.* at ¶¶ 133–134.) Therefore, the CFPB did not have constitutionally-authorized funding to issue the Advisory Opinion, violating the APA as "not in accordance with law" and "contrary to a constitutional right, power, privilege, or immunity." (*Id.* at ¶ 136.)

These violations will each substantially and materially harm ACA, CBS, and ACA members if the Advisory Opinion is allowed to take effect on December 3, 2024.

## II.    <u>LEGAL STANDARDS</u>

### A.    <u>Procedural Posture</u>

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008) ). To prevail, a party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (internal quotation marks omitted). The instant application for a preliminary injunction and temporary restraining order seeks to maintain the status quo.

If the plaintiff fails to establish a likelihood of success on the merits, the court "need not proceed to review the other three preliminary injunction factors." *Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009). The plaintiff cannot prevail without a "substantial indication of likely success on the merits." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 281 F.Supp.3d 88, 99 (D.D.C. 2017) ("[A]bsent a substantial indication of likely success on the merits, there would be no justification for the Court's intrusion into the ordinary processes of administration and judicial review." (internal quotation marks omitted) ), *aff'd*, 897 F.3d 314 (D.C. Cir. 2018). As discussed below, and as is evident from the declarations accompanying this motion, Plaintiffs are highly likely to succeed on the merits. *See* Decl. of S. Purcell on behalf of ACA (**Ex. A**); Decl. of J. Whipple on behalf of CBS (**Ex. B**); Decl. of S. Ertischek on behalf of CRM (**Ex. C**); and Decl. of J. Gonsalves on behalf of Action Collection (**Ex. D**).

**B.**     <u>**Administrative Procedure Act**</u>

The Court will "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D). In an arbitrary and capricious challenge, the core question is whether the agency's decision was "the product of reasoned decision making." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 52, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also Nat'l Telephone Co-Op. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) ("The APA's arbitrary-and-capricious standard requires that agency rules be reasonable and reasonably explained."). The court "is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856. "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational

connection between the facts found and the choice made." *Id.* (internal quotation marks omitted). When reviewing that explanation, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (internal quotation marks omitted).

For example, an agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [the explanation] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* The party challenging an agency's action as arbitrary and capricious bears the burden of proof. *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

**C.**     **Review must be on Administrative Record, and the Administrative Record before this Court includes only the Federal Register Publication.**

When reviewing final agency action, the court "should have before it neither more nor less information than did the agency when it made its decision, . . . so the APA requires review of 'the whole record.' " *Dist. Hosp. Partners, L.P. V. Sebelius*, 794 F.Supp.2d 162, 173 (D.D.C. 2011) (quoting 5 U.S.C. § 706 and *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)). "A district court reviewing an agency action under the APA's arbitrary and capricious standard does not resolve factual issues." *Atl. Sea Island Grp. LLC v. Connaughton*, 592 F.Supp.2d 1, 12–13 (D.D.C. 2008). Instead, the "entire case on review is a question of law and can be resolved on the agency record in the context of a motion to dismiss under Rule 12(b)(6)." *Id.* (internal quotation marks omitted).  Finally, "the party challenging an agency's action as arbitrary and capricious bears the burden of proof." *Bean*, 2017 WL 4005603, at *5 (quoting *San Luis Obispo Mothers For Peace v. U.S. Nuclear Reg. Comm'n*, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc)).

"No principle of administrative law is more firmly established than that a court must review discretionary actions in terms of the rationale on which the agency acted, rather than 'accept appellate counsel's post hoc rationalizations.' " *Ashland Oil, Inc. v. F.T.C.*, 548 F.2d 977, 981 (D.C. Cir. 1976) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943)). Because the Advisory Opinion was not opened for notice and comment, the only record before the court is that set forth in the Federal Register final publication. 89 Fed. Reg. 80715-80724 (Oct. 4, 2024).

To the extent that an agency action is based on the agency's interpretation of a statute it administers, the court's review is governed by *Loper Bright*. "[W]hen a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it. But courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 144 S.C. 2244, 2273 (2024). Thus, an issue with an agency's statutory interpretation is reviewed *de novo*. *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 992 (D.C. Cir. 2024) (citing *Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2261 & n.4, 2273 (2024)). Instead of deferring to the agency's interpretation of the statute, the court must apply what it regards as the statute's "best" reading. *Id.*

### III.    ANALYSIS

ACA and CBS are the best parties to bring this action, as relief for them will solve the immediate problem. But relief in this matter will benefit society at large. Government agencies looking for political wins cannot be allowed to exceed their statutory authority and change complex systems without public engagement. Based on the arguments below, Plaintiffs seek temporary and/or preliminary injunctive relief.

A.    <u>**ACA and CBS have Standing**</u>

Article III of the U.S. Constitution limits the "judicial Power" of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "[T]here is no justiciable case or controversy unless the plaintiff has standing." *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017). As the Supreme Court has interpreted this requirement, "the irreducible constitutional minimum of standing contains three elements": (1) the plaintiff must have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks omitted). "The burden of establishing these elements falls on the party invoking federal jurisdiction, and at the pleading stage, a plaintiff must allege facts demonstrating each element." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). The plaintiff "must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

An organization like ACA can sue on its members' behalf through "associational standing" when (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The organization's members would otherwise have standing to sue if they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). So long as the plaintiff seeking review is personally "among the injured," *Sierra Club v. Morton*, 405 U.S. 727, 735

(1972), an "injury in fact" can be to "environmental" interests, including aesthetic, conservational and recreational ... interests." *Envtl. Def. Fund v. EPA*, 465 F.2d 528, 531 (D.C. Cir. 1972). To survive a summary judgment motion, the plaintiffs must submit affidavits or other evidence" to establish standing. *Lujan*, 504 U.S. at 563.

As to the first requirement, ACA and CBS alleged a sufficient injury-in-fact. ACA, CBS, and ACA members such as Cascade Receivables Management, Inc. and Action Collection Agencies, Inc. imminently face new substantial costs of compliance if the Advisory Opinion is allowed to go into effect. (Compl. ¶¶ 53, 78, 82–85; Ex. A. ¶¶ 13-14; Ex. B ¶¶ 11–15, 53–54; Ex. C ¶¶ 4–5, 13–15, 50–54; Ex. D ¶¶ 2, 23.) The Advisory Opinion poses an imminent threat to ACA members', including those listed above, revenues. (Compl. ¶ 87–88, Ex. A. ¶ 13) It also poses an imminent threat to ACA's membership levels and revenues from membership dues, harming ACA directly. (Compl. at ¶ 86, Ex. A. ¶ 13). Further, the members face increased legal costs to combat CFPB enforcement under this expanded version of the FDCPA and to deal with the uncertainty and new requirements that this new rulemaking has already caused. (Compl. ¶ 85; Ex. A ¶ 12; Ex. B ¶ 11, Ex. C ¶ 54.) Moreover, if ACA members are unable to collect on accounts they own, these accounts lose all value and become worthless. (Compl. ¶ 88; Ex. C ¶ 5.) These injuries to revenue and property interests are concrete, particular to ACA, ACA members, and CBS, and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560–61. Indeed, evidence shows that friction in the collection process directly causes declined revenues. *Supra* Section I.B, fn.5.

The second standing requirement, traceability, is met. The substantial costs that CBS and ACA and its members face stem directly from the CFPB's new interpretations under the Advisory Opinion to review account-level documents before sending validation notices (*see* Compl. ¶¶ 32–39), meeting the new "reasonableness" standards (*see id.* at ¶¶ 40–54), the new definition of debt in "default" (*see id.* at ¶¶ 55–68), and the new requirement to perform medical procedure audits (*see*

*id.* at ¶¶ 69–80). Without these new requirements imposed by the Advisory Opinion, CBS, ACA, and its members would not face imminent harm from the substantial costs and threat to revenue levels. *Supra* 12.

Finally, the Plaintiff's claims are redressable. "Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663–64 (D.C. Cir. 1996) (footnote omitted).  Plaintiffs seek one substantive form of relief: an order from this Court enjoining the CFPB from enacting and enforcing the Advisory Opinion in its entirety. (Compl. ¶ 107.) The requested relief, if granted, would redress ACA/CBS's alleged injury and preserve the status quo. ACA and CBS state that they face imminent threat to their revenues and costs directly attributable to attempting to comply with the Advisory Opinion; it follows that vacating the government's decision to engage in arbitrary and capricious rulemaking without public notice-and-comment would alleviate that harm.

**B.   <u>Claim 1 – Failure to Engage in Notice-and-Comment Rulemaking in  Violation of APA, 5 U.S.C. §§ 553, 706(2) (A), (D)</u>**

1.   <u>The Advisory Opinion is a Legislative Rule</u>

Despite imposing substantial new regulations on debt collectors and imposing restrictions contrary to another CFPB rule, the CFPB attempted to skirt notice-and-comment rulemaking required by APA section 553 by styling the Advisory Opinion as an "interpretive rule" and a "general statement of policy" of the agency. 89 Fed. Reg. 80723–24. In fact, this rule is legislative and thus subject to notice-and-comment rulemaking under APA section 553.

A rule is interpretive if it "spells out a duty that is fairly encompassed within the [statute or] regulation that the interpretation purports to construe." *Air Transp. Ass'n of Am. v. FAA*, 291 F.3d 49, 55-56 (D.C. Cir. 2002). The inquiry of whether a rule is interpretive turns on four questions. "(1) whether in the absence of the rule there would not be an adequate legislative basis for

enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule." *Am. Mining Cong. v. MSHA*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). "If the answer to any of these questions is affirmative, we have a legislative, not an interpretive rule." *Id.* at 1112.

Critically, D.C. Circuit precedent "does not defer to the agency's view that its regulations are a mere 'clarification of an existing rule' pursuant to the APA; instead, the court conducts its own inquiry into whether the new rules 'work substantive changes in prior regulations.'" *Stuttering Found. of America v. Springer*, 498 F. Supp. 2d 208, 211 (D.C. Cir. 2007) (quoting *Sprint Corp. v. FCC*, 315 F.3d 369, 374 (D.C. Cir. 2003)). "A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (citation omitted).

Of the four questions for determining whether a rule is interpretive or not under *American Mining Congress*, (2) and (3) are not applicable here. The Advisory opinion was published in the Federal Register, not the Code of Federal Regulations. 89 Fed. Reg. 80715–24. The CFPB also did not explicitly invoke its general legislative authority. In fact, it tried to mask its legislative rulemaking under the guise of an "interpretive rule" and a "general statement of policy" of the agency. *Id.* at 80723–24.

a.    The Advisory Opinion is a legislative rule under prong one of *American Mining Congress*

The Advisory Opinion is legislative because there would not be an adequate basis under the FDCPA or Regulation F for an enforcement action if the CFPB hadn't published the Advisory Opinion. Therefore, the CFPB's rulemaking under the Advisory Opinion fails under prong one of *American Mining Congress*. A rule will be deemed legislative when "in the absence of the rule

there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties." *Am. Mining Cong.*, 995 F.2d at 1112.

### (1)    Requirement One: Pre-Contact Verification

First, the Advisory Opinion forces a new requirement on debt collectors to analyze account-level documents before sending a validation notice. (*See* Compl. ¶¶ 32–39.) After the rule is effective, a medical debt collector will violate the FDCPA if it fails to analyze account-level documents and agreements for each patient so the collector may make an independent legal determination that the debt is valid prior to collection–even if there is a services agreement and the balance is accurate. 89 Fed. Reg. 80721–22. This rule requires debt collectors to perform a unilateral verification of the debt before it is requested pursuant to FDCPA § 1692g(b).

The FDCPA § 1692g plainly allows debt collectors to contact consumers about their accounts before reviewing account-level documentation. (*See* Compl. ¶¶ 32–34, ¶¶ 37–39.) The process established by the FDCPA is that a debt collector may form a reasonable belief about the validity of the debt through any valid and proven method—which does not necessarily require review of documents for each consumer account. (*Id.* at ¶¶ 43–44; Ex. A ¶ 16; Ex. B ¶¶ 24, 29; Ex. C ¶¶ 21, 23, 41.) The Advisory Opinion departs from this reliable system, saying that debt collectors may satisfy legal requirements by reviewing account-level documentation before beginning collections:

> Debt collectors may be able to satisfy this requirement by obtaining appropriate information to substantiate those assertions, consistent with patients' privacy. This information could include payment records (including from insurance); records of a hospital's compliance with any applicable financial assistance policy; copies of executed contracts or, in the absence of express contracts, documentation that the creditor can make a prima facie claim for an alleged amount under State law (*e.g.*, "reasonable" or "market rates"). 89 Fed. Reg. 80716.

*Id.*

We acknowledge that this language is couched in "may be able to" language. But notably missing from this detailed list of practices that "satisfy" legal requirements is a description of the practices currently in use: policy and procedure review, sample sets, and reviewing document requested during an FDCPA's § 1692g validation process. (Ex. C ¶¶ 21-32.) The affirmative requirement-setting in this opinion is also demonstrated by the CFPB's closing warning: "[c]ollecting or attempting to collect medical debts without substantiation violates [FDCPA] section 807(2)(A)." 89 Fed. Reg. 80722.

Had the CFPB not intended to change the law, it could have noted the well-settled law that the FDCPA does not require a debt collector to independently investigate each account prior to collection.[6] It might also have cited the importance of the current process established by the FDCPA's plain text, that the FDCPA and Regulation F require a debt collector to provide debt verification to the consumer or cease collection if the consumer disputes the debt in writing within 30 days after receiving the debt collector's initial written notice. 15 U.S.C. § 1692g; (Ex. C ¶¶ 16, 18). Existing law under the FDCPA is clear that a debt collector has the option of either providing the consumer debt verification or ceasing collection. 15 U.S.C. § 1692g. Requiring pre-collection investigation conflicts with the FDCPA's plain language and would render the verification process provided by § 1692g(a) superfluous. S*ee, e.g., Azar v. Hayter*, 874 F. Supp. 1314 (N.D. Fla. 1995)

---

[6] *See, e.g., Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1276-77 (11th Cir. 2011) ("the FDCPA does not require debt collectors to independently investigate and verify the validity of a debt to qualify for the bona fide error defense"); *Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1173-74 (9th Cir. 2006) ("Within reasonable limits, [Defendants] were entitled to rely on their client's statements to verify the debt. Moreover, the FDCPA did not impose upon them any duty to investigate independently the claims presented") (internal citations omitted); *Jenkins v. Heintz*, 124 F.3d 824, 834 (7th Cir. 1997) (holding that a debt collector has no obligation to conduct an independent debt validity investigation); *Smith v. Transworld Systems, Inc.*, 953 F.2d 1025, 1032 (6th Cir. 1992) (debt collectors are entitled to rely on the information they receive from the creditor); *Huebner v. Midland Credit Mgmt., Inc.*, 2016 WL 3172789, *6 (E.D. N.Y. June 6, 2016), *aff'd*, 897 F.3d 42 (2d Cir. 2018) (debt collector "had no obligation to independently investigate the debt prior to beginning collection.).

("No provision of the FDCPA has been found which would require a debt collector independently to investigate the merit of the debt, *except to obtain verification*, or to investigate the accounting principles of the creditor, or to keep detailed files.") (emphasis added).

### (2)    Requirement Two: Considering Legal Defenses

Second, the CFPB's new reasonableness-of-pricing standard is contrary to existing law and sets a new binding standard. The Advisory Opinion requires medical debt collectors, when attempting to collect a medical debt that is not created by an express contract between the consumer and healthcare provider setting forth the dollar amount of the services, to make a legal determination that a debt is reasonable and not unconscionable pursuant to state law. *See* 89 Fed. Reg. 80719–20. Essentially, the CFPB wants debt collectors to consider whether a consumer has a legal defense based on reasonableness or unconscionability prior to initial communication. The new standard will require debt collectors to substantially change their practices. (Compl. ¶¶ 45–49; Ex. B ¶¶ 30–35; Ex. C ¶¶ 33–37; Ex. D 13–14.) And this requirement will be outrageously expensive to implement—CBS estimates it will cost at least $ 400,000 annually in additional staffing. (Compl. ¶¶ 50–54; Ex. B ¶ 15.)

Under existing law, debt collectors are not required to make an independent legal determination as to whether the consumer has any potential legal defense to the debt prior to collection. *See Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1276–77 (11th Cir. 2011); *supra* III.B.1.a.(1) fn. 6. Additionally, debt collectors collect debt on behalf of third-parties and do not own the accounts; they therefore do not have the contractual right to adjust the underlying obligation's contract value. (Compl. ¶ 42; Ex. B ¶ 28.) Rather, a consumer who disagrees with an amount charged may work directly with the healthcare provider to reduce charges. (Compl. ¶ 42; Ex. B ¶ 28.) Currently, debt collectors rely upon existing structures, such as audits from the Centers for Medicare & Medicaid Services ("CMS") and enforcement of federal price transparency law to

form a reasonable belief in the price accuracy charged to patients. (Compl. ¶ 43; Ex. B ¶ 29.) In addition, debt collectors like Plaintiff CBS take reasonable precautions like reviewing a client's policies and procedures and researching a provider's regulatory history to establish a reasonable belief in the accuracy of account balance information. (Compl. ¶ 43; Ex. B ¶ 29.)

The Advisory Opinion requires medical debt collectors, when attempting to collect a medical debt that is not created by an express contract between the consumer and healthcare provider setting forth the dollar amount of the services, to make a legal determination that a debt is reasonable and not unconscionable pursuant to state law:

> The CFPB reminds debt collectors that State law may determine or limit the amount that medical providers may charge to consumers, and that collection of or an attempt to collect an amount that exceeds the allowable amount under State law (including applicable State case law) may misrepresent the amount of the debt in violation of the FDCPA. *See* 89 Fed. Reg. 80719–20.

This additional obligation on debt collectors represents a new standard. The Advisory Opinion's new standard eviscerates debt collectors' reasonable reliance upon their client's policies and regulatory history and subjects debt collectors to enforcement and private litigation risk that did not exist prior to this Advisory Opinion. (Ex. B ¶¶ 28, 31; Ex. C ¶¶ 34–37.)

### (3)    Requirement Three: Reviews for Upcoding

The Advisory Opinion requires debt collectors to audit how medical procedures are performed to ensure that patient bills were not "upcoded," and billed for items or care they did not actually receive. 89 Fed. Reg. 80717. The Advisory Opinion explains that medical bills, especially those from visits to hospitals, are often calculated based on a standardized set of codes that correspond to the type and degree of medical attention a patient received. The more serious, urgent, or involved the care, the higher the charge as that fits the resources used to treat the patient. *Id.* The Advisory Opinion states that collecting on "upcoded" bills is an FDCPA violation, even if was

done pursuant to hospital billing policies and pricing, and even if it is consistent with the agreement between the consumer and the hospital. *Id.*

The Advisory Opinion says that it is an FDCPA violation to collect an account that has been "upcoded":

> A debt collector that collects or attempts to collect a debt that has been "upcoded" violates the FDCPA's prohibitions against unfair or unconscionable debt collection practices because the amount is not expressly authorized by the agreement for services actually rendered and also violates the FDCPA's prohibitions against deceptive or misleading debt collection practices because it would falsely represent the amount of the debt. *Id.* at 80720.

The concerning statement in this directive is that the Bureau is establishing a new FDCPA violation when there may be upcoding and "the amount is not expressly authorized by the agreement for services actually rendered." *Id.* In CBS's experience, for example, many agreements with hospitals provide that a patient will be billed for services in accordance with hospital policy. (*See* Compl. ¶ 71; Ex. B ¶ 45.) Moreover, debt collectors would have no reason to know that "upcoding" occurred unless they performed a detailed audit on each bill or invoice. (Ex. B ¶ 46; Ex. C ¶ 39; Ex. D ¶ 22.) ACA members—in order to ensure that they are not collecting on debts that are potentially "upcoded"—will need to conduct invasive and expensive audits of medical providers. (Ex. B ¶¶ 47–49; Ex. C ¶¶ 42–44; Ex. D ¶¶ 21–22.) It is asking collectors to be intimately involved in the coding process (over 74,000 codes to choose from) and to substitute their judgment for the judgment of their clients—the actual health care providers. (Ex. A. ¶ 19.) The new requirement would require an outrageous expansion of staff to review each bill and each procedure to determine if medical bill coding accurately captured the medical services and devices provided. (Ex. B ¶ 15; Ex. C ¶¶ 52–53; Ex. D ¶ 23.) Moreover, this type of detailed review would be a serious invasion of patient privacy and run contrary to the Health Insurance Portability and Accountability Act, Pub. L. No. 104–191 (1996) ("HIPAA"). (Compl. ¶ 84; (Ex. B ¶¶ 51–52.)

The FDCPA expressly allows debt collectors to seek payment for amounts authorized by agreement. 15 U.S.C. § 1692f(1). Yet the Advisory Opinion states that collecting on "upcoded" bills is an FDCPA violation, even if was done pursuant to hospital billing policies and pricing, and even if it is consistent with the agreement between the consumer and the hospital. 89 Fed. Reg. 80717.

### (4)    Requirement Four: Redefining Default

Finally, the new definition of a debt in "default" extends the FDCPA to the entire medical billing industry without a legal basis. The Advisory Opinion redefines "default" for medical debt where the consumer and healthcare provider have not otherwise defined the term by agreement, to occur when the consumer has failed to pay in full "at a given time," regardless of how the creditor treats the debt:

> To be sure, the terms of a given contract or the principles of applicable law may differentiate between one (or more) missed payments and contractual breach, in which case the debt may not be ''in default'' if a single payment is missed. But absent such terms or applicable legal principle, failure to make full payment by the given time constitutes a breach of the consumer's contractual obligation. If a person obtains that debt (or the right to collect it) after that failure to make full payment, that person has obtained a debt ''in default at the time it was obtained'' and therefore does not qualify for the section 803(6)(F)(iii) exemption. 89 Fed. Reg. 80723.

This new bright-line rule that all debts are in "default" if they are not paid in full "at a given time," regardless of how the creditor is treating the debt, is contrary to longstanding law interpreting the FDCPA and constitutes a substantive change of law, rather than a mere explanation or interpretation of existing law. (*See* Compl. ¶¶ 56–59.)

Under current law, The FDCPA only applies to debt that is in "default" when obtained by the debt collector. *See* 15 U.S.C. § 1692a(6)(F)(iii). "Default" is not defined in the FDCPA; however, where the agreement between the creditor and the debt collector does not define the term, courts interpreting the FDCPA generally consider the facts and circumstances surrounding the relationship between the consumer, creditor, and debt collector to determine if a debt is in "default"

under the FDCPA. *See, e.g., Mavris v. RSI Enterprise Inc*., 86 F. Supp. 3d 1079, 1086 (D. Ariz. 2015) (the question a court must answer to determine if a debt is in "default" under the FDCPA is whether, "at the time a third party obtains a debt for collection, would a reasonable person in the debtor's position believe that the creditor viewed the debt as being in default"). When neither an agreement between the consumer and creditor nor state law defines when a consumer defaults, courts make a factual determination on a case-by-case basis to determine whether a debt is in "default" under the FDCPA. *See, e.g., Echlin v. Dynamic Collectors, Inc*., 102 F. Supp. 3d 1179, 1185 (W.D. Wash. 2015).

The CFPB's interpretation of "default" would materially change debt collectors' practices, particularly those with medical billing services businesses in addition to their debt collection businesses. (*See* Compl. ¶¶ 60–68; Ex. B ¶¶ 40–43; Ex. D ¶¶ 17–20.) Practically, this would cause a medical account to go into "default" if the bill is not paid within 30 days of billing. (*See* Compl. ¶¶ 60–68; Ex. B ¶¶ 40–43; Ex. D ¶¶ 17–20.) This is problematic because it directly conflicts with rules promulgated by the Centers for Medicare & Medicaid Services ("CMS"), which provides that a debt may be deemed uncollectible only if it remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary and after the other requirements of 42 U.S.C. § 413.89(e) have been met. 42 U.S.C. § 413.89(e)(2)(i)(3);  (*see* Compl. ¶ 56).

The Advisory Opinion's directive that any account is in default that is not paid in full at the "due by" date is a substantive and material change of law that does substantial harm to healthcare providers and patients. (*See id.* at ¶¶ 55–56.) Indeed, the Advisory Opinion expressly acknowledges that this is a change in law when it states that the purpose of this interpretation is to set, "an objective standard for defining ''default'' [that] prevents debt collectors from attempting to expand the section 803(6)(F)(iii) exemption by reference to the subjective intent or belief of the

collector or creditor or by reference to agreements or policy documents that the consumer has no access to." 89 Fed. Reg. 80723.

In sum, after reviewing the old standards and comparing them to the new standards established by the Advisory Opinion, the CFPB clearly is attempting to establish requirements that if not met will allow it to assert new claims against debt collectors. The Advisory Opinion sets forth a factual scenario, explains how covered persons must act in those scenarios, and says that failure to act as proscribed is a law violation. In the four instances discussed above, the required actions are new and not previously dictated by statute. Absent these new rules, the FDCPA would not otherwise support action for failure to do as the CFPB directs in this rule. Therefore, it is a legislative rule under *American Mining Congress*. 995 F.2d at 1112.

           b.      The Advisory Opinion is a legislative rule under prong four of *American Mining Congress*

At least one aspect of the CFPB's rulemaking under the Advisory Opinion also fails under *American Mining Congress* prong four because the "rule effectively amends a prior legislative rule." *Am. Mining Cong.*, 995 F.2d at 1112.

The Advisory Opinion's new requirement to review account-level documents before sending a validation notice is contrary to a previous CFPB rulemaking. (*See* Compl. ¶¶ 35–36.) In enacting Regulation F, the CFPB explicitly declined to include a rule that debt collectors are obligated to substantiate a debt prior to collection, finding that such a rule was "not advisable" without the "benefit of public notice and comment." *See* 85 Fed. Reg. 76734, 76857 n.27 ("The Bureau received feedback asking the bureau to include in the final rule certain interventions that the Bureau did not pose; many such comments addressed debt collectors' obligation to substantiate debts. The Bureau concludes that it is not advisable to finalize such interventions without the benefit of public notice and comment and therefore does not address such comments further in the Notice.") (emphasis added). In the instant Advisory Opinion, however, the CFPB does just what it

determined not to do in a prior rule. This provision, therefore, is directly contrary to a prior agency position. The CFPB did not explain the necessity for this change or its rationale for this change.

2.    The CFPB did not Provide Notice as Required under the APA

Once the Court has determined that the agency has promulgated a legislative rule, it must then determine if its legislative rulemaking violated the APA.

The APA requires that, before undertaking certain actions, federal agencies publish a "[g]eneral notice of proposed rulemaking" in the Federal Register and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)–(c). Section 553 exempts "interpretative rules" and "general statements of policy" from notice and comment procedures. 5 U.S.C. § 553(b)(3)(A). Nonetheless, an agency may not label a substantive change to a rule an interpretation simply to avoid the notice and comment requirements. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000).

Notice need include only "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b); *see also  U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 700 (D.C. Cir. 2016) (stating that the APA requires agencies to "provide sufficient factual detail and rationale for [a proposed] rule to permit interested parties to comment meaningfully" (quotation marks omitted)).

The D.C. Circuit's critical-material doctrine, which states that "[u]nder APA notice and comment requirements, among the information that must be revealed for public evaluation are the technical studies and data upon which the agency relies in its rulemaking." *Banner Health v. Price*, 867 F.3d 1323, 1336 (D.C. Cir. 2017) (internal quotation marks omitted). *But see* 5 U.S.C. §

553(b)(3) (requiring only that notice shall include "either the terms or substance of the proposed rule or a description of the subjects and issues involved"); *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524, (1978) ("[S]ection [553] of the Act established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures."); *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (observing a "tension between *Vermont Yankee* and our critical material doctrine"); *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 246 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (writing that the D.C. Circuit's critical-material doctrine "cannot be squared with the text of § 553 of the APA" and that "the Supreme Court ... rejected this kind of freeform interpretation of the APA ... [in] its landmark *Vermont Yankee* decision"). However, the law of the D.C. Circuit "is not imposing new procedures but enforcing the agency's procedural choice by ensuring that it conforms to APA requirements." *Banner Health*, 867 F.3d at 1337.

The critical-material doctrine applies here because the CFPB has failed to put forth *any* data it relied on in reaching the conclusions within the Advisory Opinion.[7] In the Advisory Opinion's "Background" section, the CFPB cites to a few web articles to substantiate the US medical debt burden's size. 89 Fed. Reg. 80716. It cites some articles about how medical pricing is not very transparent or that it varies. *Id.* It cites some studies about the costs to the US healthcare system for "upcoding." *Id.* at 80716–17. However, never does the Advisory Opinion discuss *any* evidence or data that substantiates the effects that the new rule will have on the healthcare industry, debt collectors, or consumers.

Even if the critical-material doctrine does not apply here, the Advisory Opinion still runs afoul of notice-and-comment requirements under APA section 553. The CFPB did not provide

---

[7] The logical-outgrowth doctrine does not apply here because there was no proposed rule and final Rule.

notice of an intent to issue an opinion nor did it accept comments from the public when it promulgated the Advisory Opinion. There was no SBREFA panel related to this rule. The Advisory Opinion does not contain a cost-benefit analysis or any studies that measured the necessity, impact, paperwork, or expense of the rules in the Advisory Opinion. If ACA, ACA members, and CBS had been provided the opportunity to comment on a proposed Advisory Opinion, it would have provided documents and data informing the CFPB that its proposal would harm consumers, harm the healthcare industry, and cause the negative effects set forth in the Complaint. (*See generally* Compl. ¶¶ 25–80; Ex. B ¶ 18.)

> 3.    The CFPB's lack of notice-and-comment rulemaking will harm Plaintiffs.

CFPB's failure to follow the APA and provide notice-and-comment rulemaking to its Advisory Opinion has already harmed ACA and its members and will in the future cause irreparable harm to ACA, its members, and CBS. First, ACA and its members have already incurred costs reviewing and considering the Advisory Opinion and taking initial steps to comply with the new rules.

These costs are unrecoverable. The harms are not compensable through monetary relief, as the principal violator here has sovereign immunity and no private right of action would aid recoupment.

ACA and its members have also suffered from the CFPB's silencing in violation of the APA. By not engaging in notice-and-comment rulemaking while making substantive changes to current law, the CFPB closed off important channels of communication between it and stakeholders. Had notice and comment happened, ACA, CBS, and ACA members would have pointed out significant costs, harms, and public policy mistakes in the proposed rule. (Compl. ¶ 25; Ex. B ¶ 18; Ex. C ¶ 20.) These stakeholders were deprived of important dialogue about the rule's

costs and benefits as well as how best to comply with the new standards. (Compl. ¶ 25; Ex. B ¶ 18; Ex. C ¶ 20.) The harm caused by curtailment of rights granted by legislation are not compensable.

Finally, should the rules be implemented, ACA members must spend the significant sums to comply, and face government enforcement and private plaintiff litigation if they do not comply. (Ex. B ¶ 15; Ex. C ¶¶ 52–54; Ex. D ¶ 23.) Again, no private right of action exists to allow these costs to be recovered.

**C.**     **Claim 2 – Arbitrary and Capricious in Violation of APA, 5 U.S.C. §§ 553, 706(2)(A)**

Plaintiffs are likely to succeed on Count II because the CFPB's failure to provide evidence or data to show that it considered the rules' costs is a separate violation under 5 U.S.C. 706(2)(A).

An agency action must be set aside if a court finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. 706(2)(A). "[A]n agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). "Integral to these requirements is the agency's duty to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules. An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin*., 494 F.3d 188, 199 (D.C. Cir. 2007). The arbitrary and capricious standard of § 706(2) (A) is a "catchall" that generally subsumes the "substantial evidence" standard of § 706(2)(E). *See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 683–84 (D.C. Cir. 1984) ("When the arbitrary or capricious standard is performing that function of assuring factual support, there is no substantive difference between what it requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only

by evidence that is not substantial in the APA sense ...."); *accord Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007).

As a threshold matter, the Advisory Opinion is arbitrary and capricious because it did not provide any evidence in support of its rule changes, much less substantial evidence. No studies were cited regarding the costs of compliance, benefits to consumers, or any other impacts of these numerous changes to current regulation and law. *See generally* 89 Fed. Reg. 80715–24.

The Advisory Opinion's new requirements are not supported by substantial evidence. The Advisory Opinion did not provide any data or evidence from stakeholders of the costs of compliance with these new standards. Further, it did not provide any evidence of the benefit this change may have on consumers. While it attempts to substantiate the costs of "upcoding" nationally, (*see* 89 Fed. Reg. 80716–17), it does not attempt to apply these costs to debt collection, the only persons within the CFPB's purview here. Nor did it discuss the possible burdens on consumers, such as costs passed on by medical providers, or if physicians refuse services unless they are paid in advance.

As an example of the lack of evidence provided within the Advisory Opinion, it states that *often* there is no contract between patients and the provider, so debt collectors may need to collect documents sufficient to make prima facie cases for the demanded amount for *each* of these situations. 89 Fed. Reg. 80721. The CFPB's discussion notes that collecting this information is not a regular practice under current law. *Id.* at 80722 (noting that many debt buyers purchase portfolios of debts that may not be accompanied by underlying contracts or customer agreements. But the Advisory Opinion fails to substantiate the costs associated with these changes. The CFPB's failure to consider these costs and factors is arbitrary and capricious under APA section 706(2)(A).

Likewise, nowhere within the Advisory Opinion does the CFPB consider the data or evidence of stakeholders such as costs of compliance, let alone the actual benefit the margin cases

in this area might bring to consumers. Nor does it attempt to quantify the amount of debts that may be affected by this change. This new standard is simply unsubstantiated and thus arbitrary and capricious in violation of APA section 706(2)(A).

The Advisory Opinion's new definition of "default" is arbitrary and capricious because it was not supported by substantial evidence. The CFPB wholly fails to consider that its new definition of "default" brings within the definition of "debt collector" medical billing services businesses. (*See* Compl. ¶¶ 60–68.) Because of the expansion of the definition of "default" to include anything past its "due by" date, a whole new industry will be subject to the FDCPA. (*Id.*) The Advisory Opinion does not account for estimated costs of compliance for these firms with the FDCPA, which may incur costs of fifty-thousand dollars initially and an estimated twenty-thousand dollars annually per firm, or roughly seventy million dollars the first year and twenty-eight million dollars annually nationally. (*See id.* at ¶¶ 63, 66.) Additionally, it does not account for the increased costs to medical providers that lose the cost-savings of medical billing service companies, and therefore healthcare costs that get passed on to consumers. (Compl. ¶ 67.) The CFPB's failure to consider these costs and factors is arbitrary and capricious under APA section 706(2)(A).

CFPB's arbitrary and capricious implementation of the Advisory Opinion likely will cause irreparable harm to ACA, its members, and CBS. By not providing the data and evidence to substantiate the changes, the CFPB deprives stakeholders such as Plaintiffs the information necessary to reach informed decisions about how best to address these new standards. This will irreparably harm Plaintiffs and will cause them to incur significant costs to comply without justification of the new standards. *Supra* 26. The CFPB's arbitrary and capricious actions further deprive Plaintiffs of their rights under the APA, irreparably harming them.

**D.**    <u>**Claim 3 – Without Observance of Procedure Required by Law, 5 U.S.C. § 706(2)(D)**</u>

In addition to failing to engage in notice-and-comment rulemaking in violation of APA sections 553 and 706(D), the CFPB in issuing its Advisory Opinion violated 706(D) by failing to follow other procedures required by law, namely: the Regulatory Flexibility Act ("RFA") (5 U.S.C. §§ 601–612), Small Business Regulatory Enforcement Fairness Act ("SBREFA") (5 U.S.C. §601–612), or the Paperwork Reduction Act ("PRA") (44 U.S.C. § 3501–3521). As the Advisory Opinion was legislative in nature, the CFPB was subject to the RFA, SBREFA, and the PRA, but it failed to consider all three.

The RFA, modified by the SBREFA, requires an agency subject to publishing general notice under 5 U.S.C. § 553 to publish an initial regulatory flexibility analysis ("IRFA"). 5 U.S.C. § 603(a). "Such an analysis shall describe the impact of the proposed rule on small entities." *Id.* Each IRFA must contain five specific, detailed items as described in section 603(b)(1)–(5), as well as "significant alternatives to the proposed rule." *Id.* at §§ 603(b), (c). The CFPB, as a "covered agency," is required to submit further details beyond those required by section 603(b). *See id.* §§ 603(d), 609(d)(2). Once a final rule is published, that rule is subject to a final regulatory flexibility analysis meeting the requirements of section 604. *Id.* at § 604. Because the CFPB failed to engage in notice-and-comment rulemaking, it did not complete an initial or final regulatory flexibility analysis, in violation of RFA and SBREFA, 5 U.S.C. §§ 603, 604. *See Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 5 (D.C. Cir. 2011) ("The standard of review for [RFA] challenges is governed by the Administrative Procedure Act (APA), pursuant to which we determine whether the agency's actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A), and whether the permit was promulgated 'without observance of procedure required by law,' *id*. § 706(2)(D)").

In particular, Under the Small Business Regulatory Enforcement Fairness Act of 1996

(SBREFA), the CFPB must convene and chair a Small Business Review Panel if it is considering a

proposed rule that could have a significant economic impact on a substantial number of small

entities. 5 U.S.C. 609(b). The Panel considers the impact of the proposals under consideration by

the CFPB and obtains feedback from representatives of the small entities that would likely be

subject to the rule. The Panel comprises a representative from the CFPB, the Chief Counsel for

Advocacy of the Small Business Administration, and a representative from the Office of

Information and Regulatory Affairs in the Office of Management and Budget (OMB). A SBREFA

Panel would have been necessary for this rule. Plaintiff CBS is a "small business" under relevant

definitions, and all of its similarly-situated business will be impacted by this rule. Indeed, the

CFPB convened a Panel related to its FCRA rulemaking concerning medical debt.[8] But the CFPB

did not convene such a panel here, although it should have.

Likewise, the PRA requires an agency subject to publishing general notice and gathering

public comments under 5 U.S.C. § 553 to publish to adhere to the requirements of 44 U.S.C. §§

3506, 3507. This requires that an agency get permission from the Office of Management and

Budget prior to "collection of information" as defined in section 3502(3). Because the CFPB failed

to engage in notice-and-comment rulemaking, it did not take the necessary steps under the PRA, in

violation of 44 U.S.C. §§ 3506, 3507.

Because the CFPB failed to follow proper procedures under the RFA, SBREFA, and the

PRA, its actions in issuing the Advisory Opinion as a final rule without engaging in these

procedures violated the APA under section 706(2)(D). These violations will irreparably harm

ACA, its members, and CBS. Many of ACA's members, including CBS, are afforded protections

by the CFPB's compliance with the RFA, SBREFA, and the PRA. Without these protections, such

---

[8] https://www.federalregister.gov/d/2024-13208/p-134

as special consideration for small businesses under SBREFA, like many ACA members, or special consideration from information gathered from stakeholders under the PRA, Plaintiffs are likely to suffer irreparable harm from the Advisory Opinion.

**E.**    **Claim 4 – Excess of Statutory Jurisdiction, Authority, or Limitations, or Short of Statutory Right, 5 U.S.C. § 706(2)(C)**

In issuing the Advisory Opinion, the CFPB has exceeded its statutory authority and limitations, violating the APA under section 706(2)(C). The Advisory Opinion interprets the FDCPA in a manner that is inconsistent with existing debt collection law, in excess of its statutory authority. Further, it interprets the FDCPA in a manner that is inconsistent with CMS rules and HIPAA, in excess of its statutory authority. Finally, it fails to meet the standards for rulemaking under the Dodd-Frank Act, 12 U.S.C. § 5512, in excess of its statutory limitations.

An administrative agency's power to promulgate legislative regulations is limited to the authority delegated to it by Congress. *VanDerStok v. Garland*, 86 F.4th 179, 187 (5th Cir. 2023) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)). The "core inquiry" of Section 706(2)(C) asks whether the rule in question is a "lawful extension of the statute under which the agency purports to act, or whether the agency has indeed exceeded its 'statutory jurisdiction, authority, or limitations." *Id.* at 188 (quoting 5 U.S.C. § 706(2)(C)).

A court's "task is to construe what Congress has enacted. [A court] begin[s], as always, with the language of the statute." *Duncan v. Walker*, 533 U.S. 167, 172, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). In some statutory interpretation cases, courts must make sense of vague terms, contradictory provisions, or "inartful drafting." *King v. Burwell*, 576 U.S. 473, 491 (2015). This is not one of those cases.  This Court must apply the "ordinary tools of the judicial craft," *Mozilla Corp. v. Fed. Commc'ns Comm'n*, 940 F.3d 1, 20 (D.C. Cir. 2019), including canons of construction, *see ArQule, Inc. v. Kappos*, 793 F. Supp. 2d 214, 219–20 (D.D.C. 2011). These canons confirm what the plain text reveals.

1.    <u>The Pre-Contact Validation Requirements are Contrary to the FDCPA</u>

The CFPB exceeds its FDCPA mandate in two places. First, the Advisory Opinion

provisions that require pre-contact substantiation with account-level documents run contrary to the

express language of FDCPA § 1692g(b):

> If the consumer notifies the debt collector in writing within the thirty-day period described
> in subsection (a) that the debt, or any portion thereof, is disputed, or that the consumer
> requests the name and address of the original creditor, the debt collector shall cease
> collection of the debt, or any disputed portion thereof, until the debt collector obtains
> verification of the debt or a copy of a judgment, or the name and address of the original
> creditor, and a copy of such verification or judgment, or name and address of the original
> creditor, is mailed to the consumer by the debt collector. Collection activities and
> communications that do not otherwise violate this subchapter may continue during the 30-
> day period referred to in subsection (a) unless the consumer has notified the debt collector
> in writing that the debt, or any portion of the debt, is disputed or that the consumer requests
> the name and address of the original creditor. Any collection activities and communication
> during the 30-day period may not overshadow or be inconsistent with the disclosure of the
> consumer's right to dispute the debt or request the name and address of the original
> creditor. 15 U.S. Code § 1692g.

The FDCPA establishes a procedure for the verification of debts that does not include

account-level analysis prior to first contact with a patient. Rather, a validation letter pursuant to

1692g(a) is issued, then if a patient wants the debt substantiated, it may request it in writing

pursuant to 1692g(b). The CFPB's directive that each account be substantiated prior to the period

established in 1692g(b) would render the provision a nullity.

"The authority to issue regulations is not the power to make law, and a regulation contrary

to a statute is void." *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009). It

is long-settled that "[a] regulation which ... operates to create a rule out of harmony with the

statute, is a mere nullity." *Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S.

129, 134, 56 S.Ct. 397, 80 L.Ed. 528 (1936). Thus, the CFPB's Advisory Opinion, which conflicts

with the unambiguous text of the statute, is void. *See* 5 U.S.C. § 706(2)(A), (C); *see Nat'l Min.*

*Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("[W]hen a

reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."). The FDCPA § 1692g(b) "'unambiguously foreclose[s] the agency's statutory interpretation' ... by prescribing a precise course of conduct other than the one chosen by the agency." *Vill. Of Barrington v. Surface Transp. Bd*., 636 F.3d 650, 659 (D.C. Cir. 2011) (quoting Catawba Cnty v. EPA, 571 F.3d 20, 35 (D.C. Cir. 2009)). Therefore, Advisory Opinion Requirements One, Two, and Three must be enjoined and set aside.

      2.    <u>The New Definition of "Default" is Contrary to DHH Rules</u>

The fourth legislative rule in the Advisory Opinion is also contrary to law. The FDCPA establishes that the term "debt collector" does not include "any person collecting or attempting to collect any debt owed or due another to the extent such activity . . . (iii) concerns a debt which was not in default at the time it was obtained by such person." 15 U.S.C. 1692a(6)(F)(iii). "Default" is not defined in the FDCPA; however, where the agreement between the creditor and the debt collector does not define the term, courts interpreting the FDCPA generally consider the facts and circumstances surrounding the relationship between the consumer, creditor, and debt collector to determine if a debt is in "default" under the FDCPA. *See, e.g., Mavris v. RSI Enterprise Inc.,* 86 F. Supp. 3d 1079, 1086 (D. Ariz. 2015) (the question a court must answer to determine if a debt is in "default" under the FDCPA is whether, "at the time a third party obtains a debt for collection, would a reasonable person in the debtor's position believe that the creditor viewed the debt as being in default"). Under existing law, when neither an agreement between the consumer and creditor nor state law defines when a consumer defaults, courts make a factual determination on a case-by-case basis to determine whether a reasonable person in the debtor's position believe that the creditor viewed the debt as being in default. *See, e.g., Echlin v. Dynamic Collectors, Inc*., 102 F. Supp. 3d 1179, 1185 (W.D. Wash. 2015).

The CFPB may have the authority to interpret a term in the statute it implements, but it may not do so contrary to other law. Here, its definition of default is contrary to the "bad debt" rules established by the Department of Health & Human Services' Centers for Medicare & Medicaid Services (CMS), an agency empowered under Title 42. CMS does not allow a provider to declare a Medicare patient bill as delinquent and subject to claim on a Medicare cost report until the debt is greater than 120 days old and has been billed multiple times:

> If after the provider applied reasonable and customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible. Medicare Provider Reimbursement Manual, CMS-Pub 15-2 at 11-11.[9]

The Bureau's new definition of "Default" would put medical billing companies in the position where they must use inaccurate accounting practices to simultaneously comply with both agency's rules.

The instant case is similar to the Department of Education's *ultra vires* rulemaking in *NAACP v. DeVos*, 485 F.Supp.3d 136 (D.D.C. 2020). In *NAACP*, the Department of Education issued a rule in reliance upon the CARES Act. The court observed that although Congress explicitly granted other agencies rulemaking authority in the text of the CARES Act, there was no question that Congress did not vest the Department with express rulemaking authority. *Id.*, 485 F.Supp.3d at 143. Thus the Department must have relied upon its general rulemaking authority. Of course, "[a]n agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority." *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006). "Agencies are ... bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for

---

[9] https://www.cms.gov/regulations-and-guidance/guidance/transmittals/downloads/r5p211.pdf

the pursuit of those purposes." *Id.* And neither of the general rulemaking authority provisions provided support for the Department's actions there.

By interpreting the FDCPA in a manner that is inconsistent with CMS Bad Debt rules, the Advisory Opinion exceeds the Bureau's statutory jurisdiction, authority, or limitations. The language in the CFPB's Enabling Act grants it the authority to "regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws." The CFPB's jurisdiction is thus limited to "financial products" and "financial services." *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (2010); (Compl. ¶¶ 95–97). The Advisory Opinion attempts to expand the CFPB's regulation beyond "financial products" and "financial services" into healthcare billing practices.

3.    The Entire Advisory Opinion Ignores Rulemaking Requirements under Dodd-Frank

The Advisory Opinion also failed to comply with the standards for rulemaking under the Dodd-Frank Act, 12 U.S.C. § 5512. This provision requires, among other things, that the CFPB consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule." *Id.* § 5512(b)(2)(A)(i). These requirements function to limit the CFPB's statutory authority to implement rules and regulations. Here, the CFPB did not consider any costs to consumers, and has not provided any evidence that it considered the costs to consumers or covered persons. Thus, the Advisory Opinion's failure to consider any of these factors violates the APA under section 706(2)(C).

First, "[i]t is ... a cardinal principle of statutory construction that [courts] must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal quotation marks omitted). The Consumer Financial Protection Act ("CFPA") enacted within the Dodd-Frank Act empowers the CFPB to enact

regulations only if these items are considered. Though the surplusage canon "is not absolute," *Lamie v. U.S. Tr.*, 540 U.S. 526, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 299 n.1, 126 S.Ct. 2455, 165 L.Ed.2d 526 (2006), it is plain that Congress requires the CFPB to comply with § 5512 when making rules.

Second, the canon of constitutional avoidance instructs that a court shall construe a statute to avoid serious constitutional problems unless such a construction is contrary to the clear intent of Congress. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). An overly expansive reading of the statute that extends a nearly unlimited grant of legislative power to the CFPB would raise serious constitutional concerns, as other courts have found. *See, e.g., Skyworks*, 524 F.Supp.3d at 757 (noting that such a reading would raise doubts as to "whether Congress violated the Constitution by granting such a broad delegation of power unbounded by clear limitations or principles."); *Tiger Lily*, 992 F.3d at 523 (same); *id.* ("[W]e cannot read the Public Health Service Act to grant the CDC power to insert itself into the landlord-tenant relationship without some clear, unequivocal textual evidence of Congress's intent to do so"); *Terkel*, 521 F.Supp.3d at 669–72 (holding that the CDC's eviction moratorium exceeds the federal government's power under the Commerce Clause). Congress did not express a clear intent to grant the CFPB such sweeping authority.

And third, the major questions doctrine is based on the same principle: courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.' " *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146  L.Ed.2d 121 (2000) (emphasis added)); *Am. Lung Ass'n v. EPA*, 985 F.3d 914, 959 (D.C. Cir. 2021) (collecting cases). There is no question that the decision to impose a nationwide forgiveness of billions of dollars of medical debt is one "of vast economic and political

significance." *Util. Air Regul. Grp.*, 573 U.S. at 324, 134 S.Ct. 2427 (internal quotation marks

omitted). Not only does the Advisory Opinion have substantial economic effects, healthcare

payments policy has been the subject of "earnest and profound debate across the country,"

*Gonzales v. Oregon*, 546 U.S. 243, 267, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006) (internal quotation

marks omitted).

The Patient Protection and Affordable Care Act (ACA)—the sweeping health care reform

sometimes known as "Obamacare"—was enacted in 2010. The law aims to extend health coverage

to uninsured Americans, estimated at the time the bill was passed to number around 47 million.

Since the enactment of the ACA in 2010, more than 2,000 legal challenges have been filed in state

and federal courts contesting part or all of the ACA. A recent challenge involves the ACA

requirement that most private insurance plans cover recommended preventive care services without

cost sharing. *See Braidwood Management v. Becerra*, 104 F.4th 930 (2024). Similarly, the U.S.

Congress has considered multiple bills to amend the current law, *e.g.,* H.R.1628, H.R.1425, S.352,

Better Care Reconciliation Act, Health Care Freedom Act, American Health Care Act, Obamacare

Repeal Reconciliation Act of 2017, Restoring Americans' Healthcare Freedom, Empowering

Patients First Act, Patient Freedom Act, and the Obamacare Replacement Act.

Accepting the CFPB's interpretation would mean that Congress delegated to the CFPB the

authority to resolve not only the important question of shifting the burden of unreimbursed

healthcare expenses, but endless others that are also subject to "earnest and profound debate across

the country." *Gonzales*, 546 U.S. at 267, 126 S.Ct. 904 (internal quotation marks omitted). Under

the CFPB's reading, so long as the CFPB can isolate a consumer expense that has marginally

confusing aspects in its origination, it can establish unworkable and unreasonably expensive

methods required before that expenses' collection. In these cases, there is no limit to the reach of

CFPB authority. "Congress could not have intended to delegate" such extraordinary power "to an

agency in so cryptic a fashion." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 159, 120 S.Ct. 1291. Sadly, medical expenses are rising and the insurance reimbursement process is confusing. But ACA and CBS are "confident that the enacting Congress did not intend to grow such a large elephant in such a small mousehole." *Loving*, 742 F.3d at 1021; *see also Brown & Williamson*, 529 U.S. at 160, 120 S.Ct. 1291. "When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy," the Court must "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp.*, 573 U.S. at 324 (internal quotation marks omitted).

Although some might agree with the CFPB's position as a matter of policy, "[a]n agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 325 (2014).

**F.    Claim 5 – Violation of the U.S. Constitution, 12 U.S.C. § 5497, and APA, Article I, § 9, Clause 7; 12 U.S.C. § 5497(A)(1); 5 U.S.C. § 706(2)(A), (B)**

Plaintiffs' final claim is Constitutional, and therefore may be avoided if it prevails on claims one through four.

On May 16, 2024, the Supreme Court issued its opinion in *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd., No. 22-448 (U.S. Nov. 14, 2022)*. The Supreme Court decided that the CFPB's funding mechanism complied with the Appropriations Clause. *Id*. at 420–21. The Supreme Court then held that only CFPB's funding from the Federal Reserve's "combined earnings" complied with the requirements of the Appropriations Clause because the "money [is] otherwise destined for the general fund of the Treasury." *Id*. at 425, 435.

As the Supreme Court made clear, the CFPB only has constitutional funding from the Federal Reserve's "combined earnings." 12 U.S.C. § 5497(a)(1). But the Federal Reserve has had no "earnings" since September 2022, when the Federal Reserve's costs and expenses first exceeded its income, as demonstrated in the chart below. *See generally,* Bd. of Governors of the Fed. Rsrv. Sys.,

*Federal Reserve Banks Combined Quarterly Financial Report* 2, 25 (Mar. 31, 2024).[10] Without "earnings," the Federal Reserve's transfers of funds to the CFPB after September 2022 were not in compliance with the statute governing the CFPB's funding. *See* 12 U.S.C. § 5497; *CFSA*, 601 U.S. at 435.

The CFPB lacked constitutionally appropriated funding when it published the Advisory Opinion in the Federal Register on October 1, 2024. As such, the Advisory Opinion and the CFPB's associated rulemaking violates the Appropriations Clause and must be vacated. *CFSA*, 51 F.4th at 642 (citation omitted), *rev'd and remanded on other grounds*, 601 U.S. 416; *Collins v. Yellen*, 594 U.S. 220, 258 (2021); *Seila Law LLC v. CFPB*, 591 U.S. 197, 233 (2020).

The CFPB's Appropriations Clause violation by using improper funds to issue the Advisory Opinion likely will irreparably harm ACA, its members, and CBS. *Supra* 26. The Advisory Opinion irreparably and substantially harms Plaintiffs in a multitude of ways under each of its section 553 and 706(2) APA violations. As these violations were funded with constitutionally-improper funds, the CFPB's violation of the Appropriations Clause therefore causes each of the irreparable harms associated with the individual APA violations.

## IV.    RELIEF REQUESTED

For the foregoing reasons, Plaintiffs are likely to prevail on its claims that the CFPB violated the APA under sections 553 and 706(2)(A)–(D) by failing to engage in notice-and-comment rulemaking, failing to provide evidence substantiate its findings, and therefore acting arbitrarily and capriciously, failing to remain within its statutory authority, failing to follow proper procedure under the APA, and by violating the Constitution due to the CFPB's funding. The harms caused by the enactment and implementation of the Advisory Opinion will be irreparable.

---

[10] Available at https://www.federalreserve.gov/aboutthefed/files/quarterly-report-20240517.pdf.

Therefore, Plaintiffs respectfully request this Court set aside the Advisory Opinion to avoid substantial and irreparable harm to Plaintiffs under the CFPB's improper rulemaking.

Because the CFPB violated the APA under sections 553 and 706(2)(A)–(D), its actions should be set aside. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case ...."); *Am. Bioscience, Inc.*, 269 F.3d at 1084 (holding that relief on an APA claim "normally will be a vacatur of the agency's order"). This Circuit has instructed that when "regulations are unlawful, the ordinary result is that the rules are vacated —not that their application to the individual petitioner is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (internal quotation marks omitted); *see also O.A.*, 404 F. Supp. 3d at 109. Accordingly, consistent with the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and this Circuit's precedent, *see Nat'l Mining Ass'n*, 145 F.3d at 1409, the Advisory Opinion must be set aside as to all affected parties.

<u>Defendants Have Notice of this Action</u>

Plaintiffs have properly served this request for relief upon the CFPB and Department of Justice. In addition, on Friday, November 15, Plaintiffs requested the CFPB by email to voluntarily retract the Advisory Opinion or consent to this application for injunctive relief. As of the time of this filing, the CFPB has not responded to either request.

Therefore, Plaintiffs respectfully request this Court immediately enjoin the Defendants from enforcing the Advisory Opinion and to set it aside in its entirety prior to its effective date on December 3, 2024, among any other relief that the Court deems just and equitable.

Dated: November 18, 2024

Respectfully submitted,

ACA INTERNATIONAL, LLC and COLLECTION
BUREAU SERVICES, INC.

By its attorneys,

*/s/ David B. Meschke*
David B. Meschke, #CO0069
Sarah J. Auchterlonie, #489442 *(oath pending)*
Brownstein Hyatt Farber Schreck, LLP
675 Fifteenth Street, Suite 2900
Denver, CO 80202
Telephone: 303-223-1100
Email:  dmeschke@bhfs.com;
      sja@bhfs.com

and

Leah Dempsey, #1033593
Brownstein Hyatt Farber Schreck, LLP
1155 F Street, NW
Washington, DC, 20004
Telephone: 202.296.7353
Email: ldempsey@bhfs.com

**Certification of Notice to Adverse Party**

Undersigned counsel for ACA International, LLC and Collection Bureau Services, Inc. hereby certifies that it has complied with LCvR 65.1 by timely serving defendants notice of this lawsuit and motion for application for temporary restraining order and preliminary injunction. Further, counsel certifies that is has attempted to obtain voluntary acquiescence of this motion from CFPB's counsel, and CFPB's counsel opposes this motion.

- **CFPB Counsel**: Stephanie B. Garlock, stephanie.garlock@cfpb.gov

    cfpb_litigation@cfpb.gov


*/s/ Sarah J. Auchterlonie*
Sarah J. Auchterlonie #489442