**EXHIBIT B**

Sworn Declaration of Jennifer Whipple, CEO of Collection Bureau Services, Inc.

[attached hereto]

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ACA INTERNATIONAL, LLC; COLLECTION BUREAU SERVICES, INC.<br><br>     Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau,<br><br>     Defendants. | Case No. 1:24-cv-03118-DLF |

**SWORN DECLARATION IN SUPPORT OF PLAINTIFFS'
MOTION FOR INJUNCTIVE RELIEF**

**I. INTRODUCTION**

1. I, Jennifer Whipple, am the President of Collection Bureau Services, Inc ("CBS"). I am also the President Elect of the Board of Directors of ACA International.

2. I am over the age of 18 and have personal knowledge of the facts sworn to herein and if called to testify I could and would competently so testify. I submit this Declaration in support of ACA International and CBS ("Plaintiffs") Motion for a Preliminary Injunction and Temporary Restraining Order.

3. If the advisory opinion released by the Consumer Financial Protection Bureau ("CFPB") on October 1, 2024 ("Advisory Opinion") becomes effective on December 3, 2024, my business and my personal financial situation will be irreversibly harmed with no opportunity for

recompense. I am not alone, similarly situated enterprises across the county will be similarly harmed.

4. Simply put, the Advisory Opinion creates and amends legal obligations and standards without abiding by the required rulemaking procedures. Compliance with the Advisory Opinion's improper rulemaking will fundamentally change the nature of my business and cost hundreds of thousands of dollars in compliance expenditures. The Advisory Opinion must be enjoined from taking effect or my business or I will face financial and asset losses that can never be recovered.

A.   **Collection Bureau Services, Inc.**

5. CBS is a licensed third-party debt collector and woman-owned business located in Missoula, Montana. It is a small, family-owned business in its third generation of ownership with less than 30 employees.

6. CBS is a dues-paying member of ACA International, LLC.

7. CBS's principal purpose is the collection of debts owed or due, or asserted to be owed or due, to another. It is therefore a "debt collector" under the FDCPA, see 15 U.S.C. § 1692a(6), and a "covered person" under the Consumer Financial Protection Act, see 12 U.S.C. § 5481(6).

8. CBS regularly seeks to recover unpaid past due amounts for services rendered—including for medical and hospital care. CBS acquires from healthcare providers, a variety of data and documents to support the accounts that it collects. CBS works with its healthcare clients to answer consumers' questions, resolve disputes, and arrive at achievable resolutions, including settlements and payment plans.

9. I also own and manage a medical billing services business under the CBS corporate structure. This business services accounts on behalf of healthcare companies. These services are performed on accounts during the period before the healthcare provider deems the account to be in default. The services that it provides to the healthcare providers and consumers are far different from those provided by CBS because the accounts it services are in an earlier stage of the revenue

2

management cycle and are often still receiving reimbursements from third-party payors. Further, these owed amounts are not yet past due, and often never become past due.

10. Currently, the medical billing services business is not subject to the FDCPA under the currently-established meaning of "default" under the FDCPA statute and implementing regulation at 12 C.F.R. Part 1006 ("Regulation F" or "Reg. F").

11. Upon the Advisory Opinion's implementation date, my medical billing services business must comply with the FDCPA and Reg. F, despite the fact that the medical billing services business is not currently subject to FDCPA and Reg. F. If it does not, it faces the risk of regulatory enforcement by CFPB. Before the Advisory Opinion's implementation date, I must expend valuable money and staff time preparing for compliance. This is money and time that cannot be recovered. I expect the immediate cost of compliance to CBS with the new regulations to be approximately $50,000.

12. Further, there will be ongoing costs of compliance, and I expect annual expenditures by CBS of approximately $20,000 to comply with the expanded regulations imposed by the Advisory Opinion, in addition to the other costs incurred by my entire company to comply with the Advisory Opinion.

13. These sums will be a substantial hardship to my business, are unwarranted by the evidence before the agency, and will cause irreparable harm.

**B.      Summary of the Advisory Opinion's Impact on CBS**

14. As a small business with less than thirty employees, CBS will incur substantial harm if the Advisory Opinion is implemented since its small staff must divert significant time and resources to an effort to become compliant with the Advisory Opinion by December 3, 2024.

15. This effort will require monumental changes to internal and external procedures and legal analyses and cause CBS to incur over $400,000 in additional costs annually to comply with the

3

Advisory Opinion. These costs are broken-down as follows:

   a. Costs for new employees to review account-level documents and agreements for each patient prior to initial communication with consumers, even if we have no reason to believe that the creditor's summary of balance due is inaccurate;

   b. Costs for new employees to review account-level documents and agreements for each patient to independently assess whether the charges imposed by the healthcare provider are "reasonable";

   c. Costs for CBS to make its pre-default hospital billing service comply with the FDCPA and Reg F provisions historically reserved for accounts that are in default;

   d. Cost for CBS to hire new medical billing professionals and physicians to audit hospital procedures and ask each patient and his or her doctors if the procedures performed were coded properly and/or performed in full.

16. These changes in the Advisory Opinion did not come as a result of a legislative rulemaking process. Instead, the CFPB decided these enormous changes were merely interpretive guidelines and general statements of policy.

**C.    Rulemaking and Public Comment**

17. The Advisory Opinion at issue was published by the CFPB on October 1, 2024. The CFPB did not provide notice of an intent to issue an opinion, nor did it accept comments from the public when it promulgated the Advisory Opinion. There was no Small Business Regulatory Enforcement Fairness Act ("SBREFA") panel; nor does the Advisory opinion contain a cost-benefit analysis or any studies illustrating the necessity, impact or expense of the rule changes.

18. If CBS (and other collectors) had been offered the opportunity to comment on the

proposed Advisory Opinion, we would have provided data and documents informing the CFPB that the proposal would harm consumers, harm the healthcare industry, and cause significant negative market effects (as set forth in the Corrected Complaint).

19. Further, we would have provided data and estimates of CBS's cost of compliance for the CFPB to consider the impact of the rulemaking on the industry (as set forth in this declaration).

20. Currently, CBS—as required of all licensed debt collectors—adheres to the rules outlined in Regulation F and other federal and state regulations.

21. The Advisory Opinion significantly changes the legal obligations and requirements outlined in other regulations. The Advisory Opinion's changes go into effect on December 3, 2024.

## II. THE ADVISORY OPINION IMPOSES NEW COMPLIANCE OBLIGATIONS ON CBS

### A. New Requirement to Review Account-Level Documents

22. The Advisory Opinion requires that prior to beginning collections "[d]ebt collectors must have a reasonable basis for asserting that the debts they collect are valid and the amounts correct." 89 Fed. Reg. 80716. This requirement is not new or objectionable, rather, the Advisory Opinion implements an entirely new procedure by which CBS must establish this reasonable basis.

23. The Advisory Opinion requires CBS to review account-level documentation *before* beginning collections: "[c]ollecting or attempting to collect medical debts without substantiation violates [FDCPA] section 807(2)(A)." 89 Fed. Reg. 80722.

24. It is my understanding that the FDCPA (and Regulation F) does not currently require CBS, or any debt collector, to independently investigate each account prior to collection. Rather, so long as we have a reasonable basis to believe in the accuracy of account information provided by the original creditor we have complied with this requirement. Further, CBS would not currently violate the FDCPA by attempting to collect without first substantiating it specifically by reviewing account-

5

level documents and agreements for each and every account.

25.     The Advisory Opinion that requires account-level document review changes CBS's obligations and requirements under the law.

**B.      New Reasonableness Standard**

26.     The Advisory Opinion requires medical debt collectors, when attempting to collect a medical debt that is not created by an express contract between the consumer and healthcare provider setting forth the dollar amount of the services, to make a legal determination that a debt is reasonable and not unconscionable pursuant to state law. *See* Fed. Reg. 80719–20.

27.     This obligation in the Advisory Opinion creates a new legal standard for CBS.

28.     Currently, CBS (and other debt collectors) need not make an independent legal determination as to whether the consumer has any potential legal defense prior to the debt collection. Under current law, debt collectors collect debt on behalf of third parties and do not own the accounts; they therefore do not have the contractual right to adjust the contract value of the underlying obligation. Rather, a consumer who disagrees with an amount charged may work directly with the healthcare provider to reduce charges.

29.     CBS and other debt collectors currently rely upon existing structures, such as audits from the Centers for Medicare & Medicaid Services ("CMS") and enforcement of federal price transparency law to form a reasonable belief in the accuracy of the prices charged to patients. CMS's hospital price transparency requirements are authorized by section 2718(e) of the Public Health Service Act, which requires each hospital operating in the United States to make its standard charges public. 42 U.S.C. § 300gg-18(e). In addition, CBS takes reasonable precautions like reviewing a client's policies and procedures and researching a provider's regulatory history to establish a reasonable belief in the accuracy of account balance information.

30.     My reading of the Advisory Opinion is that these procedures are no longer sufficient

and I must now conduct a far more in-depth investigation in order to make an independent, in-house determination that the debt is reasonable and not unconscionable.

31. To do so, CBS must make significant policy changes. Typically, hospitals and surgery centers establish their pricing based on a variety of factors that may include their own costs, market pressures, and the types and complexity of medical procedures offered.

32. CBS relies on bill and invoice amounts reported by healthcare clients in the ordinary course of business. The amounts charged to the consumer are provided to CBS in the form of summary data after the healthcare provider or medical billing service establishes the proper charges. CBS does not currently employ medical professionals, and we do not have the requisite expertise or experience to second-guess the prices our healthcare clients establish.

33. For example, should CBS decide whether the cost of a life-saving triple by-pass heart surgery is unreasonable? If so, how?

34. CBS does not routinely acquire sensitive health information about the consumers from whom they are attempting to collect. CBS does not know if a procedure is especially complex because of the consumer's health condition, or whether a procedure is even necessary. CBS does not know the prices of inputs such as medical devices or medications. CBS (or any collector) does not—and should not—be second-guessing the prices charged to consumers for healthcare. But that is exactly what the Advisory Opinion invites with its reasonableness standard.

35. To comply with this standard, CBS will need to audit the medical services provided and the medical billing codes that providers use to substantiate the bills we attempt to collect. We must determine for each patient whether there is a potential defense to the debt or potential reduction in the bill amount.

36. I do not know how CBS will be able to make those determinations without becoming intimately involved in the medical coding process and—at times—substituting our judgment in the

place of more experienced medical professionals.

37. These changes represent massive, material changes to the legal framework of medical debt collection, and will bring substantial harm to CBS if it is forced to comply with the Advisory Opinion.

**C.    New Definition of Default**

38. The Advisory Opinion redefines "default" for medical debt where the consumer and healthcare provider have not otherwise defined the term by agreement, to occur when the consumer has failed to pay in full "at a given time," regardless of how the creditor treats the debt. 89 Fed. Reg. 80723.

39. This new bright-line rule that all debts are in "default" if they are not paid in full "at a given time," regardless of how the creditor is treating the debt, is contrary to longstanding law interpreting the FDCPA. Our interpretation and current processes support the idea that if there is not an agreement between the consumer and creditor, nor state law that defines when a consumer defaults, courts will make a factual determination on a case-by-case basis to determine whether a debt is in "default" under the FDCPA.

40. CBS operates a separate medical billing services business that provides medical billing services for healthcare accounts that are aging, but not considered in "default" by the healthcare providers. In CBS's experience, medical providers do not consider a bill to be in default (i.e., "written off" under Generally Accepted Accounting Principles) at 31 days just because a payment in full has not been made. Generally, hospitals and medical providers do not charge-off accounts but instead give consumers a flexible period to pay medical bills and process insurance coverage. This benefits consumers by providing time and opportunities for reasonable payment plan.

41. Medical billing companies, like CBS's, do not identify themselves as FDCPA "debt collectors" because they do not collect defaulted debt, and therefore are not required to comply with

8

FDCPA provisions like, for example, providing a "mini-Miranda" notice when communicating about an account.

42. The Advisory Opinion changes that. CBS's medical billing business that was not previously a "debt collector" under the FDCPA now is—meaning that CBS must develop an entirely new regulatory compliance program as a result of the Advisory Opinion. This is a material change.

43. This change has real impacts on consumers as well. If CBS's medical billing service business is subject to the FDCPA under the Advisory Opinion, the cost-savings compared to traditional debt collection that this business provides to clients will disappear, thus increasing costs for all healthcare providers who formerly relied upon medical billing providers. These costs are passed on to consumers in the form of higher price points for goods and services. Furthermore, vastly larger numbers of patients would have the experience of being in collections—even if they received their first bill a mere 30 days earlier.

**D.      New Requirement for Medical Procedure Audits**

44. The Advisory Opinion states that "[a] debt collector that collects or attempts to collect a debt that has been "upcoded" violates the FDCPA's prohibitions against unfair or unconscionable debt collection practices because the amount is not expressly authorized by the agreement for services actually rendered and also violates the FDCPA's prohibitions against deceptive or misleading debt collection practices because it would falsely represent the amount of the debt." 89 Fed. Reg. 80720.

45. In CBS's experience, many agreements with hospitals provide that a patient will be billed for services in accordance with hospital policy, for example, a standard authorization from a patient may read:

> "I understand that I am agreeing to pay for such services and/or procedures in the amount(s) consistent with [hospital] policies and pricing and I am responsible for complying with any insurance requirements, including but not limited to obtaining pre-authorization."

46. The problem with the Advisory Opinion provision is that CBS would have no reason to know that "upcoding" occurred unless we performed a detailed audit on each bill or invoice. From CBS's perspective—and historically speaking—the standard authorization provides a clear indication of the policy and agreement in place. The Advisory Opinion changes that.

47. If the Advisory Opinion goes into effect, CBS will be forced to make substantial changes to policies and procedures.

48. Medical coding is a profession that requires specialized training where those seeking employment receive a Certified Professional Coder certification. These coders translate the documentation of a patient's treatment into a standardized system that accounts for critical factors, a patient's specific diagnoses, the treatments and services offered, and any unusual circumstances. But without the help of a professional medical coder, CBS lacks the experience and knowledge necessary to identify whether a patient's bill has been "upcoded."

49. But even with the knowledge of a professional medical coder, CBS would *still* lack the knowledge needed to effectively comply with the Advisory Opinion. CBS would need knowledge about the patient's actual illness or disease, the specifics of the treatment plan, and details on the patient's experiences with his or her physician.

50. Properly interpreting this information would require CBS to hire at least two physicians to perform this function: a significant new cost borne by compliance with the Advisory Opinion.

51. As it stands now, CBS's policy is to comply with HIPAA and all U.S. privacy laws. This means CBS must limit the use of protected health information to the "minimum necessary" to accomplish the intended purpose of the use, disclosure, or request. Complying with the Advisory Opinion, though, would require CBS to adjust its HIPAA compliance program and invade the medical privacy of consumers from whom it would seek to collect, far beyond the minimum

10

necessary under current FDCPA and Reg. F rules.

52.    For CBS, the "minimum necessary" to substantiate the debts from medical providers under the Advisory Opinion will include intrusive details about patient symptoms, treatments, reactions and outcomes, which largely defeats HIPAA's purpose.

### III. COMPLIANCE WITH THE ADVISORY OPINION WILL BE EXPENSIVE AND CAUSE IRREPARABLE HARM

53.    If the Advisory Opinion is not enjoined, CBS will face substantial and irreparable harm. Beginning now, and each day that passes, CBS must expend significant money and time to prepare for the Advisory Opinion's December 3, 2024 implementation date.

54.    The Advisory Opinion's stark changes will mean CBS must develop entirely new policies and procedures to comply. These new policies and procedures include:

   a. An independent, pre-collection investigation into each and every account, before the traditional verification period;

   b. A process, beyond and different from what currently exists, to make an in-house legal determination that each debt is reasonable and not unconscionable under state law;

   c. Procedures to reclassify debt as "defaulted" earlier in the credit lifecycle;

   d. Reclassifications of medical billing companies as debt collectors under the Advisory Opinion's change;

   e. Audits of medical procedures to ensure that debts are not "upcoded".

55.    Each of the departures from existing standards creates significant hardship for CBS. They will both cost time and money when implemented, and to maintain. The Advisory Opinion will also cause a substantial invasion of health privacy for consumers. The Advisory Opinion provisions will drain the finite resource of CBS staff time and energy.

Pursuant to LCvR 11.2, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 18, 2024.

_____
Jennifer Whipple, President
Collection Bureau Services, Inc.