# EXHIBIT C

Sworn Declaration of Shaun Ertischek, Chief Compliance Officer and General Counsel of Cascade Receivables Management, LLC

[attached hereto]

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

ACA INTERNATIONAL, LLC;
COLLECTION BUREAU
SERVICES, INC.

          Plaintiffs,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his
official capacity as Director of the Consumer
Financial Protection Bureau,

          Defendants.

Case No. 1:24-cv-03118-DLF

**SWORN DECLARATION IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING
ORDER**

**I. INTRODUCTION**

1. I, Shaun Ertischek, am the Chief Compliance Officer and General Counsel of Cascade Receivables Management, LLC ("CRM").

2. I am over the age of 18 and have personal knowledge of the facts sworn to herein and if called to testify I could and would competently so testify. I submit this Declaration in support of ACA International, LLC's and Collection Bureau Services, Inc.'s (collectively, "Plaintiffs") Motion for a Preliminary Injunction and Temporary Restraining Order.

3. CRM is an affiliated company of a debt buying entity: Cascade Capital Funding, LLC ("CCF"). CCF passively purchases consumer debt portfolios and CRM then acts as master servicer of the consumer accounts that comprise those portfolios.

4. If the advisory opinion released by the Consumer Financial Protection Bureau

1

("CFPB") on October 1, 2024 ("Advisory Opinion") becomes effective on December 3, 2024, CRM and CCF will be irreversibly harmed with no opportunity for recompense.

5. The Advisory Opinion institutes new legal obligations that make existing (and currently compliant) processes insufficient. In short: the previously acceptable due diligence procedures used prior to the Advisory Opinion are no longer acceptable under the Advisory Opinion's changes. CRM will need to revamp its procedures to become compliant. Additionally, some of the accounts CCF currently owns may become uncollectable, and therefore worthless. The Advisory Opinion must be enjoined from taking effect or our business will face financial and asset losses that can never be recovered.

A. **Cascade Receivables Management, LLC and Cascade Capital Funding, LLC**

6. CRM acts as a master servicer and collection agency for delinquent, past-due, consumer accounts. CRM is closely affiliated with a debt buying entity, CCF, which both share common ownership.

7. CRM is a dues-paying member of ACA International, LLC and would therefore benefit from the order requested by ACA in this matter.

8. CRM manages portfolios of charged-off accounts receivable that, in part, are comprised of accounts that derived from healthcare services. CRM employs staff who are responsible for the placement of accounts with third-party debt collectors who, along with CRM, are regulated by the Fair Debt Collection Practice Act ("FDCPA"). CRM manages the outsourcing of debt collection to collection agencies. CRM collects some debt in-house, but most is contracted out to agencies.

9. CRM is a "debt collector" under the FDCPA, *see* 15 U.S.C. § 1692a(6), and a "covered person" under the Consumer Financial Protection Act, *see* 12 U.S.C. § 5481(6).

10. CCF is a passive debt buyer. CRM acts as agent of CCF and as master servicer to

debts purchased by CCF, which includes medical debt. This means that CCF purchases debts from originators or other holders and then CRM manages the collection on that debt—either in-house or through contracted collection agencies. CCF does not itself collect on any of the debt it purchases.

11.     CRM and CCF follow all federal, state, and local laws and regulations. CRM and CCF are licensed in various states. Additionally, I believe CRM actually goes above what is legally required in the development and implementation of its diligence and compliance procedures.

12.     The Advisory Opinion will have drastic impacts both on how CRM and CCF conduct their operations, and on the overall health of the business. The increased compliance costs and impacts on future business will create a substantial hardship on CRM and CCF and will cause irreparable harm to both.

**B.    Summary of the Advisory Opinion's Impact on CRM and CCF**

13.     CRM and CCF have and will continue to incur substantial costs as they attempt to bring their previously-acceptable procedures into compliance with the new Advisory Opinion by December 3, 2024.

14.     These changes will not be minor. CRM and CCF will need to expend significant resources in order to, among other things:

   a. Conduct pre-collection medical provider audits of all medical accounts to determine their compliance with various state and federal regulations in accordance with the new standards set by the Advisory Opinion; and

   b. Obtain and review account-level documents for all accounts at the time of purchase, prior to collecting on the debt.

15.     Failure to implement these changes—changes that are required by the Advisory Opinion—will result in potential FDCPA violations and possibly the unconstitutional taking of otherwise valid assets (*i.e.*, the collection accounts).

16. CRM provides, either directly or through its outsourced collection agencies, significant information about the accounts in an initial written communication to consumers, as required by the FDCPA at 15 U.S.C. § 1692g (colloquially known as the "validation notice"). Under Regulation F, 12 C.F.R. 1006.34, debt collectors collecting on CCF accounts must provide in initial written notices detailed information about accounts, including accounts for medical debt, that include:

   a. The debt collector's name and the mailing address at which the debt collector accepts disputes and requests for original-creditor information.

   b. The consumer's name and mailing address.

   c. If the debt collector is collecting a debt related to a consumer financial product or service as defined in § 1006.2(f), the name of the creditor to whom the debt was owed on the itemization date.

   d. The account number, if any, associated with the debt on the itemization date, or a truncated version of that number.

   e. The name of the creditor to whom the debt currently is owed.

   f. The itemization date.

   g. The amount of the debt on the itemization date.

   h. An itemization of the current amount of the debt reflecting interest, fees, payments, and credits since the itemization date. A debt collector may disclose the itemization on a separate page provided in the same communication with a validation notice, if the debt collector includes on the validation notice, where the itemization would have appeared, a statement referring to that separate page.

   i. The current amount of the debt.

17. Accordingly, only a small fraction of consumers who are obligated to repay our accounts request debt validation (under the FDCPA) or dispute the debt.

18. This means that procedures that require debt collectors to review account-level documentation are, in practice, unnecessary in most cases. The Advisory Opinion changes that. After December 3, every account will require an account-level review of documents, and accounts from medical providers will require comprehensive audits to determine compliance.

19. Notably, these changes in the Advisory Opinion did not come as a result of an act of Congress or notice-and-comment rulemaking process. Instead, the CFPB decided these enormous changes were merely interpretive guidelines and general statements of policy.

20. Had the CFPB sought public comment on this regulatory change, we would have provided comments outlining the drastic changes required by the Rule's provisions as set forth herein.

## II. THE ADVISORY OPINION IMPOSES NEW COMPLIANCE OBLIGATIONS ON CRM AND CCF

**A.     New Requirement to Review Account-Level Documents**

21. The Advisory Opinion requires that prior to beginning collections "[d]ebt collectors must have a reasonable basis for asserting that the debts they collect are valid and the amounts correct." 89 Fed. Reg. 80716. This requirement, alone, is not controversial. CRM already takes considerable effort to establish that it has a reasonable basis for asserting that the debts it collects are valid and the amounts correct. We know these measures are appropriate and effective because our dispute and complaint rates are low. Furthermore, few of those require us to review account-level information.

22. Nevertheless, the Advisory Opinion states that methods we know are currently working are insufficient. It now requires the massive and unnecessary change that CRM review account-level documentation for every account *before* it can begin outsourcing collections: "[c]ollecting or attempting to collect medical debts without substantiation violates [FDCPA] section

5

807(2)(A)." 89 Fed. Reg. 80722. By proxy, this means that CCF must also meet this new strict standard of review so that it is not purchasing debt contrary to the new standards.

23. Currently, neither CRM nor CCF independently investigate each individual account prior to collection. Instead, when CCF purchases new accounts, it undertakes an extensive diligence process to understand and determine that there is a "reasonable basis" that the debts it is purchasing are valid, which complies with the FDCPA in its current form.

24. For example, CCF reviews information about the selling entities and the debts it purchases, including reviewing account data, reviewing a sampling of account-level documents, obtaining a "seller survey" containing information about the accounts, and obtaining information about the seller's policies, practices, and more. Further, CRM tracks, reviews, and conducts a root cause analysis related to the accounts that receive complaints, and would evaluate seller relationships if such review identified any potentially problematic portfolios of accounts.

25. CCF and CRM currently rely on medical providers to follow the laws that they are subject to, such as the No Suprises Act (26 U.S. Code § 9816), because these providers are the medical experts and medical coding experts.

26. CCF further relies on the seller warranties in the purchase and sale agreements, such as the seller's warranty of lawful origination, the seller's warranty that the debt is billed and collected in accordance with law, and others. CCF typically maintains a right to sell back (or "put back") to the seller any debts that violate these warranties or fall into specified categories in the purchase agreements.

27. The Advisory Opinion changes that. Now, CRM and CCF must attempt to conduct pre-collection account-level reviews that will be costly and sometimes impossible to complete.

28. The first issue this raises is that if CCF purchases a portfolio of debt, CRM must now wait—when it did not have to wait prior to the Advisory Opinion—to begin the collections process

until every account has been independently reviewed.

29. The second issue it raises is expense. For example, CCF will purchase a portfolio of debt from a medical provider. For some purchases, CCF may get account-level documents up-front. Under the Advisory Opinion, CCF or CRM must employ staff to organize and review all this account level documentation. Compliance with the Advisory Opinion in those cases would be technically possible, though still expensive. For other purchases, CCF does not receive account-level documents up-front. For these purchases, CCF will often have the contractual right to obtain account-level documents for a set period of time, on an as-needed basis. Neither CCF nor CRM will have or review such documents for all accounts prior to collection. The Advisory Opinion's requirement is next to impossible in cases where the contractual period of time to obtain account-level documents has expired.

30. The Advisory Opinion thus raises significant questions. For example, imagine that CCF purchases a large portfolio of debt and that the contractual period to obtain documents has now come and gone. In that time, CRM began a compliant collection process, all without a timely validation request or dispute. Does the Advisory Opinion mean that collection would now be a FDCPA violation if we no longer have access to the account-level documents? CRM is likely compliant in every other way, but because of the Advisory Opinion's regulatory change, our collection would go from being compliant to being a violation. This does not indicate that the Advisory Opinion is merely interpretive.

31. Even if CRM had access to the documents, which, again, is no guarantee, CRM faces substantial costs in reviewing them for every account. We estimate we will need to employ many additional full-time staff members and invest in additional technology resources to comply with the Advisory Opinion.

32. The Advisory Opinion changes CRM and CCF's obligations under the law and

7

potentially deprives them of the value of their contracts by instituting impossible compliance procedures.

B. **New Reasonableness Standard**

33. The Advisory Opinion requires medical debt collectors to make a legal determination that a debt is reasonable and not unconscionable pursuant to state law when attempting to collect a medical debt that is not created by an express contract between the consumer and healthcare provider setting forth the dollar amount of the services. *See* Fed. Reg. 80719–20. This is an entirely new standard for CRM and CCF to follow.

34. Currently, CRM does not make an independent legal determination regarding any potential defenses prior to debt collection. The Advisory Opinion calls this a "reasonableness" standard.

35. CRM likely is not able to even get the necessary information to determine "reasonableness" in an economically-feasible amount of time, if at all.

36. The increased compliance costs and impacts on future business of dealing with this new "reasonableness" standard will create a substantial hardship on CRM and will cause irreparable harm.

37. CRM does not currently know how to determine if a medical debt is "reasonable." We do not want to be in the position of second-guessing medical charges, nor do we have the experience to do so. But to determine if any individual debt is "reasonable," CRM will need to conduct costly and invasive audits of medical practices and procedures. I will address our concerns regarding these audits in the subsequent section.

C. **New Requirement for Medical Procedure Audits**

38. The Advisory Opinion states that "[a] debt collector that collects or attempts to collect a debt that has been "upcoded" violates the FDCPA's prohibitions against unfair or unconscionable debt collection practices because the amount is not expressly authorized by the agreement for services

8

actually rendered and also violates the FDCPA's prohibitions against deceptive or misleading debt collection practices because it would falsely represent the amount of the debt." 89 Fed. Reg. 80720.

39. The challenge here is that when CCF purchases debt, it would have no reason to know that the debt is "upcoded" without an audit of all medical practices and procedures.

40. As it stands now, before CCF purchases debt, sellers provide CCF with information about their business, the debt portfolio, documentation, and account data so CCF can review and, potentially, offer an informed bid price.

41. CRM and CCF also conduct a pre-purchase due diligence review of a sample of the accounts, their documents, and certain policies and procedures of the seller. CCF relies on representations and warranties in purchase agreements, such as assertions that the debt seller complies with applicable law (for example, the No Suprises Act, charity care requirements, financial assistance programs, etc.). These procedures, and the assertions from sellers, form the "reasonable basis" for us to believe the debts are valid. Prior to the Advisory Opinion, this "reasonable basis" would be enough to comply under the FDCPA.

42. No longer. Now, the Advisory Opinion creates FDCPA violations where they previously did not exist. CRM must adjust to this new reality by independently auditing sellers (medical providers) to determine if they are compliant with laws and regulations, and to determine if they are charging consumers the appropriate amount.

43. The warranties and assertions included in debt buying contracts are no longer enough to form a reasonable basis of valid debt. Now, we—the debt purchaser and collector—must learn a new proficiency in the profession of medical billing, auditing, and coding.

44. That also means that we must learn a new proficiency in the profession of patient illnesses, symptoms, and treatments. The Advisory Opinion suggests CRM, and other agencies like it, must comb through individual patient files, learn the details of diseases and medical care, and

make determinations regarding the "reasonability" of costs. In practical terms, the threat of a FDCPA violation means that prior to purchasing debt, CCF is incentivized to ensure—by way of audits and other invasive review processes—that medical practices are billing consumers in the way that we at CRM feel is appropriate.

45. The necessity of this expensive process and invasion of patient privacy is unproven and not established by the Advisory Opinion. Indeed, it appears as if it was not considered at all.

46. The current due diligence regime can already ascertain systemic issues with debt sellers. We discover these issues through our normal due diligence process, internal reviews, consumer disputes and complaints, and reviews of regulatory actions. If we were to discover a material issue, CCF would likely cease to purchase debt from that seller and remediate the issue. CRM staff is trained and qualified to handle billing issues on the *back end,* meaning we are well-equipped to respond to any potential systemic or individual issues that come up in the course of debt collection. We have no experience or expertise in handling pre-collection, medical billing related issues, and medical coding substantiation.

47. Neither CRM nor CCF have anyone on staff that is qualified to conduct medical audits. Compliance with the Advisory Opinion will likely require staff with such experience. In our market of Petaluma, California, a medical billing specialist with 3 or more years of experience can be hired for $21.99 - $41.98 per hour (according to the Indeed.com hiring website).

48. Further, many of our portfolio purchases are from medical holding companies that have debts from multiple providers in multiple locations, which would potentially require employees in each of these locations just to be able to audit the medical coding to meet the stringent standards created by the Advisory Opinion.

49. We estimate we will need to employ many additional full-time staff members and invest in additional technology resources to comply with the Advisory Opinion's new standards to

conduct medical audits pre-collection.

### III. COMPLIANCE WITH THE ADVISORY OPINION WILL BE EXPENSIVE AND CAUSE IRREPARABLE HARM

50. If the Advisory Opinion is allowed to go into effect on December 3, 2024, CRM and CCF will face substantial and irreparable harm. The departure from existing regulations means CRM and CCF will need to invest resources into additional compliance well before the December 3 effective date.

51. CRM must expend both money and valuable staff time to come into compliance with the Rule. This will involve developing, establishing, and implementing entirely new procedures.

52. CRM may need to hire approximately twenty-six (26) additional full-time staff members whose only task is to ensure compliance with the added procedural requirements. Furthermore, CRM may need to acquire and develop new technology solutions to assist in ensuring compliance with the added procedural requirements. The Advisory Opinion has real, material impacts on CRM's staffing decisions.

53. CRM estimates it may spend as much as one and a half million dollars ($1,500,000.00) per year (at current account levels) to implement the new procedures required under the Advisory Opinion.

54. The Advisory Opinion will also (as described above) impact the ability to purchase debt as well. This is because the price of collecting on such debt will go up as more procedural requirements mean more costs. Smaller deals may no longer be a decent value proposition for CCF. This will have an effect both up and down stream: medical providers may not have their debts purchased or collected, and consumers may face the prospect of increased litigation as a result. For CRM, the result will be the same: fewer accounts to collect and less revenue to support our businesses. The Advisory Opinion will have substantial negative impacts on CRM and CCF's business.

Pursuant to LCvR 11.2, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 18, 2024

*Shaun Ertischek*
Digitally signed by Shaun Ertischek
Date: 2024.11.18 15:41:06 -08'00'

Shaun Ertischek

Chief Compliance Officer & General Counsel
Cascade Receivables Management, LLC

Authorized Agent
Cascade Capital Funding, LLC