# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ACA INTERNATIONAL, LLC;
COLLECTION BUREAU
SERVICES, INC.,

                    Plaintiffs,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his
official capacity as Director of the Consumer
Financial Protection Bureau,

                    Defendants.

Case No. 1:24-cv-03118-DLF

---

R.M. GALICIA, INC., d/b/a
PROGRESSIVE MANAGEMENT
SYSTEMS,

                    Plaintiff,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU; and ROHIT CHOPRA, in his
official capacity as Director of the Consumer
Financial Protection Bureau,

                    Defendants.

Case No. 1:24-cv-03149-DLF

**DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS ACA INTERNATIONAL,
LLC, AND COLLECTION BUREAU SERVICES, INC.'S MOTION ON APPLICATION
FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER AND
PLAINTIFF R.M. GALICIA, INC., D/B/A PROGRESSIVE MANAGEMENT
SYSTEMS'S MOTION ON APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

## INTRODUCTION

The Fair Debt Collection Practices Act (FDCPA) protects consumers from debt collectors' use of unfair or deceptive means to collect debts. One type of debt covered by those FDCPA protections is medical debt—which is common across American households. Indeed, by some estimates, anywhere from 17 to 35 percent of American adults carry medical debt at any given time. *See* CFPB, *Medical Debt Burden in the United States* at 7 (Feb. 2022).[1] But, despite the protections the FDCPA affords them, consumers are regularly subjected to unfair or deceptive conduct by companies attempting to collect medical debt from them. The Consumer Financial Protection Bureau—the agency Congress charged with implementing the FDCPA—receives thousands of complaints each year from consumers who have been hounded by debt collectors for medical debts that they do not owe or that they or an insurer have already paid. *See* CFPB, *Fair Debt Collection Practices Act: CFPB Annual Report 2024* at 3–4 (Sept. 2024) ("FDCPA 2024 Annual Report").[2]

So, to remind medical debt collectors of their obligations under the FDCPA and clarify how those well-established statutory protections apply in the context of medical debt, on October 1, 2024, the Bureau issued an Advisory Opinion on medical debt collection. *See* Debt Collection Practices (Regulation F); Deceptive and Unfair Collection of Medical Debt, 89 Fed. Reg. 80715 (Oct. 4, 2024) ("Medical Debt Collection Advisory Opinion" or "Advisory Opinion"). This Advisory Opinion, which is in part an interpretive rule and in part a statement of agency policy, restates the relevant law governing unfair and deceptive debt collection practices, identifies

---

[1] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_medical-debt-burden-in-the-united-states_report_2022-03.pdf.

[2] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_fdcpa-2024-annual-report_2024-09.pdf.

various factual circumstances in which well-established FDCPA prohibitions could come into play, and explains how, given the complexity of medical billing practices, collectors of medical debt risk violating those well-established prohibitions in certain circumstances. While the Advisory Opinion provides the Bureau's view on certain steps debt collectors might consider taking to mitigate those risks, the document itself creates no new requirements for or binding obligations on medical debt collectors. Any obligations come from the FDCPA itself—which, as enacted by Congress in 1977, makes it unlawful to attempt to collect debts that consumers do not in fact owe. In addition, the Advisory Opinion interprets a certain exception to the statute's definition of "debt collector" in select contexts involving medical bill collection.

A month after the Advisory Opinion's release, ACA International, LLC, and Collection Bureau Services, Inc., filed suit seeking to challenge several discrete sections of the Advisory Opinion under the Administrative Procedure Act (and to challenge the entire document under the Appropriations Clause). A few days later, R.M. Galicia, Inc., doing business as Progressive Management Systems (PMS), separately brought suit, this time challenging only one of the sections of the Advisory Opinion covered in the ACA suit. Both sets of Plaintiffs have moved for a temporary restraining order and preliminary injunction.

The Court should reject Plaintiffs' requests for preliminary relief. Plaintiffs have not established that they are likely to succeed on the merits of any of their challenges to the Advisory Opinion—most basically because the Bureau's guidance document, which only provides restatements of the law, highlights risks of noncompliance in the medical-debt industry, offers suggestions for mitigating those risks, and interprets an ambiguous statutory term, is not final agency action reviewable in this Court. Beyond that, their challenges to the Advisory Opinion all fail on the merits, including because this guidance document creates no binding legal obligations

and therefore is not a legislative rule that needed to go through notice-and-comment rulemaking or any of the other procedural steps Plaintiffs invoke. Regardless, the Court should not grant Plaintiffs the extraordinary remedy of a preliminary injunction because they have not established that the Advisory Opinion will cause them irreparable harm or that an injunction is in the public interest. Plaintiffs' claims about the effects of this non-binding guidance on regulated entities, which they never place in context or meaningfully support, are not enough. For these reasons, the Bureau respectfully requests that the Court deny the motions for preliminary relief.

## BACKGROUND

### A.  The Fair Debt Collection Practices Act

Congress enacted the Fair Debt Collection Practices Act (FDCPA) "to eliminate abusive debt collection practices by debt collectors," which Congress found had "contribute[d] to considerable consumer harm, including "personal bankruptcies" and "the loss of jobs." Pub. L. No. 95-109, § 802(e), 91 Stat. 874, 874 (1977) (codified at 15 U.S.C. § 1692(a), (e)). As Congress recognized, debt collectors have little incentive to treat consumers fairly because, legislators observed, they "are likely to have no future contact with the consumer and often are unconcerned with the consumer's opinion of them." S. Rep. No. 95-382, at 2 (1977). So, to address "widespread" and "serious" abuses in the debt collection industry, *id.*, Congress enacted the FDCPA and "impos[ed] affirmative statutory obligations upon debt collectors and proscrib[ed] certain abusive conduct." *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 388–89 (4th Cir. 2014).

Among the prohibitions Congress adopted is 15 U.S.C. § 1692e(2)(A), which makes it unlawful for debt collectors to "use any false, deceptive, or misleading representation or means in connection with the collection of any debt"—including any "false representation" about "the character, amount, or legal status of any debt." When analyzing whether a given communication

is deceptive, courts look from the perspective of the "least sophisticated" or "unsophisticated" consumer, "to prevent debt collectors from deceiving naive consumers." *Jones v. Dufek*, 830 F.3d 523, 526 n.2 (D.C. Cir. 2016). It is well established that a debt collector violates the FDCPA's prohibition on making false representations when it sends debt collection notices indicating that consumers owe amounts that they in fact do not—because, for example, that debt has already been paid off or is somehow legally invalid. *See, e.g.*, *Vangorden v. Second Round, Ltd. P'ship*, 897 F.3d 433, 437 (2d Cir. 2018) (holding that debt collector violated § 1692e(2) by sending a letter indicating that a consumer still owed a debt that had already been settled); *Kaiser v. Cascade Cap., LLC*, 989 F.3d 1127, 1134 (9th Cir. 2021) ("[I]f a debt collector's letter falsely represents, even by implication, that a debt is legally enforceable, it violates the FDCPA."). As these courts have recognized, "[w]hether a debt is legally enforceable is a central fact about the character and legal status of that debt." *McMahon v. LVNV Funding, LLC*, 744 F.3d 1010, 1020 (7th Cir. 2014). "A misrepresentation about that fact thus violates the FDCPA" under a "straightforward" reading of § 1692e(2)(A). *Id.*; *see also id.* (holding that "a debt collector violates the FDCPA when it misleads an unsophisticated consumer to believe a time-barred debt is legally enforceable").

In § 1692f, Congress also prohibited the use of "unfair or unconscionable means to collect or attempt to collect any debt" and provided a non-exhaustive list of practices that violate that prohibition. On that list, the statute identifies as unfair the collection of "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1). This provision similarly "protects consumers from being subjected to attempts to collect debts not owed." *Smith v. Stewart, Zlimen & Jungers, Ltd.*, 990 F.3d 640, 647

(8th Cir. 2021) (internal quotation marks omitted). Thus, in a variety of circumstances, courts have concluded that debt collectors can be held liable for attempting to collect amounts that consumers or another responsible party have already paid, as well as amounts that are either entirely unauthorized or above the amount permitted by law. *See, e.g.*, *Gonzalez v. Allied Collection Servs., Inc.*, No. 2:16-cv-02909-MMD-VCF, 2019 WL 489093, at *8 (D. Nev. Feb. 6, 2019), *aff'd*, 852 F. App'x 264 (9th Cir. 2021) (explaining that debt collector violated § 1692f(1) by seeking to collect the full amount of a medical debt that an insurer had partially paid); *Duffy v. Landberg*, 215 F.3d 871, 875 (8th Cir. 2000) (holding that demanding unauthorized fees and penalties and "slightly overstated" interest amount violated § 1692f(1)).

Because neither §§ 1692e nor 1692f includes any *mens rea* requirement, the FDCPA's bars on deceptive and unfair methods of debt collection impose strict liability on debt collectors. Every court of appeals to address the question has concluded as much. *See Vangorden*, 897 F.3d at 437–38 (2d Cir.); *Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 368 (3d Cir. 2011); *Stratton v. Portfolio Recovery Assocs., LLC*, 770 F.3d 443, 448–49 (6th Cir. 2014); *Randolph v. IMBS, Inc.*, 368 F.3d 726, 730 (7th Cir. 2004); *Picht v. Jon R. Hawks, Ltd.*, 236 F.3d 446, 451 (8th Cir. 2001); *Kaiser*, 989 F.3d at 1135 (9th Cir.); *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270–71 (11th Cir. 2011); *see also McLean v. Ray*, 488 F. App'x 677, 682 (4th Cir. 2012).

Alongside that strict liability for deceptive or unfair debt collection efforts, the FDCPA also provides debt collectors with an affirmative defense. Under the statute's bona-fide error provision, "[a] debt collector may not be held liable in any action brought" under the FDCPA if it can "show[] by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c).

Since 2011, the FDCPA has vested primary authority for administering the FDCPA in the Bureau. *See id.* §§ 1692*l*(b)(6), (d); *see also* 12 U.S.C. § 5481(12)(H), (14); *id.* § 5512(b).

## B.  Medical Debt and Medical Debt Collection

Medical debt is a major burden for many Americans. According to recent estimates, Americans owe at least $220 billion in medical debt—and about 14 million people (or six percent of all adults) owe over $1,000 in medical debt. *See* Shameek Rakshit et al., *The Burden of Medical Debt in the United States*, Kaiser Fam. Found. (Feb. 12, 2024).[3] In several significant ways, medical debt is unlike mortgage, credit card, or other major categories of debt. First, consumers rarely plan to take on medical debt. In fact, most medical debt arises from acute or emergency care—where consumers have particularly little control over the providers they see or the services they're given. 89 Fed. Reg. at 80716. Second, in both emergency and non-emergency settings, consumers may have little ability to price-shop due to restrictive insurance networks, price opacity, or limited provider availability. *Id.* Third, there are not always clear contracts governing consumers' payment obligations to health care providers. Agreements between patients and providers often do not set out clear price terms for services rendered. And in many circumstances, consumers may not have any contract with the various independent contractors or provider groups (like anesthesiologists or labs) involved in their care. *Id.* Finally, medical debt arises out of a complex medical billing process, which involves multiple players— including providers, insurers, government programs, and more—each shaped by different incentives and governed by various regulations. *Id.* As a result, it may be difficult for consumers to ascertain or understand the amount they ultimately owe, and there is substantial risk of error somewhere during this complicated billing process. In one recent, nationally representative

---

[3] *Available at* https://www.kff.org/health-costs/issue-brief/the-burden-of-medical-debt-in-the-united-states/.

survey, more than half of all adults with medical debt reported receiving a medical or dental bill that they believed included an error. *See* Karen Pollitz & Kaye Pestaina, *Could Consumer Assistance Be Helpful to People Facing Medical Debt?*, Kaiser Fam. Found. (July 14, 2022).[4]

Unsurprisingly, then, problems with medical debt collection are a major concern for American consumers. Last year, the CFPB received more than 7,000 complaints about attempts to collect medical bills. *See* FDCPA 2024 Annual Report, *supra*, at 3–4. Of those complaints, more than half concerned attempts to collect debts that consumers did not owe—including bills that consumers had already paid, or that had or should have been paid by insurance, hospital financial assistance programs, and other third-party payors. *Id.* In other complaints, consumers noted how difficult it can be to obtain accurate information about the debt owed because, among other things, healthcare providers and debt collectors may provide conflicting information about the status of their accounts and the amount owed. *Id.*

### C.  The Bureau's Advisory Opinion on Medical Debt Collection

To help ensure that debt collectors in the complex area of medical debt are respecting the statutory protections Congress crafted for consumers, in October 2024 the Bureau issued guidance—the Medical Debt Collection Advisory Opinion—regarding the deceptive and unfair collection of medical debt under the FDCPA and its implementing regulation, Regulation F. *See* 89 Fed. Reg. at 80715. With this Advisory Opinion, the Bureau does not regulate health care or the health care industry. Rather, the Advisory Opinion explains and clarifies the law that applies to debt collection—and, specifically, how that law applies in the context of collecting medical debts. The Advisory Opinion does so first by restating the law governing deceptive and unfair collection practices and identifying common factual situations in which the FDCPA's provisions

---

[4] *Available at* https://www.kff.org/policy-watch/could-consumer-assistance-be-helpful-topeople-facing-medical-debt.

are relevant in the context of medical debt collection. It then provides general statements of Bureau policy advising regulated entities of steps that, in the Bureau's view, could help them comply with their obligations under the statute and regulations in those various factual situations. The Advisory Opinion also includes an interpretation of when a debt is in "default" that bears on whether an entity will qualify as a "debt collector" subject to the FDCPA. As the Bureau explained, the Advisory Opinion is in part a policy statement and in part an interpretive rule. The Advisory Opinion was published in the Federal Register on October 4, 2024. *See id.* at 80715.

Three aspects of the Advisory Opinion are particularly relevant to this litigation.

*First*, the Advisory Opinion reiterates the established law that § 1692e(2)(A)'s prohibition on false representations of "the character, amount, or legal status" of any debt requires that debt collectors have a "reasonable basis on which to represent that the specific amount demanded is due and legally collectible." 89 Fed. Reg. at 80721. That's because, as the Advisory Opinion observes, a demand for payment contains an implied representation that the collector "has a reasonable basis to assert" that "the specific amount demanded is due and legally collectible." *Id.* So, if a debt collector does not in fact have sufficient substantiation to have a "reasonable basis" to assert that an amount is owed, it has made a false representation and thus violates the FDCPA. The Advisory Opinion then notes that various features of the healthcare market create heightened "risks of uncertainty as to the 'character, amount, or legal status' of debts." *Id.* It explains that, while a debt collector must have a reasonable basis to assert that the debts collected are in fact owed, "the type and amount of information that is necessary to substantiate a particular representation will vary" based on various factors. *Id.* It thus advises debt collectors to "exercise heightened care to ensure that they have a reasonable basis" for collection based on the circumstances. *Id.* The Advisory Opinion then outlines certain steps that debt collectors may

consider taking to mitigate the risk of violating this reasonable-basis requirement. For instance, it notes that a reasonable first step "may include" obtaining patient agreements and that a collector "may reduce risk of liability" if it has access to full payment histories. *Id.*

*Second*, the Advisory Opinion discusses several contexts in which consumers may not actually owe medical debts and where, accordingly, the FDCPA's well-established prohibitions on falsely representing "the character, amount, or legal status" of a debt and on collecting any amount unless it is "expressly authorized by the agreement creating the debt or permitted by law" can come into play. *See id.* at 80718–20. The Advisory Opinion notes that these provisions are relevant, among other circumstances, to any effort to collect debt that has already been paid (whether by the consumer, an insurance company, or some other third party), *id.* at 80718; where federal or state law relieves consumers of the obligation to pay or limits the amounts that consumers can be charged, *id.* at 80718–20; and when consumers are billed for services they never received, *id.* at 80720. Throughout, the Advisory Opinion identifies various features of the healthcare market that debt collectors should be mindful of to avoid violating the FDCPA's straightforward prohibitions on unfair and deceptive conduct. For instance, it highlights that a medical debt could be paid not just by the consumer but also by insurers or other third parties. *Id.* at 80718. It highlights that various laws, such as state workers' compensation regimes and the federal Nursing Home Reform Act, may limit consumers' obligation to pay certain charges. *Id.* at 80719. It highlights that other laws limit the amounts that consumers can be charged—including the federal No Surprises Act, state law analogues, and state contract or common law principles limiting prices to a "reasonable" amount when there is no express agreement for a service. *Id.* at 80719–20. And it highlights that medical bills sometimes include "upcoded" charges for services that consumers never agreed to and did not in fact receive. *Id.* at 18720. When a debt collector

seeks to collect an amount that a consumer does not actually owe—for these reasons (or any other)—they violate the FDCPA's straightforward bar on collecting debts that consumers do not actually owe. The Advisory Opinion also notes that collectors "may be able to minimize risk" of violations in these contexts by "working with client medical providers" to ensure appropriate billing practices. *Id.* at 80720 n.56, n.61.

*Third*, the Advisory Opinion interprets a provision of the FDCPA's definition of debt collector that exempts any person who collects or attempts to collect a debt assertedly owed another where the debt "was not in default at the time it was obtained by such person," 15 U.S.C. § 1692a(6)(F)(iii). *See* 89 Fed. Reg. at 80722. As the Advisory Opinion observes, the term "in default" is not defined in the FDCPA. *Id.* The Advisory Opinion thus interprets the term in this context according to "its ordinary meaning," which is "the failure to satisfy an agreement, promise, or obligation, especially a failure to make a payment when due." *Id.* (citing various dictionary definitions, including Merriam-Webster and Black's Law Dictionary). As the Advisory Opinion notes, this definition is consistent with the purpose of the exemption—which was meant to cover debt "servicers"—as well as the statute's general remedial purposes. *Id.* The Advisory Opinion clarifies that, when applied to medical debt, "in default" is "coextensive with contractual breach under applicable law": For medical debts governed by contracts requiring consumers to pay in full by a certain time, those accounts are in default once consumers fail to make the required payment by the due date and thus violate that contractual provision.[5] And because the bills are in default at that point, any person who obtains them for collection from

---

[5] The ACA Plaintiffs repeatedly misconstrue the Bureau's interpretation to consider a debt "in 'default' if they are not paid in full 'at a given time.'" ACA Mot. at 21. The Advisory Opinion makes clear, however, that the touchstone is the contract: "medical debts are *contractually* generally due in full *at a given time*," and it is the terms of those contracts that govern when default occurs under the Bureau's interpretation. 89 Fed. Reg. at 80723 (emphasis added).

then on would, in the Bureau's view, qualify as a debt collector under the FDCPA. *Id.* at 80723.

### D. Plaintiffs' Challenges to the Advisory Opinion

On November 1, 2024, ACA International—a debt collection industry trade group—and Collection Bureau Services, Inc. (CBS)—a debt collector that collects past-due medical bills—sued the Bureau and its Director (collectively, the Bureau) to challenge various portions of the Advisory Opinion. *See* Compl., *ACA Int'l v. CFPB*, No. 1:24-cv-3118 (D.D.C. Nov. 1, 2024), ACA Dkt. No. 1[6] ("ACA Compl."). The plaintiffs in *ACA* bring four claims under the Administrative Procedure Act (APA) and one constitutional claim. Their APA challenges take aim at four particular aspects of the Advisory Opinion: (1) its discussion of substantiation, which reiterates that debt collectors must not expressly or implicitly misrepresent that they have a "reasonable basis" to believe a debt is in fact owed; (2) a portion of the document reiterating that it violates the FDCPA to collect debts consumers do not legally owe, in particular the discussion of state common and contract law doctrines that may limit certain charges to "reasonable" levels; (3) another portion of that discussion of the collection of legally invalid debts that focuses on debts consumers do not owe because they neither agreed to nor received the service they were billed for; and (4) the Advisory Opinion's interpretation of the statutory term "in default" in the context of medical debt. Among other things, the ACA Plaintiffs contend that these four aspects of the Advisory Opinion constitute improper legislative rules, and the Bureau could not issue them without going through notice-and-comment rulemaking. On November 18, on this and other bases, the ACA Plaintiffs moved for a temporary restraining order and preliminary injunction seeking to enjoin the Bureau from implementing the Advisory Opinion and asking the

---

[6] For ease of reference, this brief refers to filings in *ACA Int'l v. CFPB*, No. 24-cv-3118, as appearing on "ACA Dkt." and filings in *R.M. Galicia, Inc. v. CFPB*, No. 24-cv-3149, as appearing on "PMS Dkt."

Court to set it aside. *See* Mot. on Appl. For Prelim. Inj. & TRO, ACA Dkt. No. 8 ("ACA Mot.").

On November 6, 2024, PMS—another collector of medical debt—likewise sued the Bureau and its Director to challenge one portion of the Advisory Opinion. *See* Compl., *R.M. Galicia, Inc. v. CFPB*, No. 24-cv-3149 (D.D.C. Nov. 6, 2024), PMS Dkt. No. 1 ("PMS Compl."). PMS's lawsuit concerns only the Advisory Opinion's discussion of how the FDCPA treats efforts to collect unsubstantiated medical debt. Like the ACA Plaintiffs, PMS contends that this section of the document is a legislative rule that the Bureau promulgated without appropriate process. On November 19, PMS moved for a temporary restraining order and preliminary injunction. *See* Mot. on Appl. for Prelim. Inj. & TRO, PMS Dkt. No. 9 ("PMS Mot.").

The Bureau now opposes both motions.[7]

## LEGAL STANDARDS

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)). "To get a preliminary injunction the movant must show: (1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) issuing 'an injunction is in the public interest.'" *Id.*

---

[7] When the Bureau originally published the Advisory Opinion, the Federal Register notice identified an "applicable date"—required for any Federal Register publication—of December 3, 2024. *See* 89 Fed. Reg. at 80715. Because the Advisory Opinion does not itself create any binding legal obligations, the Bureau has maintained that this applicable date does not change regulated entities' obligations to comply with the FDCPA requirements, as enacted by Congress and laid out in the Advisory Opinion. *See* Debt Collection Practices (Regulation F); Deceptive and Unfair Collection of Medical Debt (Nov. 21, 2024), *available at* https://files.consumerfinance.gov/f/documents/cfpb_medical-debt-collection_revision-of-applicable-date_2024-11.pdf. However, to allow the parties and the Court sufficient time to consider the Plaintiffs' motions, on November 21, 2024, the Bureau agreed to move the "applicable date" of the Advisory Opinion to January 2, 2025. *Id.*

(quoting *Winter*, 555 U.S. at 20).

"The plaintiff bear[s] the burdens of production and persuasion with respect to each of these factors." *Spicer v. Biden*, 575 F. Supp. 3d 93, 96 (D.D.C. 2021) (internal quotation marks omitted, alteration in original). "Of these factors, likelihood of success on the merits and irreparable harm are particularly crucial, and a court 'may deny a motion for preliminary injunction, without further inquiry, upon finding that a plaintiff is unable to show either irreparable injury or a likelihood of success on the merits.'" *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 182 (D.D.C. 2021) (quoting *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016)). But "[e]ven if the movant can make an independent showing of the first two factors, relief does not issue automatically." *Id.* "Rather, as the third and fourth factors suggest, a preliminary injunction is an equitable remedy committed to the court's 'sound discretion.'" *Id.* (quoting *Winter*, 555 U.S. at 24).

## ARGUMENT

### I. Plaintiffs are not likely to succeed on the merits of any of their challenges to the Medical Debt Collection Advisory Opinion.

Likelihood of success on the merits is the "most important" factor Plaintiffs must satisfy to secure the extraordinary remedy of a preliminary injunction. *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). Neither the ACA Plaintiffs nor PMS have established that they are likely to succeed on their challenges to various aspects of the Bureau's Advisory Opinion. As explained below, those challenged portions do not constitute final agency action, so they cannot be reviewed with these APA suits. Moreover, while Plaintiffs say that these sections of the Advisory Opinion are legislative rules that needed to go through notice and comment, they are wrong. The Advisory Opinion contains only restatements of blackletter FDCPA law, explanations of how that law applies to medical debt collection, and general policy statements discussing strategies

medical debt collectors may consider taking to mitigate their risk of violating the statute's clear

commands. None of that constitutes a legislative rule subject to the APA's notice-and-comment

requirements, or any of the other procedures applicable to legislative rules. Finally, the ACA

Plaintiffs raise a grab bag of other objections to the Advisory Opinion. But the ACA Plaintiffs are

unlikely to succeed on the merits of any of these claims, so the Court has no basis to grant them

any of the preliminary relief they seek. The Court should deny the motions for this reason alone.

### A. The challenged portions of the Advisory Opinion do not constitute final agency action, so Plaintiffs cannot challenge them through these suits.

The Court should first reject Plaintiffs' requests for preliminary injunctive relief because

they do not have a cause of action for any of their challenges to the Advisory Opinion, and

therefore cannot succeed on the merits of those challenges. The APA limits judicial review to

"'final agency action for which there is no other adequate remedy in a court.'" *Soundboard Ass'n*

*v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting 5 U.S.C. § 704). Challengers thus "lack a

cause of action under the APA" where there is no "final agency action." *Id.* "Agency actions are

final if [the] two independent conditions" laid out in *Bennett v. Spear* "are met: (1) the action

'mark[s] the consummation of the agency's decisionmaking process' and is not 'of a merely

tentative or interlocutory nature;' and (2) it is an action 'by which rights or obligations have been

determined, or from which legal consequences will flow.'" *Id.* (quoting *Bennett v. Spear*, 520

U.S. 154, 177–78 (1997)). An action "must satisfy both prongs of the *Bennett* test to be

considered final." *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016).

Neither the Advisory Opinion as a whole nor any of the four portions Plaintiffs seek to

challenge in their suits satisfy the second prong of the *Bennet* test—they do not determine any

rights or obligations or create any legal consequences. The Advisory Opinion therefore does not

constitute final agency action and is not reviewable in this Court.

"Whether an agency action has 'direct and appreciable legal consequences' under the second prong of *Bennett* is a 'pragmatic' inquiry." *Sierra Club v. EPA*, 955 F.3d 56, 62 (D.C. Cir. 2020) (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 598–99 (2016)). That pragmatic inquiry is "based on the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it." *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019). "The court here primarily looks to 'the actual legal effect (or lack thereof) of the agency action in question on regulated entities.'" *Cal. by & through Brown v. EPA*, 940 F.3d 1342, 1352 (D.C. Cir. 2019) (quoting *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014)).

Because Plaintiffs challenge only four portions of the Advisory Opinion, the Court should consider the legal effects of each. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (considering the "legal consequences" not of the guidance as a whole, but of "the challenged portion"); *Ciox Health, LLC v. Azar*, 435 F. Supp. 3d 30, 56 (D.D.C. 2020) (evaluating parties' arguments about finality with respect to "each of the three aspects of the 2016 Guidance challenged by" plaintiff). None of them satisfies that second *Bennett* prong.

**1. Substantiation.** Both the ACA Plaintiffs and PMS challenge a portion of the Advisory Opinion discussing the FDCPA's requirement that debt collectors "ensur[e] that they possess a reasonable basis" to assert that amounts are owed, in order to avoid implicitly misrepresenting to consumers that they have such a "reasonable basis" when they collect. 89 Fed. Reg. at 80721.

The ACA Plaintiffs, at least, expressly agree with this baseline restatement of law—that debt collectors must have a reasonable basis to believe a consumer owes a debt when they begin to collect on it. *See* ACA Compl. ¶ 32 ("The Advisory Opinion requires that before beginning collections '[d]ebt collectors must have a reasonable basis for asserting that the debts they collect

15

are valid and the amounts correct.' 89 Fed. Reg. 80716. This statement alone is not objectionable."). And, in any event, that restatement of the law is unreviewable. That's because, where an agency's statement "tread[s] no new ground" and merely "restat[es] [an] established interpretation," it is not reviewable final agency action. *See Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004) (Roberts, J.); *see also Ariz. Mining Ass'n v. Jackson*, 708 F. Supp. 2d 33, 39 (D.D.C. 2010) ("[A]n agency's restatement of an established interpretation is not reviewable final agency action."). Nothing about this aspect of the Advisory Opinion treads new ground. As the Bureau (and, before it, the Federal Trade Commission) has previously made clear, the statute already requires debt collectors to avoid implicitly misrepresenting that they have a reasonable basis to believe an amount is owed when they in fact do not have such substantiation. *See* 85 Fed. Reg. 76734, 76857 (Nov. 3, 2020) (concluding, in notice-and-comment rulemaking under the FDCPA, "it is clear that a debt collector must have (or have access to) records reasonably substantiating its claim that a consumer owes a debt in order to avoid engaging in deceptive or unfair collection practices in violation of the FDCPA when it attempts to collect the debt"); FTC, *Collecting Consumer Debts: The Challenges of Change—A Workshop Report* at 24 (2009)[8] (similarly concluding that a "representation that a consumer owes an amount of money [] conveys the implied claim that the collector has a reasonable basis to substantiate the assertion that the consumer owes the debt"). And regulators, including the Bureau, have brought enforcement actions against debt collectors for collecting on debts they did not have a reasonable basis to believe were owed. *See* 89 Fed. Reg. at 80722 n.71 (gathering complaints and consent orders in Justice Department and Bureau cases). Thus, to the extent any Plaintiffs challenge this restatement, the APA does not give them a cause of action to do so.

---

[8] *Available at* http://www.ftc.gov/bcp/workshops/debtcollection/dcwr.pdf.

Plaintiffs' main challenges to the substantiation portion of the Advisory Opinion focus not on that restatement of law, but on an imagined requirement they read into the document— which, in their view, "requires debt collectors to analyze for accuracy account-level documents like hospital bills and treatment plans before its first contact with a consumer." ACA Mot. at 5; *see also* PMS Mot. at 12 (construing the document to require "medical debt collectors to investigate, through reviewing account-level documentation, the validity and reasonableness of medical debt prior to collection"). But that kind of requirement appears nowhere in the Advisory Opinion. In fact, the document itself refutes the idea that debt collectors must or should obtain private patient documents or necessarily review any documents at all before beginning collections. *See* 89 Fed. Reg. at 80721 & n.68 (noting that "the type and amount of information that is necessary to substantiate a particular representation will vary" based on the circumstances and clarifying that the Advisory Opinion was not even encouraging collectors to "obtain access to documents beyond relevant patient contracts or bills as permitted under applicable privacy laws"). The closest Plaintiffs get is the Bureau's observation that a "debt collector *may reduce risk of liability* if it has access to full payment histories for the patient accounts" and otherwise "confirm[s] the hospital's compliance with any affirmative legal obligations." *Id.* at 80721 (emphasis added). That recommendation neither "commands," "requires," "orders," nor "dictates," so it imposes no new legal obligations on regulated entities. *Appalachian Power Co.*, 208 F.3d at 1023.

In their preliminary injunction briefing, Plaintiffs contend that the Bureau has here *implicitly* created a new requirement for account-level review before collections can begin— which they presumably take to be the kind of dictate that qualifies as final agency action. That argument misses the mark. As just noted, the Advisory Opinion itself suggests other ways debt

collectors can ensure that they have a reasonable basis to believe the debts they are collecting are in fact owed. For example, the Advisory Opinion notes that a debt collector onboarding a new hospital client "may reduce risk of liability if it has access to full payment histories for the patient accounts" and "confirms the hospital's compliance with" its "legal obligations." 89 Fed. Reg. at 80721. The Advisory Opinion elsewhere suggests "obtaining any relevant patient agreements," *id.*, but a recommendation to *obtain* documentation clearly neither contemplates nor requires any particular, account-level review. Of course, whether any given debt collector's efforts would satisfy the reasonable-basis requirement in particular circumstances is beyond the scope of this Advisory Opinion. But pointing out the legal framework and explaining how it might play out in practice does not itself "impose[] . . . obligations, prohibitions, or restrictions," or "put [any] party to the choice between costly compliance and the risk of a penalty of any sort." *Sierra Club*, 955 F.3d at 63. It is therefore not final agency action.

  **2. Debts related to legally invalid bills.** The ACA Plaintiffs next challenge a portion of the Advisory Opinion, 89 Fed. Reg. at 80719–20, discussing unfair and deceptive efforts to collect on debts that consumers do not owe because they are in some way legally invalid. Again, the ACA Plaintiffs do not contest the Bureau's restatement of FDCPA law—that collectors may not misrepresent the character, amount, or status of a debt, or collect or attempt to collect debts that are not actually owed. Instead, they home in on a short discussion of the bodies of law that may affect the validity of certain medical debts—including state contract and common law limiting the amount that can be charged when there is no express price term in a contract for medical services. *See* ACA Mot. at 18–19. And again, the ACA Plaintiffs misread this discussion. In their view, the Advisory Opinion mandates that debt collectors take certain steps to review patient bills before collecting on a medical debt in all circumstances. *See id.* at 5, 13.

That's flatly not true. All this portion of the Advisory Opinion does is "remind[] debt collectors that" certain state laws may "determine or limit the amount that medical providers may charge," which could affect the amount of a debt that they can legally try to recover without running afoul of the FDCPA's bars on collecting amounts that are not actually owed. *See* 89 Fed. Reg. at 80720. That kind of "remind[er]" to regulated parties "of their duties under" the statute and warning of "the various risks associated" with a particular industry is not final agency action. *See ForUsAll, Inc. v. U.S. Dep't of Lab.*, 691 F. Supp. 3d 14, 29 (D.D.C. 2023). To the extent debt collectors *are* bound to consider those state laws, that legal obligation comes from the FDCPA's bar on unfair and deceptive collection practices—not the Advisory Opinion itself.

    **3. Debts related to upcoded bills.** In their third challenge, the ACA Plaintiffs urge the court to review the Advisory Opinion's discussion of the FDCPA's bar on collecting amounts that are not owed because the underlying medical bills have been "upcoded" to charge for services consumers never actually agreed to or received. In the ACA Plaintiffs' telling, this portion of the document amounts to a "new requirement to perform medical procedure audits," ACA Mot. at 13, and so would necessarily impose new legal obligations on regulated entities. But once more, they misread the Advisory Opinion. The only legal obligation it describes is drawn straight from the statute, which, as relevant here, limits collection to amounts "expressly authorized by the agreement creating the debt" or permitted by law and forbids any "false representation" of the "amount" of any debt. 89 Fed. Reg. at 80720 (discussing §§ 1692f(1) and 1692e(2)(A)). The Advisory Opinion contains no other mandatory statements, instead offering only suggestions—none of which include auditing medical procedures—that may minimize the risk that debt collectors would violate the statute by improperly collecting inflated medical bills. *See* 89 Fed. Reg. at 80720 n.61 (expressly disclaiming suggestion that debt collectors should

obtain medical records and suggesting that "working with client medical providers to ensure appropriate medical billing practices" may minimize risk of misrepresentations). Again, there are "no obligations, prohibitions, or restrictions" beyond what's outlined in the statute, *Sierra Club*, 955 F.3d at 63, so this portion of the document is not final agency action.

**4. Interpretation of "in default."** Finally, Plaintiffs ask the Court to review the Advisory Opinion's interpretation of the statutory phrase "in default," as it appears in an exemption to the FDCPA's definition of "debt collector." This interpretive portion of the Advisory Opinion, too, does not create any legal consequences. Here, the Advisory Opinion provides the Bureau's own "definitive interpretation" of the statutory term as applied to certain types of medical bills. *Cal. Cmtys.*, 934 F.3d at 638. But that does not itself open up any regulated entity to any new "possibility of an enforcement action or to enhanced fines or penalties." *Sierra Club*, 955 F.3d at 65. To bring about any legal consequences based on that interpretation, the Bureau would need to file enforcement actions (or private plaintiffs would need to file lawsuits) against medical debt collectors covered by the statute under this interpretation of "default." And in such litigation, neither the Bureau nor private parties would be able to "rely on" the Advisory Opinion "as independently authoritative." *Cal. Cmtys.*, 934 F.3d at 638. Rather, the Bureau's interpretation would only be entitled to respect under *Skidmore* according to its "power to persuade." *See Gonzales v. Oregon*, 546 U.S. 243, 256 (2006); *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2267 (2024).

"*Skidmore* respect is not the kind of 'legal consequence' that may make an interpretation final for purposes of [judicial] review." *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 643 (6th Cir. 2004). Indeed, that power of persuasion would exist whether or not the Bureau had ever articulated an interpretation of "in default" in this Advisory Opinion. As a result, that

interpretation does not carry the legal consequences necessary to render it a reviewable final agency action. *See id.* (holding that agency interpretation was not final where agency could not claim any deference and explaining that a consequence of reduced deference for agency action is that "less agency action accordingly may qualify for federal-court review").[9]

### B. The challenged aspects of the Advisory Opinion are not legislative rules, so the Bureau did not need to engage in notice-and-comment rulemaking or fulfill other procedural requirements.

The Court need not reach the substance of Plaintiffs' objections to the Advisory Opinion if it concludes that the challenged portions are not final agency action. But if it does reach any of Plaintiffs' claims, the Court should reject in full Plaintiffs' primary contention that the Advisory Opinion is a legislative rule, so the Bureau needed to promulgate it through notice-and-comment rulemaking. "[L]egislative rules generally require notice and comment," while "interpretive rules and general statements of policy do not."[10] *Nat'l Mining Ass'n*, 758 F.3d at 251; *see also* 5 U.S.C. § 553(b). A "legislative rule" is one that "has legal effect" or "that an agency promulgates with the intent to exercise its delegated legislative power by speaking with the force of law." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020) (cleaned up); *see also, e.g.*, *Nat'l*

---

[9] To be clear, the Bureau does not suggest that all agency guidance documents lack legal consequence. For example, if guidance laying out the agency's interpretation of a statute "compel[led] agency officials" to apply certain standards in, say, permitting or grantmaking, that interpretation could have independent legal effect. *Nat'l Env't Dev. Assoc.'s Clean Air Project v. E.P.A.*, 752 F.3d 999, 1007 (D.C. Cir. 2014). But the interpretation here simply does not have any real-world legal consequences, beyond putting regulated entities on notice of a position the Bureau would take in litigation—which would not be entitled to deference in any event.

[10] Notice and comment is also not required for agency actions that don't qualify as rulemaking acts at all. Under the APA, a "rule" is any "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). Restatements of established legal interpretations that "le[ave] the world just as [they] found it . . . cannot be fairly described as implementing, interpreting, or prescribing law or policy," so they are not rules that must undergo notice and comment. *Indep. Equip. Dealers Ass'n*, 372 F.3d at 428.

*Mining Ass'n*, 758 F.3d at 252 (looking to "the actual legal effect (or lack thereof) of the agency action in question on regulated entities," as well as "the agency's characterization of the guidance" as binding or not, to determine whether statement was legislative rule or policy statement).[11] None of the challenged Advisory Opinion sections qualifies as a legislative rule.

At the outset, in no part of the Advisory Opinion does the Bureau purport to exercise its delegated legislative power to speak with the force of law. Instead, it expressly characterizes the Advisory Opinion as an "interpretive rule in part and a general statement of policy in part." 89 Fed. Reg. at 80723. It has not codified the Advisory Opinion's statements in the Code of Federal Regulations. And it has made clear in this litigation that it does not view the Advisory Opinion as creating any new legal obligations. *See* Am. Joint Statement re Proposed Briefing Timeline ¶ 3 (Nov. 19, 2024), ACA Dkt. 10; Parties' Joint Status Report at 2 (Nov. 21, 2024), ACA Dkt. No 12, PMS Dkt. No. 18. Thus, it has not issued the Advisory Opinion with "the intent to exercise its delegated legislative power by speaking with the force of law," *Nat. Res. Def. Council*, 955 F.3d at 83.

Nor does any aspect of the Advisory Opinion have any actual "legal effect."

**1. Substantiation**. Contrary to the ACA Plaintiffs' and PMS's claims, ACA Mot. at 16–18, 23; PMS Mot. at 7–12, the Advisory Opinion's discussion of substantiation is not a

---

[11] Plaintiffs focus on the test in this Circuit for distinguishing legislative and interpretive rules, which requires courts to consider "(1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule." *Am. Mining Cong. v. MSHA*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). That test speaks to the overarching question of whether the agency action "has legal effect." *Id.* Factors 1 and 4 speak to the actual effect of the document, while factors 2 and 3 speak to whether the agency evinced an intent to create binding obligations with the force of law.

legislative rule. As discussed above, *supra* at 15–17, this section consists of two parts—a restatement of law and guidance about how debt collectors may, in certain circumstances, mitigate their risk of violating that law by improperly collecting medical debt that they have no reasonable basis to assert is owed. 89 Fed. Reg. at 80721. Neither part has legal effect.

The first part of this discussion does not have legal effect because it merely restates existing law. This part explains that the FDCPA's prohibitions on unfair and deceptive debt collection practices bar the collection of debts without a reasonable basis to believe they are in fact owed. The Bureau and other regulators have articulated this understanding of the statute and pursued enforcement actions based on related substantiation theories before. *See supra* at 16. Indeed, the ACA Plaintiffs do not find this statement of law "objectionable." ACA Compl. ¶ 32

The second part of the Advisory Opinion's substantiation discussion also does not have legal effect because it merely offers nonmandatory suggestions about what the Bureau thinks debt collectors "may" do to "satisfy" the pre-existing statutory requirements, all the while reminding that "the type and amount of information that is necessary to substantiate a particular representation will vary depending" on the circumstances. 89 Fed. Reg. at 80721. As even the ACA Plaintiffs concede, ACA Mot. at 17, this language is on its face nonmandatory. Because the Bureau's observations about possible ways of mitigating risk do not "purport[] to impose legally binding obligations or prohibitions on regulated parties," they are not legislative rules. *Nat'l Min. Ass'n*, 758 F.3d at 251.

Plaintiffs raise several arguments to the contrary, but they all misread either existing FDCPA authorities or the Advisory Opinion (or both).

First, Plaintiffs contend that the Advisory Opinion creates a new "pre-contact verification" duty found nowhere in prior FDCPA law, and so it must be a legislative rule. *See*

ACA Mot. at 16; PMS Mot. at 11. In support, Plaintiffs cite to FDCPA case law concluding that debt collectors do not need to "independently investigate and verify the validity of a debt." *See* ACA Mot. at 16; PMS Mot. at 7–10. This case law is a red herring because, as the Bureau has explained, the substantiation section of the Advisory Opinion discusses the FDCPA's general—and, as the ACA Plaintiffs concede, accepted—requirement that debt collectors have a reasonable basis to assert that an amount is owed. Far from imposing any particular "pre-contact verification" duty, *contra* ACA Mot. at 16, the Advisory Opinion makes clear that what it takes for a collector to have such a reasonable basis "will vary depending" on various factors. 89 Fed. Reg. at 80721.

Second, both sets of Plaintiffs suggest that the Advisory Opinion's substantiation discussion is a legislative rule because it imposes requirements inconsistent with the debt-verification procedures laid out in 15 U.S.C. § 1692g. *See* ACA Mot. at 16; PMS Mot. at 10. That provision of the FDCPA outlines what debt collectors must do if consumers dispute a debt, including "ceas[ing] collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt" and provides that verification to the consumer. 15 U.S.C. § 1692g. In Plaintiffs' view, if debt collectors had an obligation to ensure that their debts are substantiated before making a collection attempt, the after-the-fact verification provision would be pointless. Thus, they reason, debt collectors need not ensure they have a reasonable basis to collect a debt when they first begin collection.

That is mistaken. The validation requirement still plays an important role in protecting consumers, notwithstanding the independent requirement to avoid misrepresentations (including about the reasonable basis to believe a debt is owed) at the outset. As numerous circuit courts have made clear, § 1692g "is conditional, identifying a debt collector's obligations '*[i]f* the

consumer disputes a debt." *Vangorden*, 897 F.3d at 439; *see also Russell*, 763 F.3d at 393. What a debt collector will need to gather, review, and provide to the consumer at that point will vary based on the nature of the consumer's dispute—including to what extent the dispute gives the debt collector reason to doubt its original basis to believe the debt was owed. Section 1692g, moreover, requires the collector to provide verification of the debt *to the consumer* before it resumes collection—a requirement that does not exist at the outset. Nor does § 1692g's validation requirement do anything to change the well-established (and, indeed, accepted by the ACA Plaintiffs, *see* ACA Compl. ¶ 32) requirement that debt collectors must have a reasonable basis to believe a debt is owed before they begin collecting. An after-the-fact verification process does not somehow absolve debt collectors of their obligation from the outset to only attempt to collect debts when they have a reasonable basis for collection. Rather, courts have repeatedly made clear that debt collectors do not have "free rein to make false or deceptive representations about the status of a debt" up until a consumer disputes its validity. *Russell*, 763 F.3d at 393; *see also McLaughlin v. Phelan Hallinan & Schmieg, LLP*, 756 F.3d 240, 248 (3d Cir. 2014) (rejecting interpretation of § 1692g that would "have the effect of immunizing false statements that a consumer failed to promptly dispute"). What a debt collector must do to avoid engaging in deceptive and unfair conduct in the first place is simply unrelated to what it must do to comply with the FDCPA's debt-verification procedures once a consumer has pointed out a problem.

Third, the ACA Plaintiffs argue that the Advisory Opinion's discussion of substantiation is a legislative rule because, under prong four of the *American Mining* test, they say it effectively amends a prior rule. *See* ACA Mot. at 23–24 (citing *Am. Mining Cong.*, 995 F.2d at 1112). In support, they point only to a stray discussion in the Bureau's 2020 rulemaking on Regulation F— the FDCPA's implementing regulation—explaining that the Bureau had "declined" to adopt

certain specific interventions commenters had suggested related to "debt collectors' obligation to substantiate debts." *See* 85 Fed. Reg. 76734, 76737 n.27 (Nov. 30, 2020). Nothing in the Advisory Opinion expressly or implicitly amends anything about that statement in the Regulation F rulemaking preamble. The Bureau did not adopt specific substantiation standards there, nor did it do so here. Moreover, that footnote should not be taken as an indication that, in 2020, the Bureau did not believe debt collectors *had* an obligation to substantiate debts. Other parts of that same rulemaking refute that point: The Bureau there found it "clear that a debt collector must have (or have access to) records reasonably substantiating its claim that a consumer owes a debt in order to avoid engaging in deceptive or unfair collection practices in violation of the FDCPA when it attempts to collect the debt." *See id.* at 76857.

**2. Collection of debt above amounts allowed under state law requiring reasonable medical billing.** The portion of the Advisory Opinion reminding debt collectors of various bodies of state law governing reasonable pricing in medical billing is likewise not a legislative rule. As discussed above, the ACA Plaintiffs' preliminary injunction motion misreads the Advisory Opinion to create an across-the-board "reasonableness-of-pricing standard" when it in fact does no such thing. *See supra* at 18–19. That part of the Advisory Opinion does not impose any obligations or otherwise have legal effect. Instead, it first merely restates *pre-existing* legal obligations, *i.e.*, the well-established FDCPA law precluding debt collectors from misrepresenting the amount of a debt or collecting or attempting to collect an amount not permitted by law. To help entities avoid violations of those pre-existing obligations, it then points out various bodies of federal and state law that may limit what amounts consumers owe in certain circumstances—and thus the kinds of legal restrictions debt collectors may need to consider in their efforts to comply with the FDCPA's deceptiveness and unfairness provisions.

The ACA Plaintiffs nevertheless suggest that the Advisory Opinion's limited discussion of state-law reasonableness requirements creates a new and binding legal obligation because, "[u]nder existing law, debt collectors are not required to make an independent legal determination as to whether the consumer has any potential legal defense to the debt prior to collection." ACA Mot. at 18. But that's just not true. Under existing law, debt collectors can violate the FDCPA's deceptiveness and unfairness prohibitions even if the deceptive or unfair nature of the collection attempt turns on whether the consumer has a legal defense or whether a debt is not owed by some other operation of law. *See, e.g.*, *McMahon v. LVNV Funding, LLC*, 744 F.3d 1010, 1020 (7th Cir. 2014) ("[A] debt collector violates the FDCPA when it misleads an unsophisticated consumer to believe a time-barred debt is legally enforceable[.]"); *Wise v. Zwicker & Assocs., P.C.*, 780 F.3d 710, 714 (6th Cir. 2015) (reasoning that it would violate the FDCPA to attempt to collect attorney's fees under fee-shifting provision unenforceable under state law). The Advisory Opinion merely reminds debt collectors of their general obligation to avoid collecting legally invalid debt and points out that, in the highly regulated world of medical billing, the legal landscape may be varied and include state-law limits on the amount charged.

None of this means—as Plaintiffs fear—that debt collectors must make an "independent legal determination" as to the legal validity of each debt.  As the Advisory Opinion notes, "debt collectors may be able to minimize risk of misrepresentations in these circumstances by working with client medical providers to ensure that pricing and billing practices comply with applicable legal limits." 89 Fed. Reg. at 80720 n.56. Moreover, though the FDCPA imposes strict liability for deceptively or unfairly collecting a legally invalid debt, the statute's bona-fide error provision also creates an affirmative defense to liability under the FDCPA for debt collectors that inadvertently commit certain violations, so long as they have policies and procedures in place

27

designed to avoid those errors. *See* 15 U.S.C. § 1692k(c). Indeed, the ACA Plaintiffs' own authority—which they only selectively quote—focuses clearly on the role the bona-fide error defense plays in the statutory scheme, and what is needed to satisfy it. *See Owen v. I.C. Systems, Inc.*, 629 F.3d 1263, 1276 (11th Cir. 2011) (observing that the FDCPA "does not require debt collectors to independently investigate and verify the validity of a debt *to qualify for the bona fide error defense*." (emphasis added)). Both in past rulemakings and in this Advisory Opinion, the Bureau has observed that debt collectors may be able to use this bona-fide error defense to avoid liability for the "inadvertent error[s]" that may be inevitable given "the complexity of medical collections." 85 Fed. Reg. at 76833; *see also* 89 Fed. Reg. at 80718 n.36 (recognizing that bona-fide error defense may protect collectors from liability for violations described in the Advisory Opinion). Whether a bona-fide error defense would be available in any given context was beyond the scope of this Advisory Opinion, but could turn on whether the debt collector has followed policies and procedures that identify the applicable standards and are designed to ensure bills meet them. Those policies could be applied at the portfolio-level, in consultation with a collector's medical-provider clients.

    **3. Debts related to "upcoded" bills.** The Advisory Opinion's discussion of debt arising out of "upcoded" medical bills is likewise not an improper legislative rule. The ACA Plaintiffs' complaints begin from the incorrect premise that the Advisory Opinion "establishes a new FDCPA violation where there may be upcoding," ACA Mot. at 20. As with the portions of the Advisory Opinion covering state-law reasonableness requirements, discussed above, this portion of the Advisory Opinion in fact merely restates the straightforward requirements of the FDCPA and offers the Bureau's view of how those pre-existing requirements may play out in the medical debt context. Neither of those things imposes any obligations or otherwise has legal effect.

The ACA Plaintiffs again misread this discussion to impose a new substantive requirement, this time forcing debt collectors to audit how medical procedures were in fact performed for each bill they plan to collect on. *See* ACA Mot. at 19–20. Again, the Advisory Opinion expressly disclaims doing so. As the Advisory Opinion notes, nothing in the document should be taken to even suggest that, to mitigate risk, "debt collectors should obtain access to documents beyond relevant patient contracts or bills." 89 Fed. Reg. at 80720 n.61. And far from imposing any particular requirements, the Advisory Opinion indicates that collectors "may be able to minimize risk of misrepresentation in these circumstances by working with client medical providers to ensure appropriate billing practices." *Id.* So, as with the state-law reasonableness requirements discussed above, the full FDCPA scheme—including the bona-fide error defense—makes clear that there is not and has never been any auditing requirement for medical records. Debt collectors could minimize their risk of collecting improperly upcoded medical debt by, among other things, working with their medical provider clients to ensure that their bills are accurate and consistent with the contracts patients have signed. Because this so-called audit requirement is an invention of the ACA Plaintiffs' complaint rather than a product of the Advisory Opinion, it is not a legislative rule that the Bureau improperly promulgated without notice and comment.

**4. Interpretation of "in default."** Finally, the ACA Plaintiffs say that the Advisory Opinion's discussion of how the statutory term "in default" applies to medical bills governed by an express contract is an inappropriate legislative rule. Again, they are wrong. This portion of the Advisory Opinion is a classic interpretive rule. It states that, per its ordinary meaning, "default" is "coextensive with contractual breach under applicable law." 89 Fed. Reg. at 80723. Thus, for medical services governed by contracts requiring payment in full by a certain time, accounts are

"in default" once consumers fail to make the required payment by the due date and thus violate that contractual provision. The Bureau issued this determination "only . . . to explain ambiguous language" in the statute, *Sentara-Hampton Gen. Hosp. v. Sullivan*, 980 F.2d 749, 759 (D.C. Cir. 1992), and "advise the public of the agency's construction of the statutes and rules which it administers," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015). All the Bureau has done is proactively explain to regulated entities how it understands the undefined term "in default" will apply in certain circumstances. The Bureau would be able to pursue "an enforcement action" on that basis "in the absence of" the Advisory Opinion, so the interpretation does not itself have "legal effect" and is not a legislative rule. *Am. Mining Cong.*, 995 F.2d at 1112.

The Court should reject the ACA Plaintiffs' efforts to cast this portion of the Advisory Opinion as legislative. They first complain that the Bureau's interpretation of "default" is legislative because it "extends the FDCPA to the entire medical billing industry without a legal basis." ACA Mot. at 21. But the breadth of the Bureau's interpretation is not what matters. "[E]ven a consequential, conduct-altering rule remains interpretive so long as it can fairly be viewed as interpreting—even incorrectly—a statute or regulation." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 408 (D.C. Cir. 2020) (internal quotation marks omitted). Besides, the ACA Plaintiffs greatly overstate the impact of the Bureau's interpretation of "in default." The Advisory Opinion explains only that, where an express contract requires consumers to pay a medical bill in full by a date certain, consumers are "in default" when they have missed that contractual payment deadline—and so persons who obtain the debt after that point do not qualify for the relevant exemption from the FDCPA's definition of debt collector. 89 Fed. Reg. at 80722–23. Any medical billing companies that obtain the right to collect on a bill *before* consumers miss that payment deadline (and in fact may be involved from the outset) would still

be covered by the exemption to the FDCPA's definition of "debt collector," and nothing about the Bureau's interpretation of "in default" changes that.[12]

Second, the ACA Plaintiffs suggest that the Bureau has engaged in legislative rulemaking because its interpretation is inconsistent with existing FDCPA case law and other laws governing medical billing. They are wrong on both points. As to the first, the ACA Plaintiffs say only that the Bureau's definition of "in default" conflicts with the approach certain courts have taken when applying the undefined statutory term in some circumstances. *See* ACA Mot. at 21–22. But disagreement about how to apply an ambiguous statutory term between a handful of district courts and the agency tasked with implementing the statute is not enough to turn the agency's interpretation into a legislative rule. So long as it does not seek to amend its own prior legislative rule through a non-binding interpretation—and it has not done that here—the Bureau is free to "refine[] an interpretation of its . . . statutory authorities" without going through notice-and-comment rulemaking. *POET Biorefining, LLC*, 970 F.3d at 408.

The ACA Plaintiffs' claim of conflict with other laws is even more contrived. They say the Bureau's interpretation of "in default" "directly conflicts" with Centers for Medicare & Medicaid Services rules governing when medical providers can be reimbursed for certain uncollectible medical debts. *See* ACA Mot. at 22 (citing 42 C.F.R. § 413.89(e)(2)(i)(A)(3)). There is simply no conflict. A debt can be "in default" for the purposes of the FDCPA's definition of debt collector even if it is not yet considered "uncollectible" for the purposes of Medicare's reimbursement regulations. Plaintiffs have offered no reason why a medical billing company that obtains a debt after consumers have missed the contractual payment deadline, but

---

[12] To the extent medical billing companies are only taking over accounts after consumers have missed a payment deadline, it makes sense for those companies collecting on such "problem" accounts to abide by the protections the FDCPA set out for consumers in collections.

before enough time has passed for the provider to claim it on a Medicare cost report, could not comply with its obligations under both the FDCPA and the CMS regulations.

\* \* \*

In sum, none of the challenged components of the Advisory Opinion constitute a legislative rule. As a result, the Court can reject all of Plaintiffs' procedural objections to the document, *see* ACA Mot. at 24–26, 30–32, 36; PMS Mot. at 5, 12–13. The Bureau did not need to issue the Advisory Opinion through notice-and-comment rulemaking, nor did it need to comply with the Regulatory Flexibility Act, the Small Business Regulatory Enforcement and Fairness Act, the Paperwork Reduction Act, or any of the Consumer Financial Protection Act's requirements for consultation and analysis that Plaintiffs highlight. Those requirements all apply only to legislative rules. *See* 5 U.S.C. §§ 603–04 (requiring regulatory flexibility analysis for rules promulgated under the APA's notice-and-comment provisions); *id.* § 609 (outlining SBREFA requirements for rules, which 5 U.S.C. § 601(2) defines to include only notice-and-comment rules); 44 U.S.C. § 3506 (requiring agencies to take steps before collecting information in proposed rules); 12 U.S.C. § 5512(b)(2) (requiring certain analysis and consultation only for "rule[s]" under the Federal consumer financial laws, as distinct from "orders and guidance").

**C.  The ACA Plaintiffs' other challenges to the Advisory Opinion are meritless.**

The ACA Plaintiffs' preliminary injunction motion raises several other objections to the Advisory Opinion. Should it reach any of them, the Court should conclude that Plaintiffs have not shown a likelihood of success on any these claims, either.

### 1.  *Plaintiffs have not established that any aspect of the Advisory Opinion is arbitrary and capricious.*

The Court should first reject the ACA Plaintiffs' claims that the Advisory Opinion—or various aspects of it—are arbitrary and capricious.

These Plaintiffs first say that the Bureau's Advisory Opinion should be entirely set aside as arbitrary and capricious because its "new requirements are not supported by substantial evidence." *See* ACA Mot. at 27–29. But, as already explained, the Advisory Opinion doesn't impose any "new requirements." Instead, it for the most part just restates established FDCPA prohibitions, then highlights various circumstances in which those prohibitions may come into play when a debt collector collects medical debts and offers guidance about what debt collectors may do to mitigate risk of liability in those circumstances. Plaintiffs offer no support for the proposition that those sorts of agency statements must be supported by "substantial evidence" (or what that would even mean). Nor could they, given that, as explained above, those statements are not final agency action subject to review at all. The Bureau did not act arbitrarily or capriciously by issuing an Advisory Opinion without the evidentiary support that would have been necessary had it in fact adopted "new requirements."[13]

The ACA Plaintiffs also focus specifically on the Advisory Opinion's interpretation of "in default." *See* ACA Mot. at 29. While Plaintiffs fault the Bureau for not considering various costs, the implication of its interpretation was (rightly) not the focus of the Bureau's analysis. There, the Bureau engaged in an act of statutory interpretation, determining that tying "default" to the relevant contract due date was consistent with the plain meaning of the term (as well as Congress's intent in crafting this exception to the definition of "debt collector," and the FDCPA's general consumer-protective purposes). *See* 89 Fed. Reg. at 80723. Plaintiffs essentially suggest that the Bureau should have engaged in a results-oriented analysis, focusing on how its

---

[13] Much of Plaintiffs' argument on this point appears to be little more than a repackaging of its procedural objection to the Bureau's decision to issue the Advisory Opinion without notice-and-comment rulemaking—complaining about the Bureau's failure to solicit comments from stakeholders or consider the costs and benefits of the Advisory Opinion. For the reasons noted above, none of those procedural requirements applied here.

interpretation of the statutory text would impact regulated entities. But the Bureau had no need to do that in using the standard tools of construction to offer its best reading of the statute.

### 2. The Advisory Opinion is entirely consistent with governing law.

The ACA Plaintiffs next claim that two aspects of the Advisory Opinion conflict with other areas of law, and so must be vacated under the APA. *See* ACA Mot. at 33–35. In particular, they say that the discussion of unsubstantiated medical debt conflicts with the FDCPA's post-dispute verification procedures in 15 U.S.C. § 1692g and that its interpretation of the phrase "in default" conflicts with regulations governing "bad debts" under Medicare. The Bureau has already discussed both purported conflicts above, while explaining why neither relevant aspect of the Advisory Opinion qualifies as improper legislative rulemaking. *See supra* at 24–25, 31–32. For the reasons given above, no conflicts exist, and the Court should reject this argument in full.

### 3. The Advisory Opinion is an appropriate exercise of the authority the FDCPA grants the Bureau to regulate debt collection.

The ACA Plaintiffs next gesture toward a variety of different purported problems with the Bureau's authority to issue guidance regarding medical debt, including through the Advisory Opinion. None of these arguments, which their brief barely bothers to articulate, holds water.

Plaintiffs first—in discussing the imagined conflict with CMS regulations detailed above, *supra* at 31–32—suggest that the Bureau did not have authority to issue the Advisory Opinion because medical debt is not a "consumer financial product[] or service[]."[14] *See* ACA Mot. at

---

[14] The ACA Plaintiffs frame this argument around a supposed similarity with the "*ultra vires* rulemaking" in *NAACP v. DeVos*, 485 F. Supp. 3d 136 (D.D.C. 2020). There, this Court determined that a Department of Education interim rule concerning CARES Act funding was outside the scope of the Department's general rulemaking authority, after evaluating the plain text of that grant of rulemaking power. *Id.* at 143. To the extent that case stands for any relevant proposition, it is that agencies must act within the scope of their statutory authority. As the Bureau will explain, it has ample authority to regulate debt under the FDCPA—including medical debt.

35–36. On this point, Plaintiffs rely entirely on the statutory provision establishing the CFPB as an independent Bureau within the Federal Reserve, which states as a general matter that the Bureau "shall regulate the offering and provision of consumer financial products or services." 12 U.S.C. § 5491(a). Because medical debt is (in Plaintiffs' view) not a "consumer financial product or service," they (erroneously) seem to believe the Bureau cannot regulate it at all.

Plaintiffs ignore, however, that other provisions of both Dodd-Frank and the FDCPA itself give the Bureau statutory authority to issue regulations and guidance concerning the FDCPA. 12 U.S.C. § 5512(b) (authorizing Bureau to prescribe rules and issue guidance to carry out the purposes and objectives of the Federal consumer financial laws); *id.* § 5418(12), (14) (defining FDCPA as a Federal consumer financial law); 15 U.S.C. § 1692*l*(d) (authorizing CFPB to "prescribe rules with respect to the collection of debts by debt collectors, as defined in this subchapter"). And under the FDCPA, the definition of "debt" is not limited to debt related to other consumer financial products or services. 15 U.S.C. § 1692a(5). It includes "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes." *Id.* That definition undoubtedly covers medical debt, so the Bureau does not exceed its authority by offering guidance to collectors of medical debt about how to comply with their statutory obligations.

Given that clear statutory authority to regulate debt, including medical debt, under the FDCPA, the Court can reject out of hand the ACA Plaintiffs' vague suggestions that the Bureau exceeded its authority or violated the major questions doctrine by offering guidance that touches on the healthcare industry. *See* ACA Mot. at 37–38. Plaintiffs' only support for this argument is a grab-bag of observations about the scope and complexity of the healthcare industry and the laws

and regulations governing it. But that doesn't mean the Bureau lacks authority under the FDCPA to regulate medical debt collection by FDCPA-defined "debt collectors." Exactly the opposite. By drawing the statute's definition of "debt" so broadly, Congress recognized that consumers suffered from unscrupulous debt collection practices in a wide variety of contexts. It expressly authorized the Bureau to issue regulations and guidance to ensure that all debt collectors—including collectors of medical debt—comply with the protections the statute affords consumers.

### 4. *Plaintiffs' constitutional challenge based on the Bureau's funding is unsupported and provides no basis to invalidate the Advisory Opinion.*

Finally, the ACA Plaintiffs have not shown they are likely to prevail on their claim that the Bureau's method of funding remains invalid even after it was upheld in *Community Financial Services Ass'n of America, Ltd. v. CFPB*, 601 U.S. 416 (2024) ("*CFSA*")—a claim they barely articulate and that every court to have considered has rejected, *see CFPB v. SoLo Funds, Inc.*, 2024 WL 4553110, at *2 (C.D. Cal. Oct. 17, 2024); *Texas v. Colony Ridge, Inc.*, 2024 WL 4553111, at *4 (S.D. Tex. Oct. 11, 2024) (report and recommendation); *CFPB v. Active Network, LLC*, 2024 WL 4437639, at *2 (E.D. Tex. Oct. 7, 2024).

In the Bureau's organic statute, Congress authorized the Bureau to draw funds from the "combined earnings of the Federal Reserve System." 12 U.S.C. § 5497(a). The ACA Plaintiffs say (at 39–40) that the Federal Reserve is not currently generating any "earnings" from which the Bureau may permissibly draw funds. That is wrong. Last year, for example, the Federal Reserve generated earnings of more than $160 billion from interest on securities alone. *See* FRB, *Federal Reserve Board announces preliminary financial information for the Federal Reserve Banks' income and expenses in 2023* (Jan. 12, 2024).[15]

---

[15] *Available at* https://www.federalreserve.gov/newsevents/pressreleases/other20240112a.htm.

Plaintiffs seem (at 39) to read the statute's reference to "earnings" to instead mean "income" minus "costs and expenses." But while "earnings" can sometimes bear that meaning for private companies, the Federal Reserve is the nation's central bank—not a profit-maximizing private enterprise. The ACA Plaintiffs offer no argument why their preferred technical definition should be transplanted into such a different context.[16]

Nor could they. The common, everyday meaning of "earnings" is simply "money earned." *See* Earnings, *Black's Law Dictionary* (12th ed. 2024) ("Revenue gained from labor or services, from the investment of capital, or from assets. See INCOME."); Earnings, *Oxford English Dictionary* (online ed. 2024) ("[T]he money made through working, trade or business activity, etc."; "The income produced by invested capital."); *see also CFSA*, 601 U.S. at 469 (Alito, J., dissenting) ("The Federal Reserve's earnings represent specific charges for specific services to specific individuals or companies." (quotation marks omitted)). And other parts of the same statute use the term earnings in just this way, to refer to money earned by other agencies on investments or other income. *E.g.*, 12 U.S.C. § 5390(n)(2) (directing the FDIC's handling of "interest and other *earnings* from investments"); 15 U.S.C. § 78u-6(g)(5)(D) (requiring SEC to report "the amount of *earnings* on investments" made from its Investor Protection Fund).

The same meaning applies to the provision funding the Bureau, and therefore Plaintiffs cannot show a likelihood of success on the merits of this claim.

## II.    Plaintiffs have not shown irreparable harm.

For the reasons stated above, Plaintiffs have failed to show that they are likely to succeed on the merits. That failure alone defeats their preliminary injunction motion, and the Court "need not proceed to review the other three preliminary injunction factors." *Ark. Dairy Coop. Ass'n v.*

---

[16] Plaintiffs seek to rely on *CFSA* (at 39) but badly misread that decision, which did not purport to interpret the term "combined earnings" in § 5497(a)—an issue not even in dispute.

*U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009). But Plaintiffs are also not entitled to a

preliminary injunction for the additional reason that they have not shown that they will suffer any

irreparable harm as a result of the Advisory Opinion. "The basis of injunctive relief in the federal

courts has always been irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454

F.3d 290, 297 (D.C. Cir. 2006) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)).

Accordingly, failure to show irreparable harm "standing alone" is "sufficient to defeat the

motion" for injunctive relief. *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018);

*see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 ("A movant's failure to show any

irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other

three factors entering the calculus merit such relief.").

Plaintiffs contend that they will incur "substantial costs of compliance" as a result of the

Advisory Opinion and argue that the resultant economic losses constitute irreparable harm. ACA

Mot. at 26; *see also* PMS Mot. at 13–15.[17] That argument fails.

As an initial matter, Plaintiffs will not incur compliance costs as a result of the Advisory

Opinion because, as discussed above, the Advisory Opinion does not itself create any new legal

obligations. The legal obligations the Advisory Opinion discusses all derive from the statute

itself and would exist even if the Advisory Opinion were enjoined. Plaintiffs therefore cannot

establish they would suffer any "irreparable harm *in the absence of preliminary relief*." *Abdullah

v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (emphasis added); *see also Ayele v. District of

---

[17] In addition to their purported economic losses, Plaintiffs also suggest that they have suffered
procedural injuries insofar as they have been denied their rights under the APA. *E.g.*, ACA Mot.
at 27, 29. That argument fails as a matter of law. A procedural injury alone does not constitute
irreparable harm. *See Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 327–28 (D.D.C.
2018) (collecting cases); *CSL Plasma Inc. v. United States Customs & Border Prot.*, 628 F. Supp.
3d 243, 263 (D.D.C. 2022) (rejecting the argument that denial of "the right to participate in
notice-and-comment procedures" constitutes "irreparable harm").

*Columbia*, 704 F. Supp. 3d 231, 240–41 (D.D.C. 2023) (explaining that irreparable harm must "flow from" the object of the proposed injunction). They will suffer their claimed harm—being required to comply with the law—regardless.[18]

Beyond that, Plaintiffs' claims of "substantial compliance costs" would not be enough to satisfy their burden even if, as Plaintiffs claim, the Advisory Opinion created new requirements with which Plaintiffs must comply. That is because "the 'general rule' in this Circuit is that 'economic harm does not constitute irreparable injury.'" *Nat'l Council of Agric. Emps. v. U.S. Dep't of Lab.*, No. 22-cv-3569, 2023 WL 2043149, at *6–7 (D.D.C. Feb. 16, 2023) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009)). It does not matter that these economic losses "are unrecoverable." ACA Mot. at 26; *see also* PMS Mot. at 15. Under the prevailing rule, "the mere fact that economic losses may be unrecoverable does not, in and of itself compel a finding of irreparable harm." *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011); *see also Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326–27 (D.D.C. 2018) (noting that the "vast majority" of courts in this Circuit "have rejected the rule that unrecoverable monetary losses constitute per se irreparable harm").

Instead, to establish irreparable harm, a plaintiff must show that its economic losses would be financially ruinous. That is because "the fact that economic losses may be unrecoverable does not absolve the movant from its 'considerable burden' of proving that those

---

[18] The ACA Plaintiffs' claim that they face the threat of "government enforcement or private litigation," ACA Mot. at 27, is baseless for the same reason. Plaintiffs' legal obligations flow not from the Advisory Opinion but from the statute. They could be sued for failing to comply with the FDCPA even if the Advisory Opinion were enjoined. And, in any event, the ACA Plaintiffs' claim they face a threat of litigation is entirely speculative. The possibility that some unknown party will at some unspecified point initiate litigation (and against some unspecified party, no less) is not an irreparable injury. *See John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 203 (D.D.C. 2017) (holding that "the burden of impending litigation [does] not constitute irreparable harm").

losses are '*certain, great and actual*.'" *Id.* at 52 (quoting *Power Mobility Coal. v. Leavitt*, 404 F.

Supp. 2d 190, 204 (D.D.C. 2005)). And to meet that burden, Plaintiffs must show that the

economic losses would "spell financial disaster." *Watson Lab'ys, Inc. v. Sebelius*, No. 12-cv-

1344, 2012 WL 13076147, at *3 (D.D.C. Oct. 23, 2012). Or, put differently, they must prove that

the potential economic loss is so severe that it "threatens the very existence of [their] business."

*Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 211 (D.D.C. 2012) (quoting *Wis. Gas Co.*

*v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)); *see also Novartis Pharms. Corp. v. Becerra*, No.

24-cv-02234, 2024 WL 3823270, at *4 (D.D.C. Aug. 13, 2024) (same); *Nat'l Council of Agric.*

*Emps.*, No. 22-cv-3569, 2023 WL 2043149, at *6–7 (same); *Grynberg v. BP P.L.C.*, 643 F. Supp.

2d 1, 3–4 (D.D.C. 2009) (same).

      Plaintiffs fail to meet that burden because: (1) the ACA Plaintiffs do not even contend

that the Advisory Opinion threatens the very existence of their (or any member's) business, and

(2) while PMS claims the Advisory Opinion threatens its medical debt collection business, its

conclusory and internally contradictory declaration fails to substantiate that claim.

      First, the ACA Plaintiffs do not even attempt to show that the Advisory Opinion spells

financial disaster. Those Plaintiffs make no effort to show that the expected cost of compliance

threatens *the very existence of* any of their (or their members') businesses. Their declarations all

assert that the Advisory Opinion will impose substantial compliance costs, *e.g.*, Purcell Decl.,

ACA Dkt. No. 8-1 at 6, and a few of them provide specific (albeit entirely unsupported)

estimates of the annual cost of compliance, *e.g.*, Whipple Decl., ACA Dkt. No. 8-2 at 3. But even

"substantial" losses are "not enough" to show irreparable harm. *Grynberg*, 643 F. Sup. 2d at 3.

Thus, even if the Court credits the ACA Plaintiffs' various assertions pertaining to the cost of

complying with the Advisory Opinion, those costs are not enough to satisfy the irreparable-harm

standard—because they do not pose an existential threat to any ACA Plaintiff or member

thereof—and those Plaintiffs are therefore not entitled to injunctive relief.

Indeed, not only do the ACA Plaintiffs never contend that the Advisory Opinion threatens

the very existence of their businesses, they do not even attempt to put the cost of complying with

the Advisory Opinion in the context of their overall financial health. The declarations do not

compare the magnitude of the purported compliance costs to the size and profitability of the

businesses, nor do they explain what those costs mean for the businesses' overall financial

viability. For example, CBS asserts (without explanation) that it will incur over $400,000 in

additional annual compliance costs, but it does not explain what that means for CBS's overall

financial health. *Id.* Will an additional $400,000 in annual costs bankrupt the company? Or

simply render it less profitable? The declaration does not say. And the other declarations are

similarly void of this important context.

The ACA Plaintiffs' declarations are therefore insufficient to show irreparable harm,

because that inquiry, at the absolute minimum, "requires placing the alleged economic loss 'in

the context of the [movant's] overall financial health.'" *Nat'l Council of Agric. Emps.*, 2023 WL

2043149, at *6–7 (quoting *Alcresta Therapeutics*, 318 F. Supp. 3d at 327). In many instances,

monetary costs that seem large in the abstract may be insignificant when understood in the full

context. *See, e.g.*, *Alcresta Therapeutics*, 318 F. Supp. 3d at 327 (finding no irreparable harm in

alleged $15 million loss because the plaintiff "declined to place its alleged lost profits in the

context of its overall financial health"); *Cardinal Health*, 846 F. Supp. 2d at 212 (finding alleged

$1 billion loss insufficient in the context of movant's $102 billion revenue); *Air Transp. Ass'n of

Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 336 (D.D.C. 2012) (finding alleged

$2.1 billion loss insufficient in the context of movant's $31.8 billion revenue). Thus, even if the

Court fully credited the ACA Plaintiffs' representations about compliance costs, it would still need far more context to even assess whether the irreparable-harm standard has been satisfied. Having failed to provide that context, the ACA Plaintiffs are not entitled to an injunctive relief.

Second, PMS has failed to prove irreparable harm because it relies entirely on a conclusory, self-serving declaration that fails to support the magnitude of its purported injuries. The declaration submitted by PMS asserts that the company will somehow lose *all* of its $12 million in annual revenue from medical debt collection. Banta Decl. ¶ 40, PMS Dkt. No. 9-1. But it never shows why that is true. The declaration simply asserts without explanation that the Advisory Opinion will "make it impossible to collect medical debt." *Id.* ¶ 39. It does not endeavor to quantify the additional expenses required to comply with Advisory Opinion's purported "requirements" or to demonstrate that those expenses will render the collection of medical debt entirely unviable (as opposed to simply riskier or less profitable). *Id.* Moreover, the declaration is also internally contradictory. On one hand it repeatedly claims that the cost of complying with the Advisory Opinion is "impossible to estimate," but on the other hand it asserts that those costs will necessarily require it to forgo all of its $12 million in annual revenue from medical debt collection. *Id.* ¶¶ 34–35. PMS cannot credibly claim that the Advisory Opinion will require it to cease collecting medical debt entirely while at the same time acknowledging that the compliance costs "cannot be reasonably estimated." *Id.* ¶ 35.

Without further support, there is no reason for the Court to credit PMS's conclusory and internally contradictory assertions regarding the costs of complying with the law described in Advisory Opinion. *See California Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 171 (D.D.C. 2018) ("The standard [for injunctive relief] requires more than conclusory assertions of potential loss. To permit the Court to evaluate the nature and extent of the alleged

irreparable injury, the movant bears the burden of presenting 'specific details regarding the

extent to which [its] business will suffer.'" (quoting *Nat'l Ass'n of Mortg. Brokers v. Bd. of

Governors of the Fed. Res. Syst.*, 773 F. Supp. 2d 151, 181 (D.D.C. 2011)); *Jackson*, 768 F.

Supp. 2d at 52 ("Something more than [a] conclusory projection is necessary to show that any of

the plaintiff's small business members currently face certain, imminent business closings.").

PMS cannot satisfy its burden of showing irreparable harm with a declaration merely stating the

"boilerplate conclusion" that the cost of complying with the Advisory Opinion will be

"enormously burdensome and disruptive." *California Ass'n*, 344 F. Supp. 3d at 171. It is

required, instead, to provide "meaningful information about the extent of that cost." *Id.* Having

failed to do so, PMS is not entitled to an injunction.[19]

### III.    The public interest does not support an injunction.

The final two prongs of the preliminary injunction standard are whether the balance of

the equities tip in favor of issuing an injunction and whether an injunction is in the public

interest. *Winter*, 555 U.S. at 20. When the government is the opposing party, the third and fourth

factors "merge," *Nken v. Holder*, 556 U.S. 418, 435 (2009), "because the government's interest

*is* the public interest," *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

Here, an injunction is plainly not in the public interest.

To start, it is unclear what an injunction against the Advisory Opinion would even do, as

the Advisory Opinion does not impose any legal requirements, and the FDCPA's requirements

would persist. The Advisory Opinion just reminds debt collectors of legal requirements

established by Congress in the FDCPA, highlights various factual circumstances in which they

are relevant, and advises how collectors might mitigate the risk of noncompliance. Enjoining the

---

[19] And even if PMS had shown irreparable harm, that would not enable the ACA Plaintiffs to
obtain an injunction benefitting them.

Advisory Opinion would not relieve debt collectors of any obligations, but what it might do is lead debt collectors to believe (mistakenly) that the FDCPA's requirements are somehow suspended.  That would harm the consumers Congress enacted the FDCPA to protect, harm the Bureau's interest in fostering compliance with the law, and even harm debt collectors by causing confusion about their obligations.

The public interest favors leaving the Advisory Opinion in place—so it can provide helpful guidance to debt collectors about how to meet their existing legal obligations in collecting medical debt and so that it can foster their compliance with the FDCPA, to the benefit of consumers. As the Advisory Opinion explains, "[m]edical debt is a major burden for many Americans." 89 Fed. Reg. at 80716. Medical debt is also "unique" for many reasons—including that it generally arises from acute or emergency care and patients often cannot "substantively comparison-shop between medical service providers due to emergency need, restrictive insurance networks, price opacity, or limited provider availability." *Id.* Unsurprisingly, then, "[c]onsumers consistently report being confused by medical billing practices." *Id.* Compounding this problem is the fact that "[t]he CFPB has observed . . . many issues with how debt collectors collect medical debt in the United States." *Id.* at 80717. For instance, debt collectors sometimes "collect[] on disputed medical debts without adequate substantiation." *Id.* And consumers sometimes "receive[] collections notices for medical debts they should or do not owe." *Id.* Against this backdrop, it plainly served the public interest for the Bureau to issue an Advisory Opinion reminding debt collectors of their obligations under the FDCPA and Regulation F.

Plaintiffs' arguments regarding the balance of the equities do not compel a different conclusion. For one, the ACA Plaintiffs' motion never discusses the balance of equities and does not advance any argument that an injunction is in the public interest. Accordingly, those

Plaintiffs have not met their burden on this prong of the preliminary injunction standard.

PMS, on the other hand, contends that an injunction would serve the public interest because there is a public interest in having federal agencies abide by the law and because it will be irreparably injured by the Advisory Opinion. PMS Mot. at 15. But both of those arguments are wrong for the reasons explained above: the Advisory Opinion does not violate the law and no Plaintiff has demonstrated that it will be irreparably harmed. While PMS asserts that a "preliminary injunction would merely maintain the status quo," PMS Mot. at 15, it never shows how the Advisory Opinion upsets the status quo. The Advisory Opinion is non-binding and merely reminds debt collectors of their obligations under existing law. The Advisory Opinion does not impose any obligations on debt collectors that go beyond their obligations under existing law. Accordingly, an injunction is not needed to preserve the status quo. [20]

## CONCLUSION

For the foregoing reasons, Plaintiffs have not shown that they have any likelihood of success on the merits, that they would be irreparably harmed absent a preliminary injunction, or that the public interest favors the extraordinary relief they seek here. Accordingly, the Bureau respectfully requests that the Court deny both motions for preliminary relief.

---

[20] In their proposed order, the ACA Plaintiffs seek not only to stay the Advisory Opinion pending resolution on the merits but also to enjoin the Bureau from "from bringing any action under the standards proscribed by the Advisory Opinion." ACA Dkt. No. 8-5 at 3. But the ACA Plaintiffs do not even mention this relief in their motion much less offer any justification for it. Thus, any argument for this relief has been waived. In any event, barring the Bureau from bringing any action predicated on "the standards" in the Advisory Opinion would upend the status quo. It would put the CFPB in a far worse position relative to where it was before the Advisory Opinion was issued. Presently, the Bureau can enforce the FDCPA and Regulation F against medical debt collectors. If the Bureau does so and the defendant disagrees on the scope of its obligations under the law, then those differences would be resolved in the course of that litigation. But the requested injunction would tie the Bureau's hands by preventing it from bringing certain enforcement actions altogether. That would not serve consumers, who are increasingly burdened by medical debt and unfair collection practices, nor would it serve the public interest.

Respectfully submitted,

Seth Frotman
   *General Counsel*
Steven Y. Bressler
   *Deputy General Counsel*
Kristin Bateman
   *Assistant General Counsel*

*/s/ Stephanie B. Garlock*
Stephanie B. Garlock (D.C. Bar. No. 1779629)
   *Counsel*
Thomas McCray-Worrall
   *Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
(202) 435-7201 (phone)
(202) 435-7024 (fax)
stephanie.garlock@cfpb.gov

*Counsel for Defendants the Consumer
Financial Protection Bureau and Rohit
Chopra*